# 15-2801(L)

## 15-2805, 15-3228 (Con)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL,

*Plaintiff-Counter-Defendant-Appellant*,

and

NATIONAL FOOTBALL LEAGUE,

*Defendant-Appellant*,

and

MICHELLE MCGUIRK,

*Appellant*,

v.

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,
on its own behalf and on behalf of Tom Brady,

*Defendant-Counter-Claimant-Appellee*,

and

TOM BRADY,

*Counter-Claimant-Appellee*.

———————————

On Appeal from the United States District Court for the
Southern District of New York, Nos. 15-5916, 15-5982

———————————

**BRIEF FOR APPELLANTS**

———————————

[*cover continued on next page*]

DANIEL L. NASH
PRATIK A. SHAH
STACEY R. EISENSTEIN
GREGORY W. KNOPP
JAMES E. TYSSE
AKIN GUMP STRAUSS
HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000

PAUL D. CLEMENT
ERIN E. MURPHY
MICHAEL H. MCGINLEY
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellants National Football League Management Council and National Football League*

October 26, 2015

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants state the following:

The National Football League ("NFL" or "League") is an unincorporated association of 32 member clubs organized under the laws of New York. The National Football League Management Council ("Management Council"), the sole and exclusive collective bargaining representative of the NFL member clubs, is an unincorporated association made up of the NFL member clubs. The member clubs of the NFL and the Management Council are:

| CLUBS | ENTITIES |
|---|---|
| Arizona Cardinals | Arizona Cardinals Football Club LLC; Arizona Cardinals Holding Company LLC |
| Atlanta Falcons | Atlanta Falcons Football Club, LLC |
| Baltimore Ravens | Baltimore Ravens Limited Partnership; Baltimore Football Company LLC (general partner) |
| Buffalo Bills | Buffalo Bills, Inc. |
| Carolina Panthers | Panthers Football, LLC; P.F.F., Inc. (general partner) |
| Chicago Bears | The Chicago Bears Football Club, Inc. |
| Cincinnati Bengals | Cincinnati Bengals, Inc. |
| Cleveland Browns | Cleveland Browns Football Company LLC |
| Dallas Cowboys | Dallas Cowboys Football Club, Ltd.; JWJ Corporation (general partner) |
| Denver Broncos | PDB Sports, Ltd. d/b/a Denver Broncos Football Club; Bowlen Sports, Inc. (general partner) |
| Detroit Lions | The Detroit Lions, Inc. |
| Green Bay Packers | Green Bay Packers, Inc. |
| Houston Texans | Houston NFL Holdings, L.P.; RCM Sports and Leisure, L.P. (general partner); Houston NFL |

i

| CLUBS | ENTITIES |
|---|---|
| | Holdings G.P., L.L.C. (general partner of RCM Sports) |
| Indianapolis Colts | Indianapolis Colts, Inc. |
| Jacksonville Jaguars | Jacksonville Jaguars, LLC; TDJ Football, Ltd. (general partner); Dar Group Investments, Inc. (general partner of TDJ Football) |
| Kansas City Chiefs | Kansas City Chiefs Football Club, Inc. |
| Miami Dolphins | Miami Dolphins, Ltd.; South Florida Football Corporation (general partner) |
| Minnesota Vikings | Minnesota Vikings Football, LLC |
| New England Patriots | New England Patriots LLC |
| New Orleans Saints | New Orleans Louisiana Saints, L.L.C.; Benson Football, Inc. (general partner) |
| New York Giants | New York Football Giants, Inc. |
| New York Jets | New York Jets LLC |
| Oakland Raiders | The Oakland Raiders; A.D. Football, Inc. (general partner) |
| Philadelphia Eagles | Philadelphia Eagles, LLC |
| Pittsburgh Steelers | Pittsburgh Steelers LLC |
| St. Louis Rams | The St. Louis Rams, LLC |
| San Diego Chargers | Chargers Football Company, LLC; Alex G. Spanos (general partner) |
| San Francisco 49ers | Forty Niners Football Company LLC; San Francisco Forty Niners, LLC (general partner) |
| Seattle Seahawks | Football Northwest LLC |
| Tampa Bay Buccaneers | Buccaneers Limited Partnership; Tampa Bay Broadcasting, Inc. (general partner) |
| Tennessee Titans | Tennessee Football, Inc.; Cumberland Football Management, Inc. (general partner) |
| Washington Redskins | Pro-Football, Inc. |

No publicly held corporation owns 10 percent or more of any of the above-listed entities' stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES...................................................................... v

INTRODUCTION ................................................................................ 1

JURISDICTION.................................................................................. 3

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF THE CASE AND FACTS ............................................... 3

    A.     The Labor Management Relations Act ................................. 4

    B.     The Parties' CBA.................................................................... 4

    C.     Brady's Misconduct and the Subsequent Investigation ....................... 9

    D.     Brady's Discipline and Arbitration Hearing....................................... 13

    E.     The Commissioner's Final Decision.................................................. 17

    F.     Proceedings Below ............................................................................. 21

SUMMARY OF ARGUMENT................................................................ 26

STANDARDS OF REVIEW .................................................................. 29

ARGUMENT ..................................................................................... 29

I.    The Commissioner's Arbitration Award Must Be Enforced ....................... 29

    A.     Judicial Review of a Labor Arbitration Award is Extremely Limited Under the Labor Management Relations Act ....................... 30

    B.     The Commissioner's Award Easily Satisfies the LMRA .................. 33

        1.     The district court fundamentally failed to apply the correct legal standard ............................................................... 34

        2.     The district court's fair notice concerns were misplaced ................................................................................ 37

3.    The district court was wrong to second-guess the Commissioner's application of his Article 46 authority .......... 41

II.    The Commissioner's Procedural Rulings Provide No Basis For Vacating His Final Decision ........................................ 46

A.    The District Court Had No Authority—And No Grounds—To Second-Guess the Commissioner's Evidentiary Ruling ................... 47

B.    The District Court Had No Authority—And No Grounds—To Second-Guess the Commissioner's Discovery Ruling ..................... 51

III.    This Court Should Order Enforcement Of The Commissioner's Award ............................................................................ 54

CONCLUSION ................................................................... 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Gardner-Denver Co.*,
  415 U.S. 36 (1974)........................................................................34

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
  754 F.3d 109 (2d Cir. 2014)............................................... 33, 49, 53

*Andros Compania Maritima, S.A. v. Marc Rich & Co.*,
  579 F.2d 691 (2d Cir. 1978).................................................. 30, 35

*AT&T Techs., Inc. v. Communications Workers*,
  475 U.S. 643 (1986)........................................................................46

*Aviall, Inc. v. Ryder System, Inc.*,
  110 F.3d 892 (2d Cir. 1997)..........................................................57

*Bacolitsas v. 86th & 3rd Owner, LLC*,
  702 F.3d 673 (2d Cir. 2012)..........................................................58

*Booking v. General Star Management Co.*,
  254 F.3d 414 (2d Cir. 2001)..........................................................58

*Charles O. Finley & Co. v. Kuhn*,
  569 F.2d 527 (7th Cir. 1978)................................................... 40, 41

*Coca-Cola Bottling Co. v. Union Local 812*,
  242 F.3d 52 (2d Cir. 2001)............................................................33

*Crouch v. NASCAR, Inc.*,
  845 F.2d 397 (2d Cir. 1988)..........................................................41

*Eastern Associated Coal Corp.
  v. United Mine Workers of America, Dist. 17*,
  531 U.S. 57 (2000)........................................................................45

*Hill v. Staten Island Zoological Society, Inc.*,
  147 F.3d 209 (2d Cir. 1998)..........................................................39

*John Wiley & Sons, Inc. v. Livingston*,
  376 U.S. 543 (1964)........................................................................46

*Local 453, Int'l Union of Elec., Radio & Mach. Workers*
  *v. Otis Elevator Co.*,
  314 F.2d 25 (2d Cir. 1963) ...................................................................39

*Local 97, Int'l Bhd. Of Elec. Workers, AFL-CIO*
  *v. Niagara Mohawk Power Corp.*,
  196 F.3d 117 (2d Cir. 1999) .............................................................31

*Major League Baseball Players Ass'n v. Garvey*,
  532 U.S. 504 (2001)................................................................... 4, 32

*Pa. Dep't of Corrections v. Yeskey*,
  524 U.S. 206 (1998)........................................................................39

*Petrosino v. Bell Atlantic*,
  385 F.3d 210 (2d Cir. 2004) .........................................................58

*Saint Mary Home v. SEIU, Dist. 1199*,
  116 F.3d 41 (2d Cir. 1997) ................................................ *passim*

*Steelworkers v. American Mfg. Co.*,
  363 U.S. 564 (1960)................................................................ 32, 46

*Union Pac. R.R. Co. v. Sheehan*,
  439 U.S. 89 (1978)..........................................................................30

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
  484 U.S. 29 (1987)............................................................... *passim*

*United States v. Int'l Bhd. Of Teamsters*,
  954 F.2d 801 (2d Cir. 1992) .........................................................34

*United Steelworkers of America v. Enterprise Wheel & Car Corp.*,
  363 U.S. 593 (1960)................................................... 32, 36, 38, 39

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574 (1960)............................................................... 31, 32

*W.R. Grace & Co. v. Local Union 759, Int'l Union of the United*
  *Rubber, Cork, Linoleum & Plastic Workers of America*,
  461 U.S. 757 (1983).............................................................. 44, 45

*Wackenhut Corp. v. Amalgamated Local 515*,
126 F.3d 29 (2d Cir. 1997) ........................................................... *passim*

*Westerbeke Corp. v. Daihatsu Motor Co.*,
304 F.3d 200 (2d Cir. 2002) ...............................................58

*Williams v. National Football League*,
582 F.3d 863 (8th Cir. 2009) .............................................57

**Statute**

29 U.S.C. §185(a) ...........................................................4

**Other Authorities**

Collective Bargaining Agreement between NFL and NFL Players
Association (2011) ....................................................... 5, 51

E. Asinof, *Eight Men Out* (1987) ..........................................6

Major League Baseball Collective Bargaining Agreement (2012).........................40

National Basketball Association Collective Bargaining Agreement
(2011) ....................................................................40

National Hockey League Collective Bargaining Agreement (2012).....................40

vii

**INTRODUCTION**

Stripped of its celebrity, this case involves a straightforward exercise of authority expressly granted under a collective bargaining agreement ("CBA") and shielded from collateral attack by decades of precedent concerning labor arbitrations. The National Football League's collective bargaining agreement with the NFL Players Association affords the NFL Commissioner broad authority to impose discipline for conduct "detrimental to the integrity of, or public confidence in, the game of professional football." Exercising that authority, which mirrors the broad discretion given to commissioners in other sports to ensure the integrity of the game, the Commissioner suspended Tom Brady, quarterback on the New England Patriots, for four games after finding that Brady had participated in a scheme to deflate game balls to be used in a conference championship game. The scheme was aimed at gaining an unfair competitive advantage on the field, and it was devised to avoid detection by game officials. It struck at the heart of the game's integrity and the public's confidence in the NFL's on-field product. The Commissioner's conduct detrimental authority exists for incidents just like this.

Courts have long been skeptical of efforts to collaterally attack decisions that a CBA leaves to arbitration. Supreme Court and Second Circuit precedents alike have consistently emphasized that decisions like the Commissioner's here are shielded by some of the most deferential standards known to the law. Substantive

decisions need only be grounded in the CBA; procedural decisions need only avoid caprice; and remedial discretion need only avoid contradicting the terms of the CBA.

Applying those long-established standards, this should not have been a close case.  The Commissioner exercised the precise authority that the CBA grants him when considering allegations of conduct detrimental to the game.  He authorized an exhaustive investigation of the underlying conduct, which was limited only by Brady's failure to cooperate.  He conducted an extensive arbitration proceeding that conformed to the rules that govern those proceedings under the CBA.  Not every evidentiary or procedural ruling went in Brady's favor, but the CBA gives the Commissioner the authority to make those determinations and he reasonably resolved every contested issue.  The Commissioner's ultimate determination was elaborately reasoned and thoroughly grounded in the CBA.  The district court's decision vacating the Commissioner's arbitration award cannot begin to be reconciled with the appropriate judicial standards for evaluating a collateral attack on such an action.

In short, the Commissioner acted well within the bounds of discretion expressly granted by the CBA, while the district court vastly exceeded the narrow bounds of judicial review allowed under the Labor Management Relations Act and decades of precedent.  The district court's decision cannot stand.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 and the Labor Management Relations Act of 1947, 29 U.S.C. §185 *et seq.*  That court entered a final order and judgment on September 3, 2015, and Appellants filed a timely notice of appeal from the district court's final order.  This Court has jurisdiction over the appeal under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred by vacating the Commissioner's labor arbitration award based on its disagreement with the Commissioner's factual findings and the Commissioner's interpretation and application of the parties' collective bargaining agreement.

2. Whether the district court erred by vacating the Commissioner's labor arbitration award based on its disagreement with the Commissioner's discretionary procedural rulings.

## STATEMENT OF THE CASE AND FACTS

The National Football League and the NFL Management Council appeal from a judgment by the United States District Court for the Southern District of New York (Berman, J.) denying their motion to confirm the Commissioner's arbitration award and granting the Players Association's motion to vacate the award.  The district court's amended decision and order is not yet reported in the Federal Supplement but is available at 2015 WL 5148739.

3

### A.     The Labor Management Relations Act

This case arises from a disciplinary decision made pursuant to the parties' CBA and thus is governed by the "extremely limited" framework of judicial review of labor arbitration decisions under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. §185(a).  *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 507 (2001) (per curiam).  The LMRA was adopted to promote labor peace, and it achieves its goal primarily by encouraging collective bargaining and private arbitration of disputes.  Since the Act's inception, the Supreme Court and this Circuit have insisted that federal judges resist the urge to usurp the labor arbitrator's role under the parties' agreement.  Any time a court oversteps those bounds it threatens the efficacy of the congressional policy.

To avoid that harm, the federal judiciary takes an exceptionally deferential approach to labor arbitration awards.  Specifically, courts must enforce an arbitrator's award if it "draws its essence from the collective bargaining agreement"—that is, so long as the arbitrator has plausibly interpreted and applied the contract.  *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987); *Wackenhut Corp. v. Amalgamated Local 515*, 126 F.3d 29, 32 (2d Cir. 1997); *Saint Mary Home v. SEIU, Dist. 1199*, 116 F.3d 41, 44 (2d Cir. 1997).

### B.     The Parties' CBA

Consistent with federal labor policy, the NFL Management Council and the

NFL Players Association agreed in their CBA to settle their disputes through arbitration and to grant the Commissioner extensive authority to arbitrate certain disputes and to mete out discipline. The CBA, which is effective through the end of the 2020 season, governs all aspects of the parties' relationship. *See* Collective Bargaining Agreement between NFL and NFL Players Association (2011), *available at* http://bit.ly/1IThOU4. It includes 70 separate Articles and incorporates the standard NFL Player Contract, the NFL Constitution and Bylaws, the League's Substance Abuse Policy, and many other documents. *See id.*

Among its comprehensive terms, the CBA provides for arbitration of player grievances. The CBA's arbitration provisions include detailed procedures for resolving non-injury-related grievances (Article 43), injury-related grievances (Article 44), and grievances related to "Commissioner Discipline" (Article 46). *See id.* at 187-99, 204-06; JA345. The arbitration procedures vary depending on the nature of the grievance. Both non-injury and injury grievances are heard by third-party arbitrators "whose appointment must be accepted in writing by the NFLPA and the Management Council." Art. 43 §6; Art. 44 §7. By contrast, as relevant here, Article 46 recognizes the longstanding and plenary authority of the NFL Commissioner both to impose certain forms of discipline and to adjudicate internal appeals of such discipline. *See* JA345.

For over forty years, the CBA has granted the Commissioner broad authority

to impose discipline, including "a fine or suspension," on a player who engages in "conduct detrimental to the integrity of, or public confidence in, the game of professional football." *Id.* The CBA does not define what misconduct falls within this authority; nor does it specify any presumptive or maximum discipline for engaging in such conduct. Instead, the parties have left the "conduct detrimental" standard's application to the Commissioner's reasonable judgment, with the expectation that he will exercise that authority in light of developments and changes in the game over time, and they have authorized the Commissioner, upon finding such misconduct, to suspend players "for a period certain or indefinitely." JA353.

There is good reason for the Commissioner's broad discretion on these matters. The League's success depends on its integrity and the public's confidence that its games are fair. The sports world—and the professional leagues, in particular—know all too well what can come if those core values are diminished. *See, e.g.*, E. Asinof, *Eight Men Out* (1987) (detailing baseball's Black Sox scandal). If the public perceives the games as unfairly tilted in favor of certain players or teams, or even susceptible to such tilts, it will cease valuing professional sports as a paradigm of fair-play, honest effort, and healthy competition. And if players or club owners view the game as tainted, their incentive to compete fairly will be diminished. These matters run to the core of the sport's continued vitality. It is thus no surprise that the Management Council and the Players Association would *both*

6

want to ensure the game's protection.

Nor is it a surprise that they would entrust that responsibility to the individual whose job it is to manage the League. The Commissioner has no incentive to favor one team over another; he has no incentive to favor one player over another. His primary responsibility is to protect the game of professional football. And as the person chiefly responsible for the League's well-being, the Commissioner is in the best position to assess whether and to what extent specific conduct threatens the League's integrity and the public's confidence in the sport, to provide reasonable and fair process, and to ensure appropriate levels of discipline.

The Commissioner's authority to make those judgments is confirmed by the NFL Constitution and Bylaws, which itself is incorporated in the CBA. That document affords the Commissioner "complete authority" to discipline players, including by suspending players for definite or indefinite periods. JA357. The Constitution further "authorize[s]" the Commissioner to "take or adopt appropriate legal action or such other steps or procedures as he deems necessary and proper in the best interests of either the League or professional football, whenever [any NFL player or employee] is guilty of any conduct detrimental either to the League, its member clubs or employees, or to professional football." JA358.

The standard NFL Player Contract, which is incorporated as Appendix A to the CBA and signed by every player, expressly recognizes the Commissioner's

plenary authority in this area.  By signing that contract, each player acknowledges "the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players" from player misconduct.  JA353.  And through that contract each player is expressly notified of the Commissioner's authority "to suspend [the] Player for a period certain or indefinitely; and/or to terminate this contract" for conduct "reasonably judged" by the Commissioner to be detrimental to the integrity of, or public confidence in, the game.  JA353-54.

Article 46 of the CBA grants the Commissioner discretion to serve as the arbitrator in "conduct detrimental" proceedings.  Any player disciplined under Article 46 may initiate arbitration by filing an "appeal in writing to the Commissioner" within three business days of receiving notice of discipline, and "the Commissioner may serve as hearing officer in any appeal ... at his discretion." JA345-46.  Alternatively, the Commissioner, after "consultation with the Executive Director of the NFLPA," may "appoint one or more designees to serve as hearing officers."  JA345.  The hearing officer's decision—whether it comes from the Commissioner or his designee—constitutes "full, final and complete disposition of the dispute" that is "binding" on all parties, as well as on the Management Council and the Players Association.  JA346.  No further appeal or process is contemplated or permitted.

8

### C.     Brady's Misconduct and the Subsequent Investigation

Tom Brady is the starting quarterback of the New England Patriots and a 14-year veteran of the NFL.  He has led his team to six Super Bowls, has won four of those championships, and has been named Most Valuable Player in three of the games.  His most recent Super Bowl victory and MVP award came last season.

During last season's AFC Championship Game—the game before the Super Bowl—it came to light that the Patriots' footballs were deflated below the level permitted under the League's Official Playing Rules, which require game balls to be inflated to between 12.5 and 13.5 pounds per square inch ("psi").  Before the game, officials measured the Patriots' footballs and, after inflating two that were below 12.5 psi, confirmed that they complied with the rules.  But based on a complaint from the opposing team, the Indianapolis Colts, "eleven of New England's footballs were tested at halftime; all were below the prescribed air pressure range as measured on each of two gauges."  SPA44.  "Four of Indianapolis's footballs were tested at halftime" as well, and "all were within the prescribed air pressure range on at least one of the two gauges."  *Id.*

The League initiated an investigation into how the footballs came to fall below the prescribed measurement, which resulted in a 139-page report authored by Theodore V. Wells, Jr. of the law firm Paul, Weiss, Rifkind, Wharton & Garrison ("the Wells Report").  *See* JA92.  Based on documentary evidence, more than 60

interviews, and a forensic report prepared by independent experts, the Wells Report concluded that James McNally, the Patriots' attendant in the Officials' Locker Room, and John Jastremski, a Patriots equipment manager, had conspired to deflate the footballs in violation of League rules. Specifically, the report concluded that, after the pre-game official testing and in violation of established protocol, McNally snuck the balls into a bathroom, where he proceeded to deflate their pressure.

Although Brady refused to cooperate fully with the Wells investigation, significant evidence linked him to the deflation scheme. Brady refused to provide any of his own phone records, text messages, or e-mails—even after investigators offered to allow his counsel to screen and control their production. But other phone records revealed that he had an inordinate number of communications with Jastremski immediately following the AFC Championship Game. The day after the game, as the League's investigation was becoming public, the two men spoke on the phone four separate times, for a total of 25 minutes, and exchanged 12 text messages. *See* JA196. Records showed no phone communication between them for at least six months before that day. JA198 n.64. The text messages also revealed that Brady had invited Jastremski to meet with him in the quarterback room that afternoon—an unprecedented invitation from him or any other Patriots quarterback during Jastremski's 20 years with the club. JA200. This pattern of unusually frequent communications continued over the following two days. JA201-205.

10

Text messages between Jastremski and McNally also indicated that the two had been deflating game balls at Brady's request long before the AFC Championship Game. In messages dating back to May 2014 and continuing during the 2014-2015 season, McNally referred to himself as "the deflator" and the two discussed deflation using "needles." JA170, 175. At one point, Jastremski told McNally that Brady "actually brought you up and said you must have a lot of stress trying to get them done." JA172. At various times, McNally expressed frustration with Brady's requests, once saying to Jastremski that "Tom sucks … im going to make that next ball a f—kin balloon." JA173.

The Wells Report also found considerable evidence that in response to their demands, Brady had provided both men with autographs and other memorabilia. McNally often asked Jastremski to convey to Brady his demands for items of value (*e.g.*, "cash and newkicks"), and on at least one occasion McNally suggested that he was prepared to disclose the arrangement ("not going to espn… yet") if his demands were not met. JA170, 176. The two were, in fact, handsomely rewarded. JA182-189. For example, on January 10, 2015, before the Patriots' AFC divisional playoff game—the game before the AFC Championship Game—Brady signed a game-worn jersey and two footballs for McNally. JA184. "Jastremski confirmed that Brady autographed the items for McNally around the time that Brady was selecting the game balls to be used during" that game. *Id.* Brady also gave occasional gifts to

11

Jastremski, including money, gift cards, and a signed game ball. *See* JA184-85.

The investigation also revealed how unlikely it was that Jastremski and McNally would have been deflating game balls without Brady's consent. Although Brady professed ignorance before October 2014 of the permissible inflation range under the NFL rules or the range targeted by the Patriots' staff during game preparations, his preference for deflated footballs had been a matter of public knowledge for years. He publicly expressed this preference a number of times to the media both before and after October 2014, and in 2006 he specifically discussed inflation levels when he was personally involved in a successful effort to change League rules to allow each team to prepare its own game balls. JA129-30. The Patriots' equipment staff thus knew that inflation level was important to Brady and "that he wanted the footballs inflated at the lowest permissible level." SPA43; *see also* JA132-33. While Brady claimed during his interview that he did not even know who McNally was until after the AFC Championship Game incident, McNally "told [League] investigators that 'Tom … always has me pass a message to the Officials that he likes the balls at the minimum permissible PSI of 12.5.… I know this is what Tom wants, and I have been personally told by him of the ball weight preference." SPA43; JA224. Jastremski told investigators that Brady knew McNally and was well aware of his ball preparation responsibilities. JA224.

While the Wells Report lamented that Brady's refusal to cooperate completely

12

with the investigation "limited the discovery of relevant evidence and was not helpful to the investigation," JA116, it found "substantial and credible evidence" that Brady "was at least generally aware of the inappropriate activities of McNally and Jastremski involving the release of air from Patriots game balls." JA97. The report further found it "unlikely" that McNally and Jastremski would have deflated the footballs without Brady's "consent" and "approval." JA114.

### D. Brady's Discipline and Arbitration Hearing

On May 11, 2015, the League informed the Patriots that, after considering all the evidence and findings in the Wells Report, the Commissioner had concluded that the club had violated the NFL's Policy on Integrity of the Game & Enforcement of Competitive Rules ("Competitive Integrity Policy") and imposed a penalty of a $1 million fine and forfeiture of two draft picks. The Commissioner also prohibited both McNally and Jastremski, whom the Patriots had already suspended indefinitely, from future involvement in the preparation, supervision, or handling of footballs.

The same day, the League informed Brady of the Commissioner's finding that he had engaged in "conduct detrimental to the integrity of, or public confidence in, the game of professional football," in violation of Section 1(a) of Article 46 of the CBA. Further, and pursuant to his authority under Article 46 and the Standard Player Contract, the Commissioner suspended Brady without pay for the first four games of the 2015 season.

13

A timely appeal was filed under the CBA, and the Commissioner exercised his discretion to serve as the hearing officer for that appeal. Before the arbitration hearing, the Players Association and Brady filed a number of motions. First, they asked the Commissioner to recuse himself, contending that he was a central witness, had prejudged the issues when he publicly thanked Wells for performing a thorough investigation, and could not impartially arbitrate the dispute. Based on his express authority under Article 46 of the CBA and his judgment that he was fully capable of acting impartially, the Commissioner denied the recusal motion. *See* SPA67-69.

Second, the Players Association and Brady moved to compel the testimony of Commissioner Goodell, NFL General Counsel Jeff Pash, NFL Executive Vice President for Football Operations Troy Vincent, Sr., and Wells. The Commissioner granted the motion, in part, and denied it, in part. Because Article 46 "does not address the permitted scope of witness testimony at appeals hearings," the Commissioner concluded that "it is within the reasonable discretion of the hearing officer to determine the scope of the presentations and, where appropriate, to compel the testimony of any witnesses whose testimony is necessary for the hearing to be fair." SPA62. Because Wells had led the investigation of the events, the Commissioner ordered him to testify "regarding the substance and conclusions of his report," subject to the limits of attorney-client privilege. SPA63. And because Vincent had first-hand knowledge of some of the relevant events, the Commissioner

14

compelled his testimony regarding those matters.  *Id.*

With respect to himself and Pash, however, the Commissioner ruled that the testimony was not necessary because neither had first-hand knowledge of the events and neither had been substantively involved in the Wells investigation.  Although a League press release had initially suggested that Pash would co-lead the investigation, Pash's ultimate "role was limited to facilitating access by Mr. Wells to witnesses and documents."  *Id.*  The Commissioner specifically authorized Wells to be questioned regarding "whether Mr. Pash played a substantive role in the investigation," however, and he expressed willingness to "revisit" his ruling if that questioning or any other evidence at the hearing revealed that the testimony of either witness "is necessary for a full and fair hearing."  SPA64.  No party ever asked the Commissioner to revisit that ruling.

Third, the Players Association and Brady moved to compel the production of interview notes and memoranda generated by Paul Weiss attorneys during their investigation.  The Management Council had already produced the Wells Report, all documents that the Paul Weiss team considered when preparing the report, and all documents that the Commissioner reviewed in arriving at his conclusions.  The remaining documents sought were the Paul Weiss attorneys' internal attorney work product.  Relying on the express terms of Article 46 and past precedent applying those terms, the Commissioner concluded that the documents did not need to be

15

produced because the CBA contemplates only very limited discovery in conduct detrimental appeals. *See* SPA64-65.

The Commissioner gave four other independent reasons for denying the request: (1) he did not review the Paul Weiss notes before imposing the suspension; (2) the documents are attorney work product; (3) Brady's counsel was present for many of the interviews at which the notes were prepared, including Brady's interview; and (4) the Players Association did not "identif[y] any material factual dispute that Paul, Weiss' internal work product would help resolve." SPA65-66.

On June 23, 2015, the Commissioner held a hearing involving "almost ten hours of sworn testimony and counsel argument" and over 300 exhibits. SPA42. In addition to confirming the Wells Report's findings, the hearing revealed that Brady's obstruction of the investigation was even more serious than previously understood. At the hearing, Brady confirmed that, on March 6, 2015, "the very day that he was interviewed by Mr. Wells and his investigative team," he "instructed his assistant to destroy the cellphone that he had been using since early November 2014, a period that included the AFC Championship Game and the initial weeks of the subsequent investigation." *Id.* During that period, "almost 10,000 text messages were sent or received by Mr. Brady using that cellphone." *Id.* Those messages could not be recovered from the phone after it was destroyed.

When "he arranged for its destruction, Mr. Brady knew that Mr. Wells and his

team had requested information from that cellphone." SPA42-43. Yet Brady instructed that the phone be destroyed anyway; he did not even tell the investigators of its destruction. While he later claimed that it was his standard practice to destroy his phone every time he gets a new one, he had not destroyed two of his previous phones. Nor did Brady explain why he suddenly decided to replace his phone on the very day that he was meeting with investigators who had asked him repeatedly to produce communications from it, or why he never revealed that fact when questioned by the investigators about the phone and its contents.

### E. The Commissioner's Final Decision

On July 28, 2015, the Commissioner issued a written "final decision" affirming the four-game suspension. Considering all the relevant evidence, including the evidence that came to light after the Wells Report was issued, the Commissioner found that "Brady knew about, approved of, consented to, and provided inducements and rewards in support of a scheme to tamper with the game balls after they had been approved by the game officials to be used in the AFC Championship Game." SPA51. On that basis, he concluded that Brady had engaged in conduct detrimental to the integrity of, and public confidence in, the game within the meaning of Article 46.

Among his many other findings, the Commissioner concluded that: "(1) Mr. Brady participated in a scheme to tamper with the game balls after they had

been approved by the game officials for use in the AFC Championship Game and (2) Mr. Brady willfully obstructed the investigation by, among other things, affirmatively arranging for destruction of his cellphone knowing that it contained potentially relevant information that had been requested by the investigators." SPA54. "The result" of this scheme, the Commissioner concluded, "was to undermine, if not vitiate, the game officials' efforts to ensure that the game balls used by the Patriots complied with league rules." SPA51-52. The Commissioner ruled that these actions "indisputably constitute[d] conduct detrimental to the integrity of, and public confidence in, the game of professional football." SPA54.

The Commissioner also reconsidered and affirmed the level of discipline. At the outset, the Commissioner found that the conduct here was "[u]nlike any other conduct detrimental proceeding of which [he was] aware, and certainly unlike any cited by either party." SPA55. Brady's "uncoerced participation in a scheme to violate a competitive rule that goes to the integrity of the game" differentiated his conduct from other cases. *Id.* Brady also not only "fail[ed] to cooperate with the League's investigation," but engaged in "destruction of potentially relevant evidence with knowledge that the evidence had been sought in the investigation." *Id.* All of that made his conduct "fundamentally different from" the conduct in any case to which any party attempted to compare it, and defeated the Players Association's suggestion that the absence of a comparable suspension in a comparable case

18

somehow constrained the Commissioner's discretion. *Id.*

After explaining in detail how this case differed from other cases to which the Players Association had attempted to compare it, the Commissioner noted that "the closest parallel of which [he was] aware is … the policy governing performance enhancing drugs," which also involve "an improper effort to secure a competitive advantage in, and threatens the integrity of, the game." SPA57. The Commissioner explained that the four-game penalty he imposed was "fully consistent with, if not more lenient than," that policy, which calls for a four-game suspension for a player's first positive drug test and a six-game suspension if the player is found to have used masking agents—*i.e.*, to have tried, as Brady was found to have done here, "to cover up the underlying violation." *Id.* While the Commissioner made clear that he did not rely on the steroid policy "to determine the discipline imposed on Mr. Brady," it "reinforce[d] [his] conclusion … that the discipline imposed on Mr. Brady is not excessive or without precedent, and is in fact fair and reasonable." *Id.* n.17.

Finally, the Commissioner rejected Brady's arguments about fair notice and other legal issues. "Mr. Brady had more than adequate notice," the Commissioner found, "that he could be subject to 'conduct detrimental' discipline, including suspension," for his misconduct. SPA57. It is widely understood that the Commissioner has broad authority to sanction "conduct detrimental to the integrity of, or public confidence in, the game of professional football." JA345. Because the

19

parties could not contemplate every conceivable action that might be considered conduct detrimental, the CBA "does not require itemization of specific categories of misconduct that may be deemed 'conduct detrimental'" or of the specific discipline that may be imposed for every violation. SPA57. The CBA instead expressly entrusts those determinations to the Commissioner's "reasonable judgment," and the conduct at issue here was "plainly within the scope of matters that may reasonably be judged by the Commissioner to affect the integrity of, and public confidence in, the game of professional football." SPA58.

The Commissioner also dispelled the suggestion that the discipline rested on a purported violation of the Competitive Integrity Policy rather than Article 46's "conduct detrimental" authority. As he explained, although the *Wells investigation* was conducted pursuant to the Competitive Integrity Policy (because it is the policy that governs "investigations of competitive violations by clubs"), that policy "was not the source or the basis for the discipline" imposed here. *Id.* n.19. Instead, "[a]s the discipline letter makes clear, Mr. Brady was suspended for conduct detrimental to the integrity of and public confidence in the game of professional football"— which the CBA has prohibited for decades. SPA59 n.19.

In closing, the Commissioner concluded that while he had "entered into the appeal process open to reevaluating" his earlier conclusions, "[e]specially in light of the new evidence introduced at the hearing, … [his] findings and conclusions ha[d]

20

not changed in a manner that would benefit Mr. Brady." SPA60. Instead, the evidence only reaffirmed his conclusion that "Mr. Brady engaged in conduct detrimental to the integrity of, and public confidence in, the game of professional football," and that a four-game suspension is the appropriate discipline for that violation of the CBA. SPA61.

### F. Proceedings Below

The parties filed competing motions in the United States District Court for the Southern District of New York. Appellants moved to confirm the Commissioner's award; Appellees moved to vacate it. Before deciding those motions, the district court required the parties to engage in, and personally supervised, four days of unsuccessful settlement negotiations, including two days where he required the attendance of the Commissioner and Brady. *See* JA6, 8-10. Eventually, the district court vacated the award based on three grounds—that Brady lacked notice that he could be suspended for his conduct, that the Commissioner should have compelled the testimony of Pash, and that Brady was entitled to discovery of Paul Weiss's internal notes and memoranda.

On the merits of the award, the district court did not dispute that the CBA gives the Commissioner discretion to determine whether conduct is detrimental to the integrity of, or public confidence in, the game of professional football and to determine the appropriate discipline for such conduct. *See* SPA10 n.8. Nor did the

21

district court suggest that the Commissioner's decision was outside the bounds of what he could "reasonably judg[e] … to be detrimental to the League or professional football." JA353. The court nonetheless vacated the Commissioner's decision based on its conclusion that Brady was not "reasonably … on notice" that his "discipline would (or should) be the same as applied to a player who violated the NFL Policy on Anabolic Steroids and Related Substances." SPA24. In reaching that conclusion, the court said nothing about the Commissioner's express disclaimer that he did not rely on the steroid policy in arriving at the appropriate discipline in this case. SPA57. The court instead simply detailed at length its disagreement with the Commissioner's reasoning that, while Brady's unprecedented actions were "fundamentally different from" anything the parties or the CBA discussed, the steroid policy offered "the closest parallel." SPA55, SPA57; *see also* SPA21-23.

Next, the district court held that "[n]o NFL policy or precedent provided notice that a player could be subject to discipline for general awareness of another person's alleged misconduct." SPA25. The court acknowledged that the Commissioner's findings (*i.e.*, that Brady had "approved of, consented to, and provided inducements and rewards in support of a scheme …") went "far beyond the 'general awareness' finding in the Wells Report" (which itself concluded that the scheme was most likely undertaken with Brady's "approval" and "consent," JA114). SPA17. And the district court did not question the Commissioner's discretion to

22

consider the new evidence of Brady's misconduct that came to light during the hearing.  Nonetheless, because the initial discipline letter adopted the findings of the Wells Report, the court insisted on evaluating the Commissioner's final decision as if it were supported by a finding of "general awareness" alone, without even taking into account the Commissioner's finding that Brady "participated in a scheme to tamper with the game balls after they had been approved by the game officials for use in the AFC Championship Game," SPA54, or the fact that Brady refused to cooperate with the Wells investigation and deliberately destroyed highly relevant evidence.

The district court also concluded that the Commissioner had imposed discipline under the wrong policy.  First, notwithstanding the fact that the Commissioner's final decision expressly disclaimed any reliance on the League's Competitive Integrity Policy, the district court insisted that the decision must have been based on the Competitive Integrity Policy because the Wells investigation was conducted pursuant to that policy.  SPA28 n.19; SPA58 n.19.  The district court thus held that the award must be vacated because Brady "did not have notice of the Competitive Integrity Policy" and "that Policy could not serve as the basis for disciplinary action against him."  SPA30.

The court then concluded that the Commissioner erred in interpreting the CBA to allow him to impose discipline under Article 46 instead of the "Player Policies

23

regarding equipment violations." SPA32. In the court's view, the "specific provision within the Player Policies is better calculated to provide notice to a player than a general concept such as 'conduct detrimental.'" *Id.* The district court did not explain how the equipment violations policy has anything to say about the appropriate discipline for activities intended to undermine the efforts of game officials to ensure compliance with the Official Playing Rules, not to mention affirmative efforts to obstruct a League investigation into potential violations of those rules. Nor did it mention that the equipment policy specifically recognizes the Commissioner's authority to suspend players for violations.

Finally, the court disagreed with two of the Commissioner's procedural rulings, holding that he should have required Pash to testify and should have compelled disclosure of the Paul Weiss internal work product. As to the Pash testimony, the court refused to accept the Commissioner's finding that Pash was not substantively involved in the Wells investigation. The court instead proceeded on the assumption that Pash was "the co-lead investigator" because the League had initially announced that he would co-lead the Wells investigation and because Wells had testified at the hearing that Pash had reviewed and commented on a draft of the Wells Report. *Id.* The court concluded that refusal to compel Pash's testimony therefore violated NFL arbitral precedents requiring that players be "afforded an opportunity to confront their investigators," SPA33, and was "fundamentally unfair"

24

because it "foreclosed" the parties "from exploring … whether the Pash/Wells Investigation was truly 'independent,'" SPA34-35.  In reaching that conclusion, the court did not mention the Commissioner's finding that he would have reached the same conclusion whether or not the Wells Report was "independent," or his conclusion that Appellees had waived any objection to the exclusion of Pash's testimony by declining to take the Commissioner up on his offer to "revisit" that evidentiary ruling at the appeal hearing.  SPA60 nn.20-21.

As to the Paul Weiss attorneys' work product, the court did not evaluate the Commissioner's detailed interpretation of the CBA's discovery provisions.  Instead, the court found that the denial of access to the attorneys' internal work product was "fundamentally unfair" because "[t]he interview notes were, at the very least, the basis for the Wells Report, and Brady was prejudiced by his lack of access to them." SPA37.  And again the district court suggested that the evidence was necessary to evaluate whether the Wells investigation was "independent."  *Id.*

Appellees also renewed their claim that the Commissioner could not be impartial, and they argued that the Commissioner was not permitted to rely on facts outside the Wells Report to affirm the discipline.  Because the court had already vacated the Commissioner's decision, it did not address those alternative arguments.

25

# SUMMARY OF ARGUMENT

The district court identified three purported errors in the Commissioner's disciplinary decision. Those three assignments of error reflect not an arbitration proceeding infected with fraud or riddled with the kind of manifest errors that permit a collateral attack under the LMRA's deferential standards, but the district court's decision to substitute its judgment for the arbitrator's in a way that fundamentally ignored the deferential nature of a court's review in these circumstances. When a party dissatisfied with the results of a labor arbitration seeks to collaterally attack those proceedings in court, the court's role is extremely limited. The arbitrator's determinations need only be grounded in the CBA and devoid of true caprice. Here, the Commissioner exercised authority expressly granted to him by the CBA. His decisions were eminently reasonable, but that is not the test. Applying the correct and deferential standard, his substantive and procedural decisions cannot be collaterally attacked.

Under longstanding Supreme Court and Second Circuit precedents, the Commissioner's ruling must be enforced. The Commissioner's decision was well-grounded in the CBA, specifically Article 46. That provision affords the Commissioner broad authority to define and discipline conduct detrimental to the integrity of, and public confidence in, the game. All NFL players have more than adequate notice of that well-publicized authority. It is not only a standard and

26

necessary power of the commissioner of a professional sports league; it is included in the Standard NFL Player Contract that every player signs and the NFL Constitution and Bylaws, both of which are part of the CBA. The Commissioner relied on that authority when he disciplined Brady for his involvement in a deliberate scheme to deflate game balls to be used during an important playoff game and his conscious effort to destroy the evidence of his wrongdoing during the League's subsequent investigation. And the Commissioner undoubtedly was applying Article 46 of the CBA when he exercised his considered judgment to affirm the four-game suspension. Thus, the Commissioner's decision is nothing at all like the sort of severe transgressions—*i.e.*, fraud, dishonesty, or complete departure from the CBA—required for a federal court to take the drastic measure of disturbing a labor arbitration award. The decision is, in fact, eminently fair and reasonable given the egregious conduct involved, but the League's burden was not to persuade the district court that the punishment was optimal or even fair. The district court's evident disagreement with the Commissioner's substantive rulings did not empower it to overturn his award.

The Commissioner's procedural rulings likewise cannot be collaterally attacked. Decades of precedents make clear that an arbitrator's procedural rulings are, if anything, entitled to even greater deference under the LMRA. As with his disciplinary decision, there can be no doubt that the Commissioner's procedural

27

rulings drew their essence from the parties' CBA. When the Commissioner declined to compel the Pash testimony, he exercised the discretion the CBA grants him over evidentiary matters during an Article 46 hearing. He found, as a factual matter, that Pash was not substantively involved in the Wells investigation, he ordered that Wells testify regarding Pash's involvement in the process in order to confirm that premise, and he offered to revisit the matter if any party requested that he do so. No such request was ever made.

The district court was just as fundamentally mistaken to second-guess the Commissioner's refusal to order discovery of the Paul Weiss attorneys' internal investigative notes and memoranda. The Commissioner interpreted the CBA as not requiring disclosure of the materials, and he gave a number of independent reasons supporting that decision. That sound exercise of his discretion could not be disturbed were the Commissioner a district judge under review by the Court of Appeals. It, *a fortiori*, is not subject to collateral attack under the LMRA's far more deferential standard of review.

Finally, there is no reason to remand the case for the district court to resolve Appellees' alternative claims, which were briefed below and are plainly meritless. This Court has exercised its discretion to enforce an arbitration award without a remand in similar circumstances, and judicial economy supports doing so here.

28

## STANDARDS OF REVIEW

This Court reviews "a district court decision upholding or vacating an arbitration award *de novo* on questions of law and for clearly erroneous findings of fact." *Wackenhut*, 126 F.3d at 31. Because the issues raised in this appeal are purely legal, this Court reviews the decision below *de novo*.

The Court's review of the underlying arbitration award, by contrast, is governed by some of the most deferential standards known to the law. *See Misco*, 484 U.S. at 37; *Wackenhut*, 126 F.3d at 32-33. As detailed elsewhere, substantive decisions need only be "plausibly grounded in the parties' agreement," *Wackenhut*, 126 F.3d at 32, and procedural rulings may not be disturbed unless they "amount to affirmative misconduct," *Misco*, 484 U.S. at 40. Thus, while the Court reviews the district court's decision *de novo*, it owes the Commissioner's arbitration award exceptional deference.

## ARGUMENT

### I.     The Commissioner's Arbitration Award Must Be Enforced.

The parties mutually agreed to grant the Commissioner broad authority to protect the integrity of, and public confidence in, the game of professional football. Article 46 of the CBA allows the Commissioner to determine when player misconduct has threatened the integrity of the game, and it affords him the discretion to impose discipline for such offenses according to his considered judgment. Every player has notice of this authority, as well as notice that offending conduct can result

in suspension; indeed, every player acknowledges that notice and authority when he signs his Player Contract. There was thus no legitimate basis under the LMRA for the district court to disturb the Commissioner's award.

### A. Judicial Review of a Labor Arbitration Award is Extremely Limited Under the Labor Management Relations Act.

The standard of review that the district court should have applied in this case is "among the narrowest known to the law." *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978) (per curiam). Under the LMRA, federal courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Misco*, 484 U.S. at 38. Instead, courts must enforce an arbitrator's award if it "draws its essence from the collective bargaining agreement"—that is, so long as it "is plausibly grounded in the parties' agreement." *Wackenhut*, 126 F.3d at 31-32; *Saint Mary Home*, 116 F.3d at 44.

Thus, under longstanding Supreme Court and Second Circuit precedent, courts must uphold a labor arbitration award if the arbitrator "offer[s] even a barely colorable justification for the outcome reached." *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 704 (2d Cir. 1978). Unless the award was "procured through fraud or dishonesty," or it so wholly departs from the parties' agreement that it can be understood solely as "an exercise of the arbitrator's own brand of industrial justice" without any basis in the contract, the court must enforce the award, even if it views the arbitrator's decision as "very incorrect." *Local 97,*

30

*Int'l Bhd. Of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 124-125 (2d Cir. 1999) (quotation marks omitted).

That is so whether the court is reviewing the merits of an arbitrator's decision or one of the arbitrator's procedural rulings. If anything, an arbitrator's procedural rulings are entitled to *even more* deference. Such decisions "are to be left to the arbitrator" and may be disturbed only if they are the product of "bad faith" or "affirmative misconduct." *Misco*, 484 U.S. at 40. Thus, in both circumstances, mere disagreement with the arbitrator's legal or factual conclusions is manifestly insufficient to justify vacatur of an award.

Section 301's exceptionally deferential standard rests on sound public policy. Congress crafted the LMRA "to promote industrial stabilization through the collective bargaining agreement," and "[a] major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960). Federal labor law thus "reflect[s] a decided preference for private settlement of labor disputes without the intervention of government." *Misco*, 484 U.S. at 37. In place of constant confrontation between management and labor—and the inefficient work stoppages such conflicts would entail—the LMRA encourages collective bargaining and arbitration as voluntary

31

systems of "industrial self-government." *Warrior & Gulf Navigation*, 363 U.S. at 580. Under the LMRA, "arbitration is the substitute for industrial strife." *Id.* at 578.

This system works, however, only if the parties can be sure that an arbitrator's decision will be respected. Thus, where the parties have agreed to arbitrate disputes, the LMRA prohibits re-litigation of those disputes in federal court. "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *Misco*, 484 U.S. at 37-38. The bedrock "federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960). Federal district courts, therefore, "'"have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim."'" *Garvey*, 532 U.S. at 509 (quoting *Misco*, 484 U.S. at 37 (quoting *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568 (1960))). Likewise, any procedural rulings "which grow out of the dispute and bear on its final disposition are to be left to the arbitrator." *Misco*, 484 U.S. at 40. And an arbitrator's discretion is "especially" broad when he is fashioning a remedy. *Id.* at 41.[1]

---

[1] At times, the district court relied on the Federal Arbitration Act rather than the LMRA. That was incorrect; because this dispute arises under a collective bargaining

### B.    The Commissioner's Award Easily Satisfies the LMRA.

Applying those settled standards, this should have been an easy case.  The Commissioner's arbitration award unquestionably drew its essence from the parties' collective bargaining agreement.  The Commissioner imposed Brady's discipline pursuant to Article 46 of the CBA, which grants him authority to discipline a player who has engaged in "conduct detrimental to the integrity of, or public confidence in, the game of professional football."  The Commissioner imposed a four-game suspension, which is both a form and a length of discipline that the CBA expressly authorizes him to impose.  His final decision extensively considered the evidence, made detailed findings of fact supported by that evidence, expressly concluded that the misconduct fell within Article 46's definition of conduct detrimental to the integrity of, or public confidence in, the game, and expressly considered and rejected all legal and factual objections presented by Appellees.

In short, every step of the way, the Commissioner was clearly construing and applying the CBA and exercising the authority that the parties to the CBA expressly delegated to him.  Thus, had the district court adhered to the LMRA's narrow

---

agreement, the LMRA governs judicial review of the award. *See Coca-Cola Bottling Co. v. Union Local 812*, 242 F.3d 52, 54-55 (2d Cir. 2001).  In all events, the court's analysis would fare no better under the FAA provisions on which it erroneously relied, as "the stringent standard for vacating an arbitration award is materially the same under the FAA [and the] Labor Management Relations Act."  *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 754 F.3d 109, 113 (2d Cir. 2014).

standard of review, it should have quickly concluded that this arbitration award must be upheld. Instead, the court not only second-guessed the Commissioner's findings and conclusions, but proceeded to displace them with a series of its own views, which had no place in the deferential review demanded by the LMRA.

1.    **The district court fundamentally failed to apply the correct legal standard.**

At the outset, the district court reviewed the Commissioner's decision through a fundamentally flawed construct. The court began by quoting this Court's statement that an arbitrator "'must interpret and apply [the collective bargaining] agreement in accordance with the "industrial common law of the shop."'" SPA19 (quoting *United States v. Int'l Bhd. Of Teamsters*, 954 F.2d 801, 809 (2d Cir. 1992) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53 (1974))). But whatever that statement may say about the role of an arbitrator, it in no way supports the conclusion the district court drew from it—namely, that *courts* are entitled to conduct a plenary review of whether the arbitrator followed the "law of the shop." To the contrary, this Court has expressly rejected the "argument that an arbitrator has a duty to follow arbitral precedent and that failure to do so is reason to vacate an award." *Wackenhut*, 126 F.3d at 32. What matters is whether the arbitrator's decision is "grounded in the collective bargaining agreement," not whether it is grounded in "arbitral precedent." *Id.* "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," the court *must* enforce his decision—

34

even if it is "convinced he committed serious error" or that arbitral precedent supports a different result. *Misco*, 484 U.S. at 38.

The district court made no effort to ground its own decision in that long-settled legal framework. Indeed, it hardly even mentioned this Court's or the Supreme Court's seminal labor arbitration cases. Instead, it repeatedly engaged in what can only be described as *de novo* review, rejecting every factual finding, every CBA interpretation, and every legal conclusion with which it disagreed—often referring to those conclusions as mere "arguments" or "contentions." SPA22 n.15, SPA31. But "[w]hen an 'arbitrator explains his conclusions in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result.'" *Saint Mary Home*, 116 F.3d at 44 (quoting *Andros Compania Maritima*, 579 F.2d at 704) (alteration marks omitted). The Commissioner provided far more than a "colorable justification" for his conclusions in this case. His decision not only walked through all the evidence he considered and credited in painstaking detail, but also explained at length his efforts to determine how the CBA should be applied to the unprecedented situation before him.

In doing so, the Commissioner readily acknowledged the need "for consistency in discipline for similarly situated players." SPA55. But he also explained in detail why he reached the perfectly reasonable—indeed, unassailable—

35

conclusion that Brady's conduct made this "[u]nlike any other conduct detrimental proceeding of which [he was] aware, and certainly unlike any cited by either party." *Id.* And in the absence of any direct precedent, the Commissioner did what any good arbitrator (or judge) would do when crafting an appropriate remedy: He used the combination of the CBA and arbitral precedent to reason by analogy and "bring his informed judgment to bear in order to reach a fair solution of a problem." *Enterprise Corp.*, 363 U.S. at 597.

Rather than respect the Commissioner's deep experience in and knowledge of professional football and defer to his diligent efforts to construe and apply the CBA, which gave the Commissioner broad discretion to address issues of this character, the district court fixated on its disagreement with the Commissioner's reasoning that the "closest parallel" was player steroid use because it similarly "reflects an improper effort to secure a competitive advantage in, and threatens the integrity of, the game." SPA57. This fixation was especially curious and inappropriate given that Appellees had not directly challenged the Commissioner's analogy to the steroid policy. At any rate, there is nothing remotely inappropriate—let alone so exceedingly impermissible as to constitute "his own brand of industrial justice," *Misco*, 484 U.S. at 36—about the analogy, which in all events was just that. Both forms of misconduct do, in fact, constitute "an improper effort to secure a competitive advantage," and, like the use of a masking agent, Brady's knowing

36

destruction of highly relevant evidence could reasonably be construed as an effort "to cover up the underlying violation."  SPA57.  That the district court may believe that steroid use should be punished more harshly than the conduct here is irrelevant. Both actions are plainly *mis*conduct, and the metaphysical question as to which is more detrimental to the game is quite properly assigned by the CBA to the Commissioner, not the courts.

### 2. The district court's fair notice concerns were misplaced.

The district court cannot get around the prohibition on judicial second-guessing of matters contractually assigned to the arbitrator by dressing up its disagreements with the Commissioner's conclusions as "fair notice" concerns.  The Commissioner made crystal clear that he was not imposing discipline under the steroid policy; he was simply pointing out, after the fact, that the discretionary punishment he had chosen to impose was "fully consistent with, if not more lenient than," the punishment under that policy, and therefore could not be described as wholly outside the bounds of what the parties to the CBA contemplated as appropriate punishment for conduct that seeks to "secure a competitive advantage in, and threatens the integrity of, the game."  *Id.*

In doing so, the Commissioner did what every sentencing judge in America does when confronted with an outlier case.  He looked to how a *different* type of misconduct with *similar features* has been punished to determine what is or is not a

37

reasonable outcome.  A defendant is entitled to notice of his statutory range of punishment, not to advance notice of the analogies a judge might find persuasive in selecting a punishment within that range.  Every player knows—because every player signs a contract that says so—that the Commissioner has substantial discretion to discipline conduct detrimental with a suspension up to and including indefinite suspension.  The notion that a player is entitled to advance notice that the Commissioner might draw a particular analogy in reviewing a 4-game suspension— an analogy that was particularly apt when Brady's "masking" activities came to light on appeal—is fundamentally mistaken and wholly inconsistent with the limited scope of judicial review permitted in considering this type of collateral attack.

Applying the proper standard, the only "fair notice" to which a player is entitled is notice that the Commissioner has the power to discipline a player for conduct that he deems detrimental to the integrity of, or public confidence in, the game of football, and to impose discipline for such conduct that includes the discipline imposed here.  Brady unquestionably had that in spades.  For over forty years, the CBA has consciously afforded the Commissioner broad authority to define "conduct detrimental" and to administer penalties—including suspensions, even indefinite suspensions.  Where a CBA delegates broad disciplinary authority, the arbitrator "is to bring his informed judgment to bear in order to reach a fair solution of a problem." *Enterprise Corp.*, 363 U.S. at 597.  "This is especially true when it

comes to formulating remedies," where "the need is for flexibility in meeting a wide variety of situations." *Id.* It is common sense that parties are typically unable to contemplate in advance "what specific remedy should be awarded to meet a particular contingency." *Id.* And that obvious fact is even more apparent for provisions that, like Article 46, define prohibited conduct pursuant to a standard, not to particular actions.

That sort of general authority is not uncommon in labor contracts, and it hardly poses a "fair notice" concern. Rather, like the broad "just cause" provisions found in many collective bargaining agreements, it puts players on notice that the Commissioner retains authority to punish *any* conduct that, in his reasonable judgment, harms the game. *See, e.g.*, *Local 453, Int'l Union of Elec., Radio & Mach. Workers v. Otis Elevator Co.*, 314 F.2d 25, 28 (2d Cir. 1963) (Marshall, J.) ("That the parties intended to leave such definition to the arbitrator is made plain both by the 'plenary grant' of power made to him and by the broad scope of the stipulated question, framed only in terms of 'just cause,' which accompanied the submission." (citations omitted)); *Saint Mary Home*, 116 F.3d at 45 (upholding arbitrator's application of "just cause" provision); *Hill v. Staten Island Zoological Society, Inc.*, 147 F.3d 209, 214 (2d Cir. 1998) (same); *cf. Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (observing that capacious language in the statute "does not

demonstrate ambiguity," but instead "demonstrates breadth" (quotation marks omitted)).

Indeed, other professional sports commissioners enjoy similarly broad authority to protect the best interests of their games. The Commissioner of Major League Baseball has long had the power to discipline a player "for conduct that is materially detrimental or materially prejudicial to the best interests of Baseball." Major League Baseball Collective Bargaining Agreement Art. XII(B) (2012), *available at* http://atmlb.com/1Jlouap. The Commissioner of the National Hockey League may discipline players for conduct "that is detrimental to or against the welfare of the League or the game of hockey." National Hockey League Collective Bargaining Agreement Art. 18-A.2 & Standard Player Contract (2012), *available at* http://bit.ly/1ZYvmWR. And the National Basketball Association's collective bargaining agreement grants its commissioner the power to discipline players for conduct that threatens "the integrity of, or the maintenance of public confidence in, the game of basketball." National Basketball Association Collective Bargaining Agreement Art. XXXI (2011), §§ 9(a), (b)(ii), (d), *available at* http://nbpa.com/cba/.

Federal courts have upheld other commissioners' exercise of that broad authority. *See Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527 (7th Cir. 1978) (upholding baseball commissioner's "best interests of Baseball" authority). And this Court has held—even outside the strict standard of review for labor arbitration under

40

the LMRA—that the judiciary must defer to a professional sports league's "interpretation of its own rules." *Crouch v. NASCAR, Inc.*, 845 F.2d 397, 403 (2d Cir. 1988) (citing *Finley*). Rather than "decide *de novo* whether" a league has correctly applied its own rules, the Court considers only whether league discipline was imposed "in bad faith or in violation of any local, state or federal laws." *Id.* at 402-403. "[A]ny lower standard," this Court explained, "would create too great a danger that courts will become mired down in what has been called the 'dismal swamp'—the area of a group's activity concerning which only the group can speak competently." *Id.* at 403. Simply put, "the judiciary should not be [the League's] 'umpire and governor.'" *Id.* (quoting *Finley*). Whatever the bounds of the Commissioner's broad conduct detrimental authority may be, no one can seriously suggest that he exceeded those bounds by deeming a scheme to tamper with game-day footballs during a high-profile game and then destroy evidence of that scheme "conduct detrimental to the integrity of, or public confidence in, the game of professional football." JA345.

### 3. The district court was wrong to second-guess the Commissioner's application of his Article 46 authority.

The district court strayed even further afield in concluding that the award must be vacated because Brady lacked "fair notice" that "the Competitive Integrity Policy … could … serve as the basis for disciplinary action against him." *See* SPA30. The Commissioner could not have been clearer about the contractual authority for his

41

decision, and it was manifestly not the Competitive Integrity Policy. Instead, as the Commissioner reiterated over and over (and over and over) in his final decision, Brady was disciplined under Article 46 of the CBA. *See* SPA43, 46, 54, 58-59 n.19, 61. To be sure, the *Wells investigation*, which concerned the actions of the entire Patriots organization, was conducted pursuant to the Competitive Integrity Policy— and understandably so since that policy governs "investigations of competitive violations by clubs." SPA58 n.19. But the mere fact that the Commissioner relied on a report prepared pursuant to an investigation under the Competitive Integrity Policy into the actions of the Patriots and all those affiliated with the club and implicated in this incident does not somehow convert his decision regarding Brady's conduct and discipline into an application of that policy. The district court's refusal to accept that the Commissioner was in fact applying the provision that he discussed repeatedly throughout his decision is inexplicable, but in all events makes the court's view that the Competitive Integrity Policy "could not serve as the basis for disciplinary action" wholly beside the point. SPA30.

The district court's insistence that the award must be justified only by the Wells Report's "general awareness" finding is similarly inexplicable. *See* SPA26-27. The Commissioner expressly found that "Mr. Brady knew about, approved of, consented to, and provided inducements and rewards in support of" the scheme to tamper with game balls. SPA51. As the district court itself recognized, the

42

Commissioner's finding "goes far beyond the 'general awareness' finding in the Wells Report or in Vincent's May 11, 2015 Disciplinary Decision Letter to Brady." SPA17. In fact, the Wells Report itself went "far beyond the 'general awareness' finding" on which the district court premised its conclusions. *Id.* The Wells Report also found that "it is unlikely that [McNally and Jastremski] would deflate game balls without Brady's knowledge *and approval*" or that the two equipment workers "would personally and unilaterally engage in such conduct in the absence of Brady's awareness *and consent*." JA114 (emphasis added). In all events, the Commissioner's finding had obvious support in the evidence that came to light between the initial discipline and the arbitral hearing—*i.e.*, that Brady had obstructed the investigation by destroying his cell phone—and the Commissioner unquestionably had discretion to consider that new evidence under the CBA. *See, e.g.*, *Misco*, 484 U.S. at 39-40; *Saint Mary Home*, 116 F.3d at 45.

Finally, the district court was wrong to question the Commissioner's reliance on Article 46 instead of the player equipment policy. The district court's evident preference for what it perceived to be the more specific equipment policy over the more general conduct detrimental authority is just one more example of the district court overstepping its limited role under the LMRA. Under the Act, labor arbitrators are tasked with interpreting and applying the relevant contractual provisions, which certainly includes the ability to determine which of two potentially applicable

43

contractual provisions to invoke. Federal courts do not review such decisions *de novo*; instead, so long as the contractually-designated arbitrator's interpretation has a plausible basis in the contract, the courts are obligated to uphold the arbitrator's decision. Here, the Commissioner interpreted Article 46 of the CBA to encompass Brady's misconduct, and he rejected the Players Association's argument that only a fine could be imposed under the equipment policy. The Commissioner's use of his Article 46 authority, moreover, was not even arguably inconsistent with the player equipment policy; in addition to listing fines for specific conduct, the equipment policy expressly recognizes the Commissioner's authority to issue suspensions based on the facts of a violation. *See* JA370, 389.

When an arbitrator "resolves disputes regarding the application of a contract," he exercises the heart of his discretion under the LMRA. *Garvey*, 532 U.S. at 509. "Because the authority of arbitrators is a subject of collective bargaining, just as is any other contractual provision, the scope of the arbitrator's authority is itself a question of contract interpretation that the parties have delegated to the arbitrator." *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 765 (1983). And a federal court has no power to disturb the arbitrator's efforts to reconcile contractual provisions *even if* the "'court is convinced he committed serious error.'" *Eastern*

*Associated Coal Corp. v. United Mine Workers of America, Dist. 17*, 531 U.S. 57, 62 (2000) (quoting *Misco*, 484 U.S. at 38).

Here, there was no error, let alone a serious one. Even accepting the notion that deflating game balls is an "equipment violation," there was manifestly more going on here than that. Brady participated in a scheme to interfere with the officials' ability to enforce rules going to the very heart of the game, and then not only refused to cooperate with the investigation into that scheme, but also affirmatively obstructed that investigation by destroying highly relevant evidence. Although the Commissioner's decision to act pursuant to his Article 46 authority was eminently reasonable, that is not the test under the LMRA. The Commissioner indisputably had authority to discipline Brady's conduct under Article 46. While he could have forgone that authority in favor of equipment policies crafted for more minor offenses, he was under no obligation to do so. Once the Commissioner chose to proceed under Article 46, the district court had no basis to displace that decision. Especially given that the Commissioner is uniquely entrusted with protecting the integrity of the game, the choice between the two contractual provisions is a quintessential interpretive decision that "[a] federal court may not second-guess." *W.R. Grace*, 461 U.S. at 765.

**II.    The Commissioner's Procedural Rulings Provide No Basis For Vacating His Final Decision.**

The LMRA requires, if anything, an even more deferential standard of review when it comes to collateral attacks on an arbitrator's procedural rulings.  "[W]hen the subject matter of a dispute is arbitrable," as here, "'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator."  *Misco*, 484 U.S. at 40; *see also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964).  That is because "grievance and arbitration procedures," no less than a contract's substantive provisions, "are part and parcel of the ongoing process of collective bargaining."  *Misco*, 484 U.S. at 38.  The parties are free to specify certain procedural rules, and they are free to leave others to the arbitrator's discretion.  But in both instances, it is ultimately the arbitrator's "judgment and all that it connotes that [the parties] bargained for."  *Steelworkers v. American Mfg. Co.*, 363 U.S. at 568; *see also AT&T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 649-50 (1986).  And the Commissioner is in a much better position than the courts to understand the procedural rules of the CBA that he is regularly called on to interpret and apply.  *See Crouch*, 845 F.2d at 403.  Thus, absent fraud or a complete departure from the contract, the Commissioner's procedural rulings must be respected.

46

### A. The District Court Had No Authority—And No Grounds—To Second-Guess the Commissioner's Evidentiary Ruling.

The district court was wrong to second-guess the Commissioner's decision not to compel Pash's testimony, a ruling which was inextricably intertwined with the Commissioner's factual findings. The CBA does not require the testimony of *any* witnesses in an Article 46 hearing, let alone of every witness that the parties ask to present. Instead, it leaves the question of what testimony is appropriate to the hearing officer—which, under Article 46, may be the Commissioner. The Commissioner plainly articulated and applied a contractually permissible approach in resolving that question, which was based on his factual findings about which potential witnesses had personal knowledge of the relevant facts. He agreed to compel the testimony of the two individuals with personal knowledge of the facts at hand (Wells and Vincent), but declined to compel the testimony of the two without such personal knowledge (Pash and himself). And in an abundance of caution, the Commissioner offered to "revisit" that ruling should testimony at the hearing reveal that he was mistaken in his understanding that Pash played no substantive role in the Wells investigation.

The district court did not begin to explain how that ruling could be considered so far outside the bounds of what the CBA contemplates that it could not even be said to be "plausibly grounded in the parties' agreement." *Wackenhut*, 126 F.3d at 32. Indeed, the court did not even explain how the Commissioner's ruling could

47

constitute an abuse of discretion, let alone a complete and utter failure to "even arguably constru[e] or apply[] the contract." *Misco*, 484 U.S. at 38. Instead, the court once again impermissibly substituted its own views for "the arbitrator's view of the facts and of the meaning of the contract that [the parties] have agreed to accept." *Id.* at 37-38.

According to the district court, "NFL precedent demonstrates that, in Article 46 arbitration appeals, players must be afforded the opportunity to confront their investigators," and "to present evidence and cross-examine adverse witnesses." SPA33. But even setting aside the fact that only the arbitrator, not the court, is authorized to interpret arbitral precedent and determine what it requires, *see, e.g.*, *Wackenhut*, 126 F.3d at 32, Brady received precisely the opportunity that the district court believed the precedents require: He had the opportunity to confront Wells, and the Commissioner found as a matter of fact that Wells, not Pash, was the investigator. Specifically, the Commissioner found that Wells "supervised the investigation and preparation of the Investigative Report that serves as the basis for Mr. Brady's discipline," while Pash's "role was limited to facilitating access by Mr. Wells to witnesses and documents." SPA63. Because the subjects on which Brady was allowed to confront Wells included the topic of Pash's role, the Commissioner found that Pash's testimony would be cumulative.

48

The Commissioner expressly offered to reopen his ruling on the Pash testimony if the examination of Wells undermined the Commissioner's factual determination about Pash's role. Brady never even tried to take advantage of that opportunity—even after Wells testified that Pash had reviewed and commented on a draft of the investigative report. The Commissioner was clearly in the bounds of his authority as the contractually designated hearing officer to deem the issue waived. *See, e.g.*, *Misco*, 484 U.S. at 40; *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 754 F.3d 109, 114 (2d Cir. 2014). Thus, the district court's ruling ignored a factual finding about Pash's role that the district court was powerless to disturb, the opportunity to confront Wells about Pash's role, and the failure to try to reopen the matter based on Wells's testimony. That trifecta of errors demonstrates the wisdom of decades of precedents making clear that the arbitrator's factual findings and procedural rulings are not subject to judicial second-guessing.

Rather than explain how the Commissioner's actions came even close to crossing the line of failing to "draw[] [their] essence from the collective bargaining agreement," *Misco*, 484 U.S. at 36, the district court simply refused to accept the Commissioner's view of the facts. Indeed, the court would not even accept the notion that Wells was the principal investigator, instead insisting on referring to the investigation as the "Pash/Wells Investigation," SPA2, 3, 5, 27 n.8, 28 n.19, 35, 36, and referring to Pash as "co-lead investigator," SPA12, 14, 32, 34, 35—all because

49

a press release issued before the investigation suggested that Pash would co-lead it and because Wells testified that Pash had provided minor comments on a draft of the Wells Report.  But the Commissioner expressly considered that press release, and expressly considered the other facts before him, and concluded that Pash did *not* "play a substantive role in the investigation that led to Mr. Brady's discipline." SPA63.  The LMRA prohibits the district court from substituting its own views for "the arbitrator's view of the facts."  *Misco*, 484 U.S. at 37.

Even if that were not the case, the district court's conclusion that the Commissioner's ruling was so prejudicial as to warrant vacatur of his final decision is inexplicable.  The best the district court could say was that examining Pash may have allowed Brady to "explor[e]" whether the Wells investigation was "truly 'independent.'" SPA35.  But whether the investigation was or was not "independent" is irrelevant.  Nothing in the CBA requires the League to authorize or an arbitrator to rely on only "independent" investigations; in fact, hearing officers routinely rely on investigations conducted by the League itself.  Moreover, the Commissioner made an express finding that he would have reached the same conclusion whether or not the investigation was "independent" because the Wells Report provided a "thorough and reliable" account of the relevant facts.  SPA60 n.20.  The district court did not even acknowledge that finding, let alone explain how the exclusion of Pash's testimony could possibly be prejudicial (or even erroneous) when the factfinder

50

himself had explicitly found that the only matter on which Pash was even arguably in a position to testify would have had no bearing on his ultimate conclusions.

### B. The District Court Had No Authority—And No Grounds—To Second-Guess the Commissioner's Discovery Ruling.

The district court's ruling on the disclosure of Paul Weiss internal work product was equally unlawful. The Commissioner's denial of the request for that discovery was, once again, indisputably based on an effort to interpret and apply the CBA. Indeed, the Commissioner employed precisely the sort of interpretive tools that a federal court would apply to discern the meaning of a contractual command. That the district court may *disagree* with the conclusions the Commissioner reached, or the manner in which he applied those conclusions to the facts at hand, is an entirely insufficient basis to reject them.

In resolving the discovery issue, the Commissioner began, as any contractual interpretation analysis should, with the plain text of the CBA. Article 46, §2(f)(ii) specifies the evidence that must be disclosed in an Article 46 arbitration hearing: "In appeals under Section 1(a), the parties shall exchange copies of any exhibits upon which they intend to rely…." JA346. That is it. The Commissioner sensibly interpreted that provision to indicate that more extensive discovery is not required. Second, he confirmed his conclusion based on context, as the CBA reveals that "the parties agreed to permit much more extensive discovery in other kinds of proceedings," but not for appeals under Section 1(a). SPA65. Third, the

51

Commissioner considered the purpose behind the provision, which "anticipates a reasonably efficient, expedited appeal proceeding conducted before a Commissioner who may be (and in this case is) a business executive rather than a lawyer." *Id.* And finally, he found support in prior precedent. In the *Ray Rice* matter, Retired District Judge Barbara Jones, serving as the hearing officer, reached the same conclusion about the limited nature of discovery that Article 46 contemplates. In light of that conclusion, the Commissioner found Appellees' request inconsistent with the narrow scope of discovery appropriate under Article 46.

The Commissioner also went on to explain in detail why he would not consider the request appropriate even if the CBA contemplated the possibility of broader discovery in Article 46 proceedings. As he explained, the League had already "produced all of the NFL documents considered by the investigators in preparing their report, including notes of interviews conducted by in-house NFL investigators prior to the time that the Paul, Weiss investigation began." *Id.* The dispute before him related only to internal work product generated by Paul Weiss itself during the course of the investigation—*i.e.*, notes and memoranda that the lawyers produced as they considered the materials and interviewed the witnesses. That kind of attorney work product would not be discoverable even in an ordinary legal proceeding, and the Commissioner found absolutely nothing in the CBA that supported, let alone compelled, a different result here—particularly since the

52

material had not been considered as part of the disciplinary process and the Players Association did not even "identif[y] any material factual dispute that Paul, Weiss' internal work product would help to resolve."  SPA66.

The notion that these conclusions were somehow so far outside the bounds of what Article 46 contemplates as to warrant vacatur of the Commissioner's decision is unfathomable.  The Commissioner's extensive legal and factual analysis would readily withstand scrutiny under a standard far more demanding than the "even arguably construing or applying the contract" standard that governs here.  *Misco*, 484 U.S. at 38.  Surely a trial court would act well within its discretion to deny a similar request to turn over the internal attorney work product that was created during the course of an investigation or preparation for a hearing.  The district court did not even attempt to identify anything in the CBA that contemplates a different result here—let alone compels one in terms so unassailable that any decision to disallow the discovery could not even be "plausibly grounded in the parties' agreement."  *Wackenhut*, 126 F.3d at 32.  The district court egregiously overstepped the bounds of its proper role.  Where lower courts have committed a similar error, appellate courts have not hesitated to reverse.  *See, e.g.*, *id.*; *Misco*, 484 U.S. at 40; *Am. Postal Workers*, 754 F.3d at 114.  The court should do so here.

**III.    This Court Should Order Enforcement Of The Commissioner's Award.**

Because it ruled for Appellees on the three issues discussed above, the district court did not resolve their other collateral attacks: (1) that the Commissioner could not rely on his factual conclusion that Brady participated in the scheme to tamper with game balls because, according to Appellees, the Wells Report did not reach that conclusion, and (2) that the Commissioner was "evidently partial" and incapable of fairly arbitrating the dispute.  SPA38-39.  But if this Court reverses the district court, it need not remand for consideration of those additional questions.  The issues were fully briefed below, and the arguments are plainly meritless.  Indeed, for many of the reasons that Appellees' arguments must be rejected on the three issues addressed by the district court, they must be rejected on the remaining issues as well.

Appellees argued below that the Commissioner could not rely on his factual finding—based, in part, on the newly discovered evidence that Brady destroyed his cell phone—that "Brady participated in ball tampering" because, in their view, the Wells Report did not include such a definitive conclusion.  JA73-74.  But this argument is incorrect both as a matter of fact and as a matter of law.  While the Wells Report concluded that Brady was "generally aware" of McNally and Jastremski's actions, it *also* concluded that "it is unlikely that an equipment assistant and a locker room attendant would deflate game balls without Brady's knowledge and *approval*," and thus that McNally and Jastremski acted with "Brady's awareness and *consent*."

54

JA114 (emphasis added). Appellees are therefore simply wrong to argue that the Wells Report and the Commissioner's initial disciplinary letter rested "solely" on a "general awareness" finding. JA73-74. They were based on knowledge, approval, awareness, and consent—all of which supported the Commissioner's finding that Brady participated in the scheme.

In all events, though, the Commissioner was not required to limit his review to the Wells Report's factual findings. Under Article 46 of the CBA, he was permitted to consider the new evidence that came to light at the hearing that Brady had willfully obstructed the investigation by destroying evidence and failing to inform investigators of its destruction—and he was permitted to draw adverse inferences based on that new information. Nothing in the CBA prohibits the Commissioner from considering new evidence during an Article 46 hearing. In fact, the entire point of holding a *hearing* is to present new evidence for the Commissioner's consideration. It cannot be that the Commissioner may consider only evidence that is *favorable* to the player being disciplined—particularly when, as here, the player himself is the one that introduced the evidence. At most, this was a "'procedural' questio[n] which gr[ew] out of the dispute" and was thus "to be left to the arbitrator." *Misco*, 484 U.S. at 40. Indeed, in *Saint Mary Home*, this Court rejected a similar attack on an arbitrator's consideration of evidence that arose after the initial disciplinary decision. *See* 116 F.3d at 45. As with his evidentiary and

55

discovery rulings, the Commissioner's discretionary decision to consider the new evidence cannot be disturbed.

Appellees' attacks on the Commissioner's impartiality are also meritless. Appellees argued that the Commissioner could not fairly arbitrate the matter because they had accused him of "delegating" his disciplinary authority to Vincent.  JA86. They also argued that the Commissioner's public statements thanking Wells for his thorough investigation "locked him into supporting the Wells Report and rendered him incapable of reaching a contrary conclusion."  JA86-87.  The Commissioner rejected both of these contentions as unfounded, and neither can serve as the basis for vacating his award.  The Commissioner explained that he "did not delegate [his] authority as Commissioner to determine conduct detrimental or to impose appropriate discipline."  SPA59.  Nor did he prejudge anything merely by thanking Wells and his team for their investigative work.  *See* SPA68-69.  There can be no dispute that the Commissioner was in the best position to make these factual determinations, given that they concerned the exercise of his disciplinary power.

Ultimately, Appellees' partiality arguments cannot be squared with the reality that the CBA expressly gives the Commissioner contractual discretion to serve as the hearing officer in Article 46 appeals.  The parties agreed to give the Commissioner that authority even though they recognized that he would often need to take steps or make statements concerning a high profile investigation or dispute

56

before meting out discipline or hearing an appeal under Article 46. "[T]he parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen." *Williams v. National Football League*, 582 F.3d 863, 886 (8th Cir. 2009) (rejecting evident-partiality challenge where Pash served as Commissioner's designee in player discipline hearing) (quotation marks omitted); *see also Aviall, Inc. v. Ryder System, Inc.*, 110 F.3d 892, 896-97 (2d Cir. 1997).

Appellees cannot superimpose standards developed to question the partiality of third-party arbitrators on the Article 46 process. The CBA does not give the Commissioner the authority to make determinations about conduct detrimental because he is a completely detached decisionmaker. The CBA, like comparable provisions in other sports leagues' CBAs, gives him this authority because he is the Commissioner. He is impartial between clubs and between players, but he is expected to be deeply involved with running the League—which in the case of high profile disputes will inevitably involve actions having some bearing on the investigation of the controversy. Article 46 could not function as intended if an allegation of partiality were sufficient to eliminate the Commissioner's discretion to serve in a role the CBA expressly grants to him. Instead, the Commissioner is entitled to the same deference in handling such issues as with other issues that arise in the arbitral proceedings. Absent "bad faith" or "affirmative misconduct," the test

57

is whether the Commissioner's determinations are grounded in the CBA. *Misco*, 484 U.S. at 40; *see also, e.g.*, *Saint Mary Home*, 116 F.3d at 44-45. Applying that test, none of the issues raised by Appellees—neither the three arguments the district court accepted nor the two it deferred—are even close.

This Court has taken the efficient approach of disposing of alternative arguments without a remand in previous arbitration cases. For instance, in *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 218 (2d Cir. 2002), after reversing a district court decision vacating an arbitration award, then-Judge Sotomayor disposed of the challengers' three "alternative grounds" for vacating the award "[b]ecause these arguments were fully briefed below and on appeal, and because [this Court found] them to be without merit." The same is true here. And because Appellees' alternative arguments raise "purely legal issue[s]"—and meritless ones at that—the Court would be especially justified in exercising its discretion to decide those issues in the first instance. *Booking v. General Star Management Co.*, 254 F.3d 414, 419 (2d Cir. 2001).

Resolving the issues now, moreover, would serve the interests of judicial economy, which the Court has previously viewed as a factor for deciding alternative arguments without a remand. *See, e.g.*, *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012) (citing *Petrosino v. Bell Atlantic*, 385 F.3d 210, 224 (2d Cir. 2004)). This case requires a prompt resolution, as the Court recognized when it

58

expedited this appeal. Remanding these meritless issues to the district court would add unnecessary time and expense to proceedings that should have ended with the Commissioner's arbitration award. This Court can and should order that the Commissioner's decision be enforced.

## CONCLUSION

For the reasons set forth above, this Court should reverse the district court's decision and order that the Commissioner's award be enforced.

Respectfully submitted,

DANIEL L. NASH
PRATIK A. SHAH
STACEY R. EISENSTEIN
GREGORY W. KNOPP
JAMES E. TYSSE
AKIN GUMP STRAUSS
HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000

s/Paul D. Clement
PAUL D. CLEMENT
ERIN M. MURPHY
MICHAEL H. MCGINLEY
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellants National Football League Management Council and National Football League*

October 26, 2015

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 13,904 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

October 26, 2015

s/ Michael H. McGinley
Michael H. McGinley

## CERTIFICATE OF SERVICE

I hereby certify that, on October 26, 2015, an electronic copy of the foregoing Brief for Appellants was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

s/Paul D. Clement
Paul D. Clement