# No. 15-2801(L)

## 15-2805, 15-3228 (Con)

## United States Court of Appeals for the Second Circuit

———————

NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL,
PLAINTIFF-COUNTER-DEFENDANT-APPELLANT

AND

NATIONAL FOOTBALL LEAGUE, DEFENDANT-APPELLANT

AND

MICHELLE MCGUIRK, APPELLANT

*v.*

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,
ON ITS OWN BEHALF AND ON BEHALF OF TOM BRADY,
DEFENDANT-COUNTER-CLAIMANT-APPELLEE

AND

TOM BRADY, COUNTER-CLAIMANT-APPELLEE

———————

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NOS. 15-5916, 15-5982*

———————

**BRIEF FOR APPELLEES
NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION
AND TOM BRADY**

———————

STEFFEN N. JOHNSON
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 282-5000*
*sjohnson@winston.com*

JEFFREY L. KESSLER
DAVID L. GREENSPAN
*Winston & Strawn LLP*
*200 Park Avenue*
*New York, NY 10166*
*(212) 294-6700*
*jkessler@winston.com*

*Counsel for Appellees*

[ADDITIONAL COUNSEL LISTED ON INSIDE COVER]

ANDREW S. TULUMELLO
*Gibson, Dunn & Crutcher*
*1050 Connecticut Avenue, N.W.*
*Washington, DC  20036*
*(202) 955-8500*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee National Football League Players Association hereby certifies that it is a non-profit corporation organized under the laws of the Commonwealth of Virginia, that it has no parent corporation, and that no publicly held corporation owns ten percent or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ............................................................................ iv

INTRODUCTION .......................................................................................... 1

STATEMENT OF ISSUES ............................................................................. 9

STATEMENT OF THE CASE.......................................................................... 10

    A.    The Commissioner's CBA authority to discipline players for "conduct detrimental" to the League.................................. 10

    B.    The Player Policies and the collectively bargained penalties for game-related player misconduct.......................................... 10

    C.    Players' CBA right to notice of both prohibited conduct and the disciplinary consequences................................................. 12

    D.    Commissioner Goodell's history of disregarding players' right to notice. ....................................................................... 14

    E.    Article 46 procedures for arbitration appeals of Commissioner discipline. ..................................................................... 17

    F.    The 2015 AFC Championship Game and the NFL's lack of procedures for testing for football deflation........................ 18

    G.    The Pash/Wells investigation and the Wells Report............ 19

    H.    Troy Vincent's four-game suspension of Brady. ................ 21

    I.    Brady's arbitration appeal. ............................................... 22

        1.    Goodell denies the NFLPA's improper delegation argument without a hearing. ................................... 22

        2.    Goodell denies the NFLPA's recusal motion. ......... 23

        3.    Goodell denies the NFLPA the right to examine co-lead investigator Pash. ............................................... 23

        4.    Goodell denies the NFLPA equal access to Paul, Weiss's investigative files. ................................................. 23

    J.    The Article 46 hearing....................................................... 24

    K.    Goodell's arbitral decision. ............................................... 26

**Page**

L.   The decision below...................................................27

    1.   The award violated the essence of the CBA............27

    2.   The award defied fundamental fairness...................29

SUMMARY OF ARGUMENT ...............................................30

STANDARD OF REVIEW ....................................................35

ARGUMENT .........................................................................36

I.   Goodell's award violated the essence of the parties' agreement. ................36

    A.   The award ignores that the Discipline for Game-Related Misconduct Policy specifies a fine for first-time football tampering..................................................38

    B.   Brady also lacked notice that he could be disciplined for his alleged "awareness" of the activities of others. ...................46

    C.   Affirming a suspension based on non-cooperation would likewise violate the CBA notice requirement. ....................50

II.   The judgment should be affirmed on the independent ground that the arbitral proceedings were fundamentally unfair............52

    A.   Denying Brady access to the investigative files "relied" upon by the NFL defied fundamental fairness and the CBA............53

    B.   Precluding Pash's testimony further deprived Brady of fundamental fairness. ..........................................56

III.   If this Court were to reject the district court's grounds for vacatur, the case should be remanded for further determinations or, alternatively, affirmed on the other grounds presented. ......................................58

    A.   Goodell's refusal to hear the NFLPA's delegation argument defied fundamental fairness. ..........................................58

    B.   Goodell's evident partiality compels vacating the award. ..................60

CONCLUSION .......................................................................62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*187 Concourse Assocs. v. Fishman*,
399 F.3d 524 (2d Cir. 2005) ................................................................4, 30, 37

*Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*,
492 F.3d 132 (2d Cir. 2007) ...............................................................36, 60

*Atl. Nat'l League Baseball Club, Inc. v. Kuhn*,
432 F. Supp. 1213 (N.D. Ga. 1977)................................................42

*Beaird Indus. Inc. v. Local 2297, Int'l Union*,
404 F.3d 942 (5th Cir. 2005) ...............................................44

*Boise Cascade Corp. v. Paper Allied-Indus.*,
309 F.3d 1075 (8th Cir. 2002) ....................................... 6, 35, 38, 48-49

*Clinchfield Coal Co. v. Dist. 28, United Mine Workers*,
720 F.2d 1365 (4th Cir. 1983) ...............................................43

*Commercial Risk Reins. Co. v. Sec. Ins. Co.*,
526 F. Supp. 2d 424 (S.D.N.Y. 2007) ...............................................56

*Conoco, Inc. v. Oil, Chemical & Atomic Workers Int'l Union*,
1988 WL 163062 (10th Cir. 1988) ...............................................44

*Dardana Ltd v. Yuganskneftegaz*,
317 F.3d 202 (2d Cir. 2003) ...............................................58

*Erving v. Va. Squires Basketball Club*,
468 F.2d 1064 (2d Cir. 1972) ...............................................8, 35, 61

*Finley v. Kuhn*,
569 F.2d 527 (7th Cir. 1978) ...............................................42

*George A. Hormel & Co. v. United Food & Commercial Workers, Local 9*,
879 F.2d 347 (8th Cir. 1989) ...............................................43

*Home Indem. Co. v. Affiliated Food Distribs., Inc.*,
1997 WL 773712 (S.D.N.Y. Dec. 12, 1997) ...............................................53

*Hoteles Condado Beach v. Union De Tronquistas Local 901*,
  763 F.2d 34 (1st Cir. 1985)............................................................52, 53

*Hyman v. Pottberg's Ex'rs*,
  101 F.2d 262 (2d Cir. 1939) ................................................................53

*In re Marine Pollution Serv., Inc.*,
  857 F.2d 91 (2d Cir. 1988) ........................................................4, 35, 37–38, 45

*Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co.*,
  232 F.3d 383 (4th Cir. 2000) ......................................................52, 53

*Kashner Davidson Secs. Corp. v. Mscisz*,
  531 F.3d 68 (1st Cir. 2008).................................................................44

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
  729 F.3d 99 (2d Cir. 2013) ........................................................60, 62

*Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*,
  916 F.2d 63 (2d Cir. 1990) ........................................................4, 35, 37, 41, 49

*Morris v. N.Y. Football Giants*,
  575 N.Y.S.2d 1013 (N.Y. Sup. Ct. 1991)...........................................61

*Nat'l Hockey League Players' Ass'n v. Bettman*,
  1994 WL 738835 (S.D.N.Y. Nov. 9, 1994).......................................60

*NFLPA v. NFL*,
  88 F. Supp. 3d 1084 (D. Minn. 2015), *appeal docketed*, No. 15-1438 (8th
  Cir. Feb. 27, 2015) ...................................................................16, 49

*Pac. Motor Trucking Co. v. Auto. Machinists Union*,
  702 F.2d 176 (9th Cir. 1983) ...............................................................44

*Penn. Power Co. v. Local Union No. 272, Int'l Bhd. of Elec. Workers, AFL-
  CIO*,
  276 F.3d 174 (3d Cir. 2001) ...............................................................44

*Red Apple Supermarkets/Supermarkets Acquisitions v. Local 338 RWDSU*,
  1999 WL 596273 (S.D.N.Y. Aug. 9, 1999).......................................59

*Sears, Roebuck & Co. v. Teamsters Local Union No. 243*,
  683 F.2d 154 (6th Cir. 1982) ...............................................................43

*Supreme Oil Co. v. Abondolo*,
   568 F. Supp. 2d 401 (S.D.N.Y. 2008) ...............................................................59

*Tempo Shain Corp. v. Bertek, Inc.*,
   120 F.3d 16 (2d Cir. 1997) ............................................. 8, 33–34, 36, 52, 56–59

*Tootsie Roll Indus., Inc. v. Local Union No. 1, Bakery, Confectionery &*
   *Tobacco Workers' Int'l Union*,
   832 F.2d 81 (7th Cir. 1987) ...............................................................................44

*United Paperworkers Int'l Union v. Misco, Inc*.,
   484 U.S. 29 (1987)..........................................................................31, 35, 41, 44

*United States v. Adlman*,
   134 F.3d 1194 (2d Cir. 1998) .............................................................................55

*United Steelworkers of Am. v. Enter. Wheel & Car Corp*.,
   363 U.S. 593 (1960)..........................................................5, 30, 35–37, 40, 49

*Wackenhut Corp. v. Amalgamated Local 515*,
   126 F.3d 29 (2d Cir. 1997) ...............................................................................40

*Williams v. NFL*,
   582 F.3d 863 (8th Cir. 2009) .............................................................................60

**STATUTES**

9 U.S.C. § 10(a)(2)...............................................................................................36, 60

9 U.S.C. § 10(a)(3)......................................................................8, 34, 36, 52, 53

**OTHER AUTHORITIES**

Tom Curran, *Another NFL Leak: Smith "Hears" Brady "Destroyed Phone*,"
   CSNNE.com, July 28, 2015, *available at* http://www.csnne.com/new-
   england-patriots/another-nfl-leak-via-stephen-a-smith-tom-brady-
   destroyed-phone...................................................................................................26

ELKOURI & ELKOURI, HOW ARBITRATION WORKS (7th ed. 2012).................... 12-13

8 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2024 (3d ed.
   1998) ...................................................................................................................55

# INTRODUCTION

This case involves an attempt by NFL Commissioner Roger Goodell, sitting as an arbitrator, to affirm a player's discipline in direct contravention of specific penalties that the League had collectively bargained and announced to the players. It is undisputed that the parties' Collective Bargaining Agreement ("CBA") guarantees players notice of the potential discipline for conduct that the Commissioner deems "detrimental to the League." But the NFL insists that the CBA's "conduct detrimental" provision grants Goodell unlimited authority to discipline players however he pleases—even if that means defying the CBA requirement of notice and disregarding the collectively bargained penalties for specific misconduct.

The CBA grants Goodell no such authority. Further, as a labor arbitrator, he was bound to apply the CBA's constraints on his disciplinary powers. His obstinate refusal to do so, and his failure to observe the most fundamental requirements of fair arbitration proceedings, required the district court to vacate his award.

No player in NFL history had ever received a suspension for alleged football tampering or failing to cooperate with a League investigation. Goodell, however, issued an award affirming a four-game suspension of New England Patriots quarterback Tom Brady on this basis. In so doing, Goodell never even ***mentioned*** the applicable and ***collectively bargained*** penalty—a fine—the only penalty of which

the NFL had given notice to players. Instead, Goodell applied his own *ultra vires* remedy in defiance of the CBA.

For decades, the NFL has annually provided all players with the "League Policies for Players"—hundreds of pages defining myriad types of misconduct that the Commissioner deems "conduct detrimental." Further, for many "conduct detrimental" infractions, the NFL and the NFLPA have collectively bargained specific penalties, and the NFL has provided notice of those penalties in the applicable Player Policy. That is the situation here.

In the "Discipline for Game-Related Misconduct Policy" and its "equipment violations" provision, the NFL repeatedly provides notice—in bold, italicized type —that "***First offenses will result in fines***." Specific fine amounts have been collectively bargained with the NFLPA. But Goodell ignored the collectively bargained penalty in the applicable Player Policy, and the notice it provided, and affirmed Brady's unprecedented suspension for an alleged equipment violation.

In January 2015, the NFL announced a purportedly "independent" investigation into allegations that the Patriots improperly deflated footballs at the AFC Championship Game. The investigation's report (the "Wells Report") found it "more probable than not" that two Patriots equipment staff deflated footballs, that Brady "was at least generally aware of the[ir] inappropriate activities," and that it was "unlikely" that Patriots employees "would deflate game balls without Brady's

2

knowledge and approval." The Report did *not* find that Brady participated in or directed any ball deflation. Nevertheless, relying upon the findings above and Brady's "failure to cooperate" by declining to produce private emails and texts, NFL Executive Vice President Troy Vincent suspended Brady for four games.

Invoking Article 46 of the CBA, the NFLPA and Brady appealed, contending (among other things) that Brady lacked notice that he could be suspended even if he *had* participated in football deflation (which he categorically denied under oath)—let alone based on non-cooperation or any knowledge of *others'* "inappropriate activities." Goodell appointed himself to arbitrate the appeal. After rejecting several motions seeking to ensure fundamentally fair proceedings, he affirmed.

Remarkably, Goodell's award made *no* mention of the "Discipline for Game-Related Misconduct Policy," the collectively bargained fine schedule for "equipment violations," or the NFL's notice to all players that "*First offenses will result in fines*." Instead, he compared the alleged infraction to first-time steroids use—which *is* subject to a collectively bargained four-game suspension—and substituted his own brand of industrial justice for the applicable bargained-for fine. Not surprisingly, the district court vacated the award, holding both that it violated the "essence of the [agreement]" (SPA24)—including the notice requirement "at the heart of the CBA" (SPA29)—and that, in at least two ways, the arbitration was fundamentally unfair.

3

*Essence of the agreement.*  The NFL argues that the decision below is an affront to Goodell's "broad authority" to define "conduct detrimental."  Br. 1-2.  No one, however, challenged that authority.  Rather, this litigation concerns Goodell's "remedial discretion" as an arbitrator, which the NFL concedes must not "contradict[] the terms of the CBA."  Br. 2.  That is exactly what Goodell did.  He never mentioned the collectively bargained fine announced to players as the only potential discipline for equipment violations; rather, he simply affirmed an unannounced (and unprecedented) four-game suspension.  No principle of "deference" to labor arbitrations can justify that award.

It is black-letter labor law that, where an arbitrator "eschew[s] the remedies provided" by the parties' agreement in favor of "his [own] guiding principle of equity," an award "fail[s] to draw its essence from the contract."  *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 93-94 (2d Cir. 1988).  Arbitrators may not "'impose a remedy which directly contradicts the express language'" of bargained-for provisions.  *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990).  Indeed, this Court has repeatedly vacated awards that "fashion an alternative remedy," holding that such awards "'dispens[e] [their] own brand of industrial justice.'"  *187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir. 2005).  In short, awards that ignore bargained-for penalties announced to employees violate the "essence [of] the [CBA]," and "courts have no

4

choice but to refuse enforcement." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

Asserting that "general authority is not uncommon in labor contracts," the NFL theorizes that "the CBA 'does not require itemization'" of "specific discipline." Br. 20 (citation omitted). Here, however, the parties ***did*** itemize "specific discipline" for the "specific categor[y]" of conduct—first-time equipment violations. Under the applicable Player Policy, that discipline could only be ***a fine***. Thus, the NFL cannot credibly argue that the general language of the Player Contract provides "more than adequate notice" of Goodell's authority to "suspend" players for the same conduct. Br. 26.

The NFL asserts that whether "steroids use" or "the conduct here" is "more detrimental" is a "metaphysical question" for "the Commissioner." Br. 37. Not so. The ***parties*** have provided a concrete, collectively bargained answer to that question: For equipment violations, "***First offenses will result in fines***." As the district court recognized, Brady had clear "notice that equipment violations under the Player Policies could result in fines," but "no notice that he could receive a four-game suspension." SPA30, 21.

When, after 43 pages, the League finally discusses the Discipline for Game-Related Misconduct Policy, it accepts that "deflating game balls is an 'equipment violation,'" but then argues that courts may not second-guess an arbitrator's

5

"choice between" two "potentially applicable" CBA provisions. Br. 43-45. Goodell, however, made no such "choice"—his award said not *one word* about the governing Player Policy, the bargained-for fine, or the NFL's notice that "*First offenses will result in fines*." And "federal courts have repeatedly vacated arbitral decisions that failed to discuss probative terms." *Boise Cascade Corp. v. Paper Allied-Indus.*, 309 F.3d 1075, 1082-84 & n.9 (8th Cir. 2002).

The NFL also seeks to defend the award based on Brady's refusal to turn over private electronic communications to Wells based on his agents' advice and privacy concerns. As the NFL admits (SPA21), however, Goodell did not apportion any part of the suspension to non-cooperation—he used the non-cooperation to "draw an adverse inference" that Brady participated in football tampering. Nor is this at all surprising, as Goodell recognized that no player in NFL history had ever been suspended for non-cooperation or even obstructing an investigation. Thus, for all of its sound and fury, the "non-cooperation" issue is inextricably intertwined with the alleged equipment violation and cannot cure Goodell's fundamental failure to heed the collectively bargained penalty and the CBA's notice requirement.

**Fundamental Fairness.** The League also glosses over Goodell's basic denial of fundamental fairness to Brady.

First, Goodell denied Brady access to the investigative files of Paul, Weiss—whose role evolved "from 'independent' investigators to NFL's retained counsel"

6

at the arbitration.  SPA36.  That ruling gave the NFL's counsel "access to valuable impressions, insights, and other investigative information which was not available to Brady."  *Id*.  As the district court held, nothing could be more unfair than having the NFL's attorney—who was able to consult the investigation's library of notes— cross-examine Brady and his expert witness, while the NFLPA and Brady's counsel were denied access to the same materials.

Aware that Article 46 required the NFL to "exchange copies of any exhibits upon which [it] intend[ed] to rely," Goodell asserted that the Paul, Weiss files "played no role in the disciplinary decisions."  But since it is undisputed that the NFL exclusively "relied" on the Wells Report to discipline Brady, it follows that the NFL "relied" on the investigative materials that supplied the sum and substance of that Report.  Federal law requires that an arbitral award be set aside when essential evidence in the hands of one party is denied to another.

Second, Goodell refused to compel testimony from NFL General Counsel Jeffrey Pash, whom the NFL publicly identified as its co-lead investigator, and who edited the Wells Report.  The NFL contends that "[t]he CBA does not require the testimony of … every witness."  Br. 46-47.  But Goodell's ruling left no witness to testify about the NFL General Counsel's "potential shaping of" a "supposedly independent investigation report."  SPA35.  And it is well settled that an award must be vacated when the arbitrator "exclude[s] [non-cumulative] evidence

7

… pertinent and material to the controversy." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1997); 9 U.S.C. § 10(a)(3).

Finally, there are several alternative grounds for affirmance not reached below—including Goodell's refusal to conduct a hearing, take evidence, or permit discovery on whether he improperly delegated his "exclusive[]" disciplinary authority to Vincent, and Goodell's "evident partiality" in arbitrating a dispute over the legality of his own delegation conduct. *E.g.*, *Erving v. Va. Squires Basketball Club*, 468 F.2d 1064, 1067-68 & n.2 (2d Cir. 1972) (rejecting arguments that the district court "had no power to direct the substitution of a neutral arbitrator for the disqualified Commissioner," "in spite of the contract clause naming the Commissioner as arbitrator").

The district court was neither star-struck by "celebrity" (Br. 1) nor unaware of the legal standards for judicial review of arbitration awards. Nor did the court vacate the award based on any disagreement with the facts found by Goodell. Rather, applying settled Supreme Court and Second Circuit precedent, the court recognized that judicial deference in reviewing arbitral awards is not synonymous with a rubber stamp, and that Goodell's award had to be vacated because it was anathema to the CBA's notice requirement, specific collectively bargained remedies, and fundamental fairness. That decision should be affirmed.

8

## STATEMENT OF ISSUES

I.  Whether the award violated the essence of the parties' collective bargaining agreement, including the requirement of notice of potential discipline, by affirming a four-game suspension for a first-time equipment violation without regard to the limited fine that the NFL had collectively bargained and announced to players for such offenses.

II. Whether Goodell deprived Brady of a fundamentally fair arbitral process by (A) denying equal access to the investigative files undergirding the Wells Report, which the NFL exclusively relied upon to discipline Brady, or (B) refusing to compel the testimony of NFL General Counsel Pash concerning his role as the announced co-lead investigator and in editing the NFL's purportedly "independent" Wells Report.

III. Whether, if the Court considers alternative grounds for affirmance, it should vacate Goodell's award based on (A) his refusal to hold a hearing on whether he improperly delegated his "exclusive[]" CBA disciplinary authority to Vincent, or (B) his evident partiality in arbitrating a challenge to the legality of his own conduct in delegating his disciplinary authority.

## STATEMENT OF THE CASE

**A.    The Commissioner's CBA authority to discipline players for "conduct detrimental" to the League.**

Paragraph 15 of the collectively bargained, standard form NFL Player Contract gives the Commissioner authority to discipline players who are "guilty" of conduct he "reasonably judge[s] … to be detrimental to the League," *i.e.*, "conduct detrimental."  JA353-354.  Article 46 of the CBA provides procedures to appeal such discipline.  *Infra* at 17-18.

As the NFL recognizes, however, Paragraph 15 and Article 46 merely recite the Commissioner's "general authority"; they neither define "conduct detrimental" nor "specify any presumptive or maximum discipline for engaging in such conduct."  Br. 39, 6.  The Player Contract offers only a few examples of conduct detrimental (*e.g.*, taking steroids and associating with gamblers).  JA353-354.  And apart from authorizing the Commissioner to impose up to "indefinite[]" suspensions and "reasonable" fines, the Player Contract provides no notice of the discipline for particular conduct.  *Id.*

**B.    The Player Policies and the collectively bargained penalties for game-related player misconduct.**

It is undisputed that the CBA affords players a right to notice of both "prohibited conduct and potential discipline."  ECF No. 4318214 at 1, *NFLPA v. NFL*, No. 15-1438 (8th Cir. Sept. 18, 2015) ("NFL 28(j) Letter").  Because neither the Player Contract nor Article 46 satisfies this requirement, the NFL promulgates the

10

League Policies for Players ("Player Policies") (JA366-503) and annually distributes them to players. The Player Policies include fourteen separate policies addressing various types of misconduct. For example, one policy addresses "Personal Conduct" (such as domestic violence), another "Steroids," another "Gambling," and still another—the one relevant here—"Discipline for Game-Related Misconduct." JA368-369.

Like the Player Contract and Article 46, the Player Policies cite the Commissioner's general CBA authority to "impose fines and other appropriate discipline, up to and including suspension or banishment … for conduct detrimental." JA370. The Player Policies go on, however, to provide notice of specific misconduct, including—for many infractions—notice of the ***collectively bargained penalties***. *E.g.*, JA483 (four-game suspension for first-time steroid users).

The Discipline for Game-Related Misconduct Policy contains the "Game-Related Player Conduct Rules." JA381-390. These rules govern "equipment, uniform, or On Field violations," and first address "use [of] unauthorized foreign substances (*e.g.*, stickum or slippery compounds) on [a player's] body or uniform." JA384. Under the collectively bargained "Schedule of Fines" for such violations, players may be fined $8,268 for first offenses and $16,537 for second offenses. JA389. Although these infractions "affect[] the integrity of the competition" and

11

inherently involve efforts to evade referee detection (JA384), the Policy does not provide for suspensions.

The same section of the Game-Related Player Conduct Rules then addresses "Other Uniform/Equipment Violations." *Id.* That provision unambiguously states —*twice*, in bold-faced, italicized type—that "***First offenses will result in fines***." *Id*. The collectively bargained penalties for this behavior—which, as the NFL accepts (Br. 45), includes ball tampering—are $5,512 and $11,025 fines, for first and second offenses, respectively. JA389. The Player Policies do not provide for suspensions for such infractions.

### C. Players' CBA right to notice of both prohibited conduct and the disciplinary consequences.

The NFL publishes the Player Policies for a simple reason: Advance notice of disciplinary consequences is required by the CBA. As the NFL wrote to the Eighth Circuit concerning the decision below: "The CBA requirement for which the NFLPA cites *Brady*—that players are entitled to general notice of 'prohibited conduct and potential discipline'—is not in dispute." NFL 28(j) Letter at 1. Indeed, Goodell himself testified that he is "required to give proper notification" of player "discipline." JA1349 (*Rice* Tr. 100:12-14); *see also id.* 101:7-13; JA1322.

This notice requirement is not unique to the CBA. Under black-letter labor law, "[a]n employee must receive clear notice of both what the employer expects as well as the range of penalties that may be imposed." Elkouri & Elkouri, How

12

ARBITRATION WORKS 15-71 (7th ed. 2012). In the NFL, the CBA's notice requirement has been recognized for decades, in an unbroken line of arbitrations—*i.e.*, the "law of the shop."

For example, more than 20 years ago, an NFL arbitrator vacated a team's discipline because the player was "deprived" of "notice as to what consequences would flow from his [actions]." JA1245 (*Langhorne*). "Any disciplinary program," the arbitrator held, "requires that individuals subject to that program understand, with reasonable certainty, what results will occur if they breach established rules." *Id*. Similarly, in 2000, an arbitrator vacated the discipline of a player who lacked "adequate notice," holding that, "to be enforceable," NFL rules "must clearly and unambiguously establish the scope of prohibited conduct, as well as the consequences of violations." JA1293, 1287 (*Brown*).

Likewise, in 2009, an arbitrator vacated a player's discipline due to "the absence of clear notice" and the "longstanding practice" of treating similar conduct more leniently, over the NFL's arguments that "the only real difference between the [old and new rule] was the amount of the maximum fine." JA1276, 1272 (*Coles*). And in 2012, while serving as arbitrator, former NFL Commissioner Paul Tagliabue—the League's longest-tenured Commissioner—"vacate[d] all discipline to be imposed upon [four players]," principally because they were not given a "clear understanding" of their potential discipline. JA1295, 1308 (*Bounty*).

13

**D. Commissioner Goodell's history of disregarding players' right to notice.**

Since 2012, Goodell's disciplinary actions against players have been overturned by (i) a former Commissioner (*Bounty*); (ii) a retired Southern District of New York judge (*Rice*); (iii) a federal district court (*Peterson*); (iv) Goodell's former Executive Vice President for Labor Relations (*Hardy*); and (v) the court below. Each decision found that Goodell's "conduct detrimental" authority was constrained by the CBA notice requirement.

***"Bounty."*** In 2012, Goodell disciplined four New Orleans Saints players for allegedly engaging in a "bounty" program encouraging violent in-game hits and in one case for allegedly obstructing the NFL's investigation. JA1294-1295. Goodell designated former Commissioner Tagliabue to arbitrate the appeal. Tagliabue vacated each player's suspension. Explaining that only teams—"not players"—had ever been penalized for alleged "bounty programs," he held that it would be "selective, ad hoc, or inconsistent" to discipline players without giving them advance notice. JA1299, 1296. And as to the player whom Goodell found to have obstructed the NFL's investigation, Tagliabue explained that, in "forty years of association with the NFL," "[t]here is no evidence of a record of past suspensions based purely on obstructing a League investigation." JA1306.

***Rice.*** In July 2014, Ray Rice was involved in a widely publicized incident in which he struck his fiancée in an elevator. Later, a video of Rice emerging from

14

the elevator, with his fiancée unconscious on the floor, went viral.  Goodell suspended Rice for two games—the historical maximum for first-time domestic violence offenses under the Personal Conduct Policy (JA1320 n.4)—as Goodell "ha[d] to make decisions that [were] fair and consistent with … prior case law." JA1394-1395 (Tr. 384:25-386:6) (Birch).

Months later, a second video became public showing Rice striking his fiancée inside the elevator.  Hoping to quiet the outcry over the initial two-game suspension, Goodell suspended Rice indefinitely.  JA1322.  Because Goodell's justification for disciplining the same conduct twice was at issue, he recused himself and designated retired Judge Barbara Jones as arbitrator.

Judge Jones vacated Rice's second suspension as "arbitrary."  JA1332.  Further, in considering a new and more stringent Personal Conduct Policy promulgated after the Rice incident, she held that "even under the broad deference afforded to [Goodell] through Article 46, he could not retroactively apply the new presumptive penalty to Rice."  JA1331.  In support, she cited Goodell's sworn testimony that he is "required to give proper notification" of player "discipline" before imposing a new penalty.  JA1322; JA1349 (Tr. 100:12-14).

*Peterson.*  Undaunted, Goodell defied the notice requirement yet again.  In September 2014, Adrian Peterson was criminally charged with excessive corporal punishment of his son.  Retroactively applying the harsher penalties of the new

Personal Conduct Policy, Goodell suspended Peterson for a minimum of six games. *NFLPA v. NFL*, 88 F. Supp. 3d 1084, 1088 (D. Minn. 2015) (*Peterson*), *appeal docketed*, No. 15-1438 (8th Cir. Feb. 27, 2015).

The NFLPA appealed and Goodell tapped Harold Henderson—who had spent 16 years as the NFL's Executive Vice President for Labor Relations—as arbitrator. Faced with "'the pure legal issue' of whether the New Policy could be applied retroactively"—*i.e.*, the question Judge Jones had already answered "no"— Henderson nonetheless sustained the suspension. *Id.* at 1090-91.

The NFLPA successfully sought vacatur under the LMRA. A federal court in Minnesota held that Henderson's award violated the "essence of the CBA" by ignoring "the established law of the shop," which "unequivocally recognized" players' contractual right to advance notice of the discipline for their behavior. *Id.*

***Hardy.*** In April 2015, Goodell ***again*** applied the new Personal Conduct Policy retroactively, this time suspending Greg Hardy for ten games for alleged domestic violence occurring three months before the new Policy was announced. The NFLPA appealed, and even Arbitrator Henderson would not affirm Goodell's suspension, reducing it to four games because ten games was "simply too much … of an increase over prior cases without notice." JA1344.

16

### E. Article 46 procedures for arbitration appeals of Commissioner discipline.

Conduct detrimental discipline may be imposed "only after giving [the] Player the opportunity for a hearing." JA353-354 (Player Contract). Article 46 of the CBA provides procedures for such appeals, which either the Commissioner or his designee arbitrates. JA345-346 § 2(a).

Under Article 46, the parties must "exchange copies of any exhibits upon which they intend to rely" at the hearing. JA346 § 2(f)(ii). Article 46 arbitrators have held that, if the NFL relies on an investigative report in imposing discipline, then it must produce the underlying investigative materials. *E.g.*, JA1186-1189 (*Bounty*) (ordering production of NFL investigative reports). Moreover, Article 46 arbitrators must "compel[] the witnesses necessary for the hearing to be fair." JA1162 (*Rice*). This includes the right to compel testimony from investigators and even the Commissioner. *Id.*; *see also* JA1159 (*Bounty*) (compelling an NFL investigator and Saints personnel to testify).

Whereas Article 46 permits the Commissioner to delegate his role as ***arbitrator***, his role as ***disciplinarian*** is "exclusive[]" and may not be delegated. *Compare* JA353-354 *with* JA345-346 §§ 1(a), 2(a). As Commissioner Tagliabue has held: "The use of the word 'exclusively' [in Article 46] demonstrates the parties' intent that the Commissioner, and only the Commissioner, will make the

17

determination of conduct detrimental." JA1330. Accordingly, Goodell's assignment to Vincent of the role of disciplining Brady violated the CBA.

### F. The 2015 AFC Championship Game and the NFL's lack of procedures for testing for football deflation.

Before the AFC Championship Game, the Indianapolis Colts sent an e-mail to the NFL accusing the Patriots of deflating footballs. JA139-140. But the NFL had no protocols to test for ball pressure tampering. JA1007-1008 (Vincent); JA1021, 1028, 1034 (Wells).

After the Colts again complained during the game, the referees—at the direction of Vincent—measured the pressure of both teams' footballs at halftime. JA159, 161. The Patriots balls were below the 12.5 PSI minimum. JA103.[1] Vincent later testified that, at the time, no one involved understood that, under the Ideal Gas Law, environmental factors alone—*e.g.*, the cold, rainy weather at the game—would predictably cause significant deflation, potentially explaining the measurements. JA1007-1008 (Vincent); *see also* JA1028 (Wells).

Accordingly, the NFL never recorded the data necessary to understand **why** the Patriots balls deflated below 12.5 PSI (*e.g.*, timing, temperature, and wetness). JA1007-1008 (Vincent); JA1021, 1034 (Wells). To render opinions on whether the balls were tampered with, the League's scientific consultants had to make myr-

---

[1] All four Colts balls tested also measured below their (assumed) pre-game pressure measurements, and on one of the two gauges used at halftime, three of the four Colts balls tested **below** the 12.5 PSI minimum. JA103.

iad, uncertain assumptions about missing information.  JA107, 146-147.  As the NFL's investigators conceded, the failure to record the necessary data meant that "undue weight" could not be given to the "experimental results"—which were "dependent upon assumptions and information that is uncertain"—and "varying the applicable assumptions can have a material impact on the ultimate conclusions." JA226.

Whatever the cause, not even the NFL suggests that the alleged deflation affected the game's outcome.  "Brady's performance in the second half of the AFC Championship Game—after the Patriots game balls were re-inflated—improved." JA217 n.73.  The Patriots won by 38 points.

### G.    The Pash/Wells investigation and the Wells Report.

On January 23, 2015, the NFL announced an investigation into "whether the footballs used in last Sunday's AFC Championship Game complied with the [League's] specifications."  JA1198.  The press release stated that this investigation would be "led jointly by NFL Executive Vice President [and General Counsel] Jeff Pash and Ted Wells" of the Paul, Weiss law firm.  *Id*.  According to the press release, "Wells and his firm br[ought] … a valuable *independent* perspective" to the investigation.  *Id*. (emphasis added).

Paul, Weiss regularly represented the NFL.  For example, the NFL paid Paul, Weiss over $7 million to defend it in ongoing concussion-related litigation.

JA1203.  As of Brady's arbitration, Paul, Weiss had billed the League $2.5-$3 mil-

lion for work on the Pash/Wells investigation.  JA1019 (Tr. 279:5-13) (Wells).

Most notably, Paul, Weiss was co-arbitration counsel for the NFL in defending

Brady's four-game suspension—thus ending any pretense of "independence."

JA1016 (Tr. 267:15-268:12) (Wells).  Further, Wells testified that NFL General

Counsel Pash provided comments and edits on a draft of the Wells Report, alt-

hough Wells did not know what edits Pash made.  JA1016 (Tr. 268:13-269:21).

All 66 witnesses interviewed during the investigation denied knowledge of

any ball tampering.  JA119-122; JA1030-1031 (Tr. 325:21-326:11) (Wells); JA962

(51:4-16), 968 (75:4-25), 973 (95:12-97:11) (Brady).  And the NFL admitted that it

uncovered no "direct" evidence connecting Brady to any ball tampering.  JA1421

(Aug. 12, 2015 Tr. 22:3-9).

Wells interviewed Brady for seven hours and found him "totally coopera-

tive."  JA1034 (Tr. 340:24-341:9).  The only request that Brady declined was pro-

ducing his private electronic communications, on the advice of his agents (who are

lawyers), but Brady answered all questions about those communications.  JA970

(Tr. 84:18-85:9), 971-972 (89:24-90:9) (Brady).  In addition, he had no notice that

declining to produce the communications could lead to discipline.  As Wells testi-

fied: "I want to be clear—I did not tell Brady at any time that he would be subject

to punishment for not giving—not turning over the documents. I did not say anything like that." JA1033 (Tr. 336:15-23).

On May 6, 2015, Paul, Weiss issued the "Wells Report" summarizing the investigation's findings. The Report found it "more probable than not" that two Patriots equipment employees—John Jastremski and Jim McNally—"participated in a deliberate effort to release air from Patriots game balls after the balls were examined" before the Championship game. JA97.

Concerning Brady, however, the Report's findings were far more limited, concluding only that it was "more probable than not that Brady was at least generally aware of the inappropriate activities of McNally and Jastremski." JA112, 97. In support, Wells surmised that it was "unlikely" that Patriots equipment staff "would deflate game balls without Brady's knowledge and approval," or his "awareness and consent." JA114. These findings were not tied to the AFC Championship Game. JA111-112. Nor did the Report find that Brady himself participated in or directed ball deflation at **any** game—only that he was cognizant of others' "inappropriate activities." JA112.

## H.     Troy Vincent's four-game suspension of Brady.

Goodell then announced—contrary to the CBA—that he was appointing Vincent to discipline Brady. JA1207. Vincent's disciplinary letter to Brady announced a four-game suspension:

21

> With respect to your particular involvement, the [Wells Report] established that there is substantial and credible evidence to conclude you were at least generally aware of the actions of the Patriots' employees involved in the deflation of the footballs and that it was unlikely that their actions were done without your knowledge.

JA329.   Vincent also cited Brady's decision not to "cooperate" by declining to produce his private electronic communications.  *Id.*

Vincent testified that he based Brady's discipline exclusively on the Wells Report.  JA1010 (Tr. 242:21-243:10, 244:19-245:2).

## I.    Brady's arbitration appeal.

The NFLPA appealed under Article 46.   Goodell served as arbitrator and proceeded to deny multiple NFLPA pre-hearing motions.

### 1.    Goodell denies the NFLPA's improper delegation argument without a hearing.

Without honoring Brady's CBA right to a hearing (JA353-354), Goodell denied the first ground for appeal: improperly delegating his "exclusive[]" disciplinary authority to Vincent.  JA1118; SPA67-69; JA345 § 1(a).  In the NFL's words, Goodell "deci[ded] not to hear evidence" on this subject.  NFL Mem. of Law, ECF No. 35 at 12.  Instead, he declared "facts" about his own conduct and ruled that it was CBA-compliant:

> *I* did not delegate my disciplinary authority to Mr. Vincent; *I* concurred in his recommendation and authorized him to communicate to Mr. Brady the discipline imposed under *my* authority as Commissioner.

SPA67 (emphases added).  To challenge these "findings," the NFLPA moved to compel Goodell's and Vincent's testimony about the delegation issue.  JA1137-1138.  Goodell denied this motion too, asserting that his findings about his own conduct rendered a hearing unnecessary.  SPA62-63.

### 2.     Goodell denies the NFLPA's recusal motion.

The NFLPA moved for Goodell's recusal based on precedent—judicial and arbitral (*Bounty* and *Rice*)—that he could not arbitrate the legality of his own delegation conduct.  JA1121-1130.  Despite Goodell's "evident partiality" under these circumstances, he concluded that the CBA gives him discretion to serve as Article 46 arbitrator no matter how involved he might be in the factual underpinnings of the controversy.  SPA67-69.

### 3.     Goodell denies the NFLPA the right to examine co-lead investigator Pash.

The NFLPA moved to compel Pash's testimony concerning his role as co-lead investigator.  Goodell denied the motion, declaring that Pash merely "facilitat[ed] access by Mr. Wells to witnesses and documents."  SPA63.  But Wells testified that Pash edited the Wells Report—a role inconsistent with mere facilitation.  JA1016 (Tr. 268:13-269:21); SPA60 n.21.

### 4.     Goodell denies the NFLPA equal access to Paul, Weiss's investigative files.

Finally, Goodell denied the NFLPA's motion to compel production of the Paul, Weiss investigative files.  SPA64-66.  According to Goodell, those files

23

"played no role in the disciplinary decisions; the Wells Report was the basis for those decisions." SPA65. But Vincent exclusively relied upon the Wells Report to impose discipline, and the investigative files were the basis of that Report. Moreover, the NFL's arbitration co-counsel—Paul, Weiss—was free to use the files, and Goodell did not attempt to reconcile his ruling with Article 46 precedent compelling production of investigative files. *Compare* SPA64-66 *with supra* at 17 (*Bounty* and *Rice*).

### J. The Article 46 hearing.

The arbitration was held on June 23. It established, as Goodell would later find, that "no player may have been suspended before for tampering with game footballs or obstructing an investigation." SPA55. In fact, in all known prior incidents of ball tampering, only Clubs or Club personnel—not players—were disciplined. In 2009, for example, the NFL suspended a New York Jets equipment employee for "attempt[ing] to use unapproved equipment to prep the K[icking] Balls" to "gain a competitive advantage." JA1194. In 2014, ball boys were caught warming Minnesota Vikings footballs during a frigid game, but the League sent a warning only *to the Club*. JA1208. And in 2015, when Green Bay Packers quarterback Aaron Rodgers publicly stated that he "like[s] to push the limit to how much air we can put in the football, even go over what they allow you to do and see if the offi-

cials take air out of it" (JA1209), the League did not even ***question*** him—or anyone else. JA1011 (Tr. 248:13-16) (Vincent).

Brady testified that he knew nothing about the alleged deflation and believed it did not occur. JA962 (Tr. 51:4-16), 968 (75:4-25), 973 (95:12-97:11). He also testified that he did not know that he could be punished for not disclosing his personal electronic communications, and that, if he had been notified, he would have provided those communications. JA971 (Tr. 86:8-20).

During the arbitration, Brady produced his e-mails and phone records. There was not one relevant email. NFLPA Am. Answer, Ex. 2, ECF No. 28-9–28-19. With respect to text communications, Brady testified that he could not locate the phone(s) used during the relevant time period—which he had not been asked to produce—because of his longstanding practice of recycling phones due to his and his wife's celebrity status and privacy concerns. JA971 (Tr. 87:7-88:6), 972 (90:11-91:9). To address this, Brady produced his phone bills, which logged each and every text and phone call that he sent or received during the relevant period. As those records established, all of Brady's text communications with Patriots equipment staff were already in Paul, Weiss's possession. NFLPA Am. Answer, Ex. 1, ECF No. 28-1–28-8; JA125 n.5. None of these facts deterred the NFL from suggesting that Brady nefariously "destroyed" incriminating evidence—an accusation that Brady categorically denied but is irrelevant here.

### K.    Goodell's arbitral decision.

On July 28, the NFL leaked that the arbitration had allegedly revealed that Brady had destroyed his cell phone.[2]  Within hours, with the public inflamed by the leak, Goodell affirmed the four-game suspension.  Less than an hour later, the NFL filed this lawsuit seeking to confirm the award.

Goodell's 20-page award made no mention of the Discipline for Game-Related Misconduct Policy, the collectively bargained schedule of fines for equipment violations, or the Policy's unequivocal language that "***First offenses will result in fines***."  JA384.  Goodell nowhere discussed his basis for ignoring the applicable Policy or reconciled that failure with the CBA notice requirement.  Rather, he sought to justify Brady's suspension by reference to the four-game suspensions imposed on first-time violators of the bargained-for Steroid Policy.  SPA57.

The award also ignored that Vincent's discipline of Brady was based exclusively on the Wells Report's limited findings about his "general awareness" of the "inappropriate activities" of others.  Instead, in a "quantum leap" (JA1458) from the Wells Report, Goodell repeatedly described Brady as having "participated" in a conspiratorial "scheme"—findings that appear ***nowhere*** in the 139-page Wells Report or Vincent's disciplinary letter.  SPA48-49, 51, 54-56.  And while acknowl-

---

[2] Tom Curran, *Another NFL Leak: Smith "Hears" Brady "Destroyed Phone*," CSNNE.com, July 28, 2015, http://www.csnne.com/new-england-patriots/another-nfl-leak-via-stephen-a-smith-tom-brady-destroyed-phone.

edging that "no player may have been suspended before for … obstructing an investigation" (SPA55), Goodell ignored Wells' testimony that he "did not tell Mr. Brady at any time that he would be subject to punishment for … not turning over the documents." JA1033 (Tr. 336:15-23).

### L. The decision below.

"[F]ully aware of the deference afforded to arbitral decisions," the district court denied the NFL's motion to confirm the award, and granted the NFLPA's motion to vacate, citing "several significant legal deficiencies." SPA20.

### 1. The award violated the essence of the CBA.

Recognizing that the notice requirement "is at the heart of the CBA"—and that "the 'law of the shop'" requires "provid[ing] professional football players with advance notice of prohibited conduct and potential discipline"—the court held that Goodell violated the essence of the CBA in several ways. SPA29, 19-32.

First, Brady had "no notice" that his alleged conduct could result in "[a] suspension as opposed to [a] fine." SPA28. Citing the collectively bargained "Schedule of Fines," the applicable "fine of $5,512," and the Game-Related Player Conduct Rules' unequivocal statement that "***First offenses will result in fines***," the court held that Brady was only "on notice that equipment violations under the Player Policies could result in fines." SPA28, 30. By contrast, the Steroids Policy cited by Goodell "sets forth in great detail 'testing procedures,'" various player

27

rights, and the collectively bargained penalty of a four-game suspension for first-time violations.  SPA22.  Thus, "no player" in Brady's shoes "reasonably could be on notice that [his] discipline would (or should) be" comparable to a four-game suspension for first-time steroids use.  SPA23-24.

Second, insofar as Brady's discipline was based on awareness of ***others'*** misconduct—the findings of the Wells Report and Vincent's disciplinary letter— "no NFL policy or precedent notifies players that they may be disciplined (much less suspended)" on this basis.  SPA27.

Third, noting the NFL's admission that Goodell did not specify "what portion of Brady's discipline was attributable to alleged ball tampering and what discipline was attributable to non-cooperation" (SPA21), the court found that, in any event, Brady had "no notice of a four-game suspension" for non-cooperation.  SPA24-25, 27 n.18.  The court cited Wells' admission that he gave Brady no notice of potential discipline for non-cooperation and the "forty years" without a player being suspended for obstruction.  SPA24-25 (citations omitted).

Finally, insofar as Goodell "reli[ed] on notice of broad CBA 'conduct detrimental' policy—as opposed to specific Player Policies regarding equipment violations"—that reliance was "legally misplaced."  SPA32.  Under Second Circuit law, Goodell could not rely on "a general concept such as 'conduct detrimental'" to override "an applicable specific provision within the Player Policies."  *Id.*

## 2.    The award defied fundamental fairness.

The district court also held that, in two independent respects, the award rested on a fundamentally unfair arbitral process.

First, denying the NFLPA the opportunity to examine Pash unfairly "foreclosed [Brady] from exploring … whether the Pash/Wells Investigation was truly 'independent.'"  SPA35.  As Judge Berman recognized, because Wells "did not know the content of Mr. Pash's pre-release edits," "there was simply 'no reasonable basis for [Goodell] to determine that … [Pash's] testimony would be cumulative,'" and Brady was "prejudiced," as no other witness could "address the substantive core of the claim."  *Id.* (citations omitted).

Second, by denying the NFLPA access to the investigative files of Paul, Weiss—whose role evolved "from 'independent' investigators to NFL's retained counsel" at the arbitration—Goodell gave the NFL's counsel "greater access to valuable impressions, insights, and other investigative information which was not available to Brady."  SPA36.  Citing the arbitrator's "affirmative duty … to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other party," the court found that Wells' testimony "failed to

put Brady 'in the same position as the document[s] would [have],'" providing yet another ground for vacatur. SPA36-37 (citations omitted).[3]

## SUMMARY OF ARGUMENT

**I.A.** By ignoring the parties' collectively bargained and announced remedy for equipment tampering (a fine), and issuing an award that "fashion[ed] an alternative remedy" more to his own liking (a four-game suspension), Goodell violated the essence of the CBA notice requirement and "'dispense[d] his own brand of industrial justice.'" *Fishman*, 399 F.3d at 527 (citations omitted). Goodell analogized Brady's alleged conduct to steroid use, which *is* subject to a collectively bargained four-game suspension. However, he never mentioned the Discipline for Game-Related Misconduct Policy, the applicable collectively bargained fine, or the NFL's repeated notice to players that, for equipment tampering such as ball deflation, "*First offenses will result in fines*." JA384. Under longstanding Supreme Court precedent, "courts have no choice but to refuse enforcement" of arbitral awards that ignore bargained-for remedies. *Enter. Wheel*, 363 U.S. at 597.

---

[3] Having vacated Brady's suspension on three independent grounds, the district court did not decide whether the award should also be vacated because (i) it was fundamentally unfair for Goodell to deny Brady's delegation argument without a hearing, (ii) Goodell was "evidently partial" concerning the legality of his own delegation conduct, or (iii) the admitted absence of essential ball testing data rendered Brady's punishment legally incompatible with the CBA requirement of fair and consistent treatment. SPA38-39.

Citing the Commissioner's "general authority" to suspend players for "conduct detrimental," the NFL asserts that "the CBA 'does not require itemization'" of "the specific discipline that may be imposed" for "'specific categories of misconduct.'" Br. 39, 20 (citations omitted). But "parties … may limit the discretion of the arbitrator" in assessing "sanction[s]" (*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 41 (1987)), and the parties here did just that. They collectively bargained a fine for first-time equipment violations—the only penalty for which the NFL provided notice.

Try as it might, the NFL cannot sweep under the rug the Discipline for Game-Related Misconduct Policy, the collectively bargained fines schedule, or the fact that players' only notice of the penalty for ball or other equipment tampering is found in the Player Policies. The NFL misleadingly asserts that the "parties are typically unable to contemplate in advance what specific remedy should be awarded to meet a particular contingency." Br. 39 (quotations omitted). But whatever is "typical[]," the parties here ***did*** contemplate, bargain for, and announce the "specific remedy" that applies to the "particular" conduct at issue—a fine. *Id*.

The argument that Goodell made a "choice" between two CBA provisions—choosing the "more general" over the "more specific" (NFL Br. 45, 43)—is fanciful. Although the NFL acknowledges that the equipment violations provision is "potentially applicable" (Br. 43), Goodell's award never ***mentioned*** the relevant

Player Policy, the equipment violations provision, or the governing fine, let alone interpreted them not to apply. Further, nothing in the Commissioner's "general conduct detrimental authority" allows him to override a collectively bargained fine announced to every player. Indeed, the effect of a collectively bargained and announced fine schedule is to ***limit*** the Commissioner's remedial discretion under Article 46. Having defied this limitation, Goodell's award must be set aside.

**I.B.** Even if Brady had notice that he could be suspended for participating in ball tampering, it would still be necessary to affirm. The Wells Report, which Vincent testified was the sole basis for the discipline, did not find that Brady engaged in ball tampering—only that he was cognizant of the "inappropriate activities" of ***others***. There is simply no plausible argument, and the NFL does not assert, that any NFL Policy or CBA provision notified Brady that he could be suspended for mere "knowledge" or even "approval" of "misconduct by others." SPA26-27. Indeed, the Player Contract states that a player may be disciplined by the Commissioner only if "he" is found "guilty" of conduct detrimental. JA353-354. Thus, no NFL player has ever been disciplined for "knowing" or "approving" of others' "conduct detrimental."

**I.C.** Goodell's award also may not be confirmed based on the argument that Brady failed to cooperate with, or even obstructed, the investigation. As the NFL admits, Goodell did not apportion the discipline between Brady's alleged obstruc-

32

tion and his alleged involvement with ball tampering. SPA21. Instead, Goodell relied on the non-cooperation to "draw an adverse inference" about Brady's awareness of ball tampering. SPA54. Thus, the non-cooperation issue is inextricably intertwined with the alleged equipment violation.

Even if Goodell had attributed part of Brady's suspension to non-cooperation, that part of the award would still violate the CBA's notice requirement. As Wells testified: "I want to be clear—I did not tell Mr. Brady at any time that he would be subject to punishment for not giving—not turning over the documents." JA1033 (Tr. 336:15-23). Moreover, no player in NFL history had ever been suspended for obstructing an NFL investigation. As former Commissioner Tagliabue, serving as arbitrator, explained based on his "forty years of association with the NFL": "There is no evidence of a record of past suspensions based purely on obstructing a League investigation." JA1306 (*Bounty*). Thus, Brady had no notice he could be suspended for any failure to cooperate or purported obstruction.

**II.** The decision below should also be affirmed because the arbitral proceedings failed even the minimum requirements of fundamental fairness. "[A]n arbitrator 'must give each [party] … adequate opportunity to present its evidence and argument'"; and if an arbitrator excludes non-cumulative evidence "pertinent and material to the controversy," his award must be set aside. *Tempo Shain*, 120 F.3d

at 20-21; 9 U.S.C. § 10(a)(3).  As the district court held, Goodell violated this requirement in two respects.

**II.A.**  First, Goodell denied Brady equal access to the investigative files relied upon by Paul, Weiss, announcing that they "played no role in the disciplinary decisions."  SPA65.  But Article 46 expressly required the NFL to "exchange copies of any exhibits upon which [it] intend[ed] to rely" (JA346 § 2(f)(ii)); and since it is undisputed that Vincent "relied" on the Wells Report as the sole basis for disciplining Brady, it follows that the NFL "relied" on the underlying investigative materials.  It was fundamentally unfair to permit only the NFL's counsel to have access to those materials for the arbitration.

**II.B.**  Second, although an NFL press release and the Wells Report announced that the investigation was being "led jointly by NFL Executive Vice President Jeff Pash and Ted Wells" (JA1198; JA96), Goodell refused to compel Pash's testimony.  Goodell stated that Pash was a mere "facilitat[or]."  SPA63.  Yet Wells testified that Pash *edited* the Report (JA1016)—which is not a "facilitat[or's]" role.  Nor could anyone else testify to what edits Pash made.  *Id.*  Thus, there is no "reasonable basis" to conclude that Pash's critical testimony would have been "cumulative."  *Tempo Shain*, 120 F.3d at 20-21.

**III.A-B**.  Should the Court reject the above grounds for vacatur, the case should be remanded or, alternatively, affirmed on other grounds.  First, Goodell's

refusal to conduct a hearing on whether he improperly delegated his "exclusive[]" disciplinary authority to Vincent defied both fundamental fairness and the CBA. Conduct detrimental discipline may be imposed "only after giving Player the opportunity for a hearing." JA353-354. Goodell, however, "deci[ded] not to hear evidence" on this issue (NFL Mem. of Law, ECF No. 35 at 12)—he simply announced the "facts" of his own delegation conduct.

Second, Goodell was bound by the statutory prohibition of evident partiality, and no reasonable person would believe that Goodell could impartially arbitrate the legality of his own delegation of authority. The fact that the CBA "nam[ed] the Commissioner as arbitrator" did not immunize Goodell from being "disqualified" from arbitrating his own conduct. *Erving*, 468 F.2d at 1067, 1068 & n.2.

## STANDARD OF REVIEW

Although arbitration awards are accorded deference by the courts, an award that "eschew[s] the remedies provided" in collectively bargained provisions "fail[s] to draw its essence from the contract." *Marine Pollution*, 857 F.2d at 93-94. "[C]ourts have no choice but to refuse enforcement" of such awards. *Enter. Wheel*, 363 U.S. at 597. The same is true of arbitral decisions that "fail[] to discuss a probative contract term" (*Boise Cascade*, 309 F.3d at 1084) or "ignore the plain language of the contract" (*Misco*, 484 U.S. at 38). Courts need not defer to an arbitrator's "noises of contract interpretation." *Leed*, 916 F.2d at 65.

35

Awards must also be vacated where the arbitrator "exclude[s] [non-cumulative] evidence ... pertinent and material to the controversy" (*Tempo Shain*, 120 F.3d at 20; 9 U.S.C. § 10(a)(3)) or "exceed[s] the scope of the [parties'] submission" (*Enter. Wheel*, 363 U.S. at 597). Further, arbitrators are bound by the prohibition on "evident partiality" (9 U.S.C. § 10(a)(2)), which applies where a reasonable person would conclude that the arbitrator could not rule impartially (*Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007)).

## ARGUMENT

### I. Goodell's award violated the essence of the parties' agreement.

As the district court held, Brady had "no notice that he could receive a four-game suspension" for his alleged misconduct—only "notice that equipment violations under the Player Policies could result in fines." SPA21, 30. Goodell could conclude otherwise only by ignoring the plain language of numerous constraints on his arbitral authority—the Discipline for Game-Related Misconduct Policy, the collectively bargained "Schedule of Fines," and the NFL's express notice that, for players' equipment tampering, "***First offenses will result in fines***." JA384. In upholding Brady's discipline, Goodell violated both bargained-for CBA remedies and the undisputed notice requirement "at the heart of the CBA"—*i.e.*, the "essence of the agreement." SPA29.

36

According to the NFL, "an arbitrator's discretion is 'especially' broad when he is fashioning a remedy." Br. 32 (citation omitted). But even where an arbitrator is "formulating remedies," "courts have no choice but to refuse enforcement" of awards that reflect "an infidelity to th[e] obligation" to "draw [their] essence from the collective bargaining agreement." *Enter. Wheel*, 363 U.S. at 597. "This rule applies not only to the arbitrator's substantive findings, but also to his choice of remedies." *Leed*, 916 F.2d at 65.

Accordingly, where bargaining produces a specific remedy for a specific type of misconduct and that remedy is announced to the employees, an arbitrator may not "impose a remedy which directly contradicts the express language." *Id*. Nor may an arbitrator "eschew[] the remedies provided" in collective bargaining in favor of "his [own] guiding principle of equity." *Marine Pollution*, 857 F.2d at 93 (quotations omitted). An award that does so "fail[s] to draw its essence from the contract" (*id*. at 94), and an arbitrator who "fashion[s] an alternative" to a collectively bargained remedy "'dispense[s] his own brand of industrial justice.'" *Fishman*, 399 F.3d at 527 (citation omitted).

These Second Circuit decisions—all of which vacated arbitral awards—compel affirmance. The applicable Player Policy provided notice of "the specific discipline that may be imposed" for the "specific categor[y] of misconduct" here (NFL Br. 20)—equipment tampering. Thus, Goodell could not ignore the applica-

ble collectively bargained fines—or Brady's lack of notice—in affirming a four-game suspension.

### A. The award ignores that the Discipline for Game-Related Misconduct Policy specifies a fine for first-time football tampering.

1. This case involves a textbook example of an arbitrator "eschew[ing] the remedies provided" in bargaining in favor of "his [own] guiding principle of equity." *Marine Pollution*, 857 F.2d at 93. In upholding Brady's suspension, Goodell did not even ***acknowledge*** the applicable collectively bargained remedy for equipment violations. Thus, this Court should again join the long line of "federal courts [that] have repeatedly vacated arbitral decisions that failed to discuss probative terms." *Boise Cascade*, 309 F.3d at 1084 & n.9.

It is undisputed that the NFL annually distributes to every player numerous Player Policies detailing categories of conduct detrimental and, in many cases, providing a collectively bargained list of penalties for specific infractions. JA366-503. That is the situation here: The League's Discipline for Game-Related Misconduct Policy (JA371) provides players with notice of the Game-Related Player Conduct Rules (JA381) and penalties governing such player misconduct, including equipment tampering. JA384.

Noting that such misconduct "can give a team an unfair advantage," the provision on uniform and equipment tampering addresses both violations involving "unauthorized foreign substances (*e.g.*, stickum or slippery compounds)" and all

38

"Other Uniform/Equipment Violations." *Id.* For the latter, the Policy states— twice—"***First offenses will result in fines***." *Id.* Further, the provision cross references the "On Field Policy," which states ***three more times*** that "***First offenses will result in fines***." JA406 ¶7; *see id*. ¶6 (specifying "a first offense resulting in a fine"); JA407 ¶9 ("a first offense potentially resulting in a fine"). Yet Goodell never even discussed this unambiguous, collectively bargained remedy.

2. This case is not about whether Goodell "exceeded" his authority "by deeming [the alleged conduct here] 'conduct detrimental.'" Br. 41 (citation omitted). Neither the NFLPA nor the court below questioned Goodell's authority to deem ball tampering "conduct detrimental." Nor did anyone challenge Goodell's factual findings. SPA20. Rather, this case is about Goodell's lack of authority as arbitrator to disregard the CBA's undisputed notice requirement, the applicable Discipline for Game-Related Misconduct Policy, and the collectively bargained fine schedule for first-time equipment violations.

The NFL sounds the refrain that, because the CBA grants the Commissioner "general authority" to discipline players for conduct detrimental, "up to and including indefinite suspension," Goodell had *carte blanche* to affirm Brady's suspension. Br. 38-39; *accord* Br. 26-27, 29, 33. The NFL says "the CBA 'does not require itemization of specific categories of misconduct'" or "of the specific discipline that may be imposed for every violation," but rather "entrusts those determi-

nations to the Commissioner's 'reasonable judgment.'" Br. 20. But these rhetorical flourishes are belied by the fact that the parties did itemize the "specific categor[y]" of conduct detrimental at issue (equipment violations) and the "specific discipline" for first-time violations (a fine).

Goodell's disdain for this collectively bargained remedy did not give him the right to "dispense his own brand of industrial justice." *Enter. Wheel*, 363 U.S. at 597. Goodell applied Paragraph 15 of the Player Contract's general reference to suspensions in a vacuum—as if there were no more specific collectively bargained penalties for equipment tampering and no CBA requirement to give players notice of both "prohibited conduct and potential discipline." NFL 28(j) Letter 1.

That undisputed CBA notice requirement is rooted in the unbroken "law of the shop"—decisions including *Peterson*, *Rice*, *Bounty*, *Hardy*, *Coles*, *Brown*, and *Langhorne*. Indeed, *Peterson, Bounty*, and *Hardy* could not have vacated or reduced Goodell's discipline on notice grounds if the Player Contract and Article 46 were one-size-fits-all notice provisions for each and every player infraction. As former Judge Jones found in *Rice*, "even under the broad deference afforded to him through Article 46, he could not retroactively apply the [newer and more stringent Personal Conduct Policy.]" JA1331 (*Rice*).[4]

---

[4] Citing dictum from *Wackenhut Corp. v. Amalgamated Local 515*, 126 F.3d 29 (2d Cir. 1997), the NFL asserts that failure "to follow arbitral precedent" is not a "reason to vacate an award." Br. 34; *see* 126 F.3d at 32 ("[t]he role of the doctrine

To appreciate the extraordinary overbreadth of the NFL's position, one need only consider its logical bounds. The NFL's position would authorize Goodell to use his "general authority" to discipline players for "conduct detrimental" to ***suspend*** a receiver for using "stickum" if he believed the collectively bargained and announced fine for this conduct was too lenient. JA384. Similarly, it would authorize the Commissioner to impose an eight-game suspension for a first-time steroids violation if he believed the bargained-for and announced four-game suspension was too light. The NFL's position is the antithesis of "deference" to bargained-for labor-management relations: It is a sweeping grab for power that is contrary to collectively bargained penalties. No arbitrator may affirm discipline that so blatantly defies collectively bargained penalties and the required notice.

The NFL's authorities acknowledge that "[t]he parties … may limit the discretion of the arbitrator" in assessing "sanction[s] imposed for … misconduct." *Misco*, 484 U.S. at 41. Having "impose[d] a remedy which directly contradicts the express language" of the collectively bargained fine schedule, "[Goodell's] award cannot stand." *Leed*, 916 F.2d at 65-66. As the district court held, Goodell could

---

of *stare decisis* in arbitration is not raised by this case"). But the NFLPA need not rely on "arbitral precedent" for the CBA notice requirement, as it "is not in dispute." NFL 28(j) Letter 1. The argument that "[w]hat matters is whether the arbitrator's decision is 'grounded in the collective bargaining agreement'" (Br. 34) gets the League no further. The notice requirement, and the collectively bargained penalties for equipment violations, ***are*** "grounded in the [CBA]."

not even arguably construe the CBA to mean that the Commissioner's "general" conduct detrimental authority overrides the notice provided by "an applicable specific provision within the Player Policies." SPA32.[5]

3. The NFL does not discuss the "player equipment policy" until page 43 of its brief. When it finally does so, it does not dispute that the Policy's provisions are "more specific" than Goodell's "general conduct detrimental authority," or that "deflating game balls is an 'equipment violation.'" Br. 43, 45. The NFL argues that this is irrelevant because Goodell had "no obligation" to "forgo[] [his Article 46] authority in favor of equipment policies crafted for more minor offenses"—he simply made a "choice between the two contractual provisions," each of which was "potentially applicable." Br. 45, 43. This is pure sophistry.

For starters, Goodell made no such "choice." The Discipline for Game-Related Misconduct Policy is never mentioned in the award. Without record citation, the NFL asserts that Goodell "rejected the … argument that only a fine could be imposed under the equipment policy." Br. 44. But one searches the award

---

[5] Citing *Finley v. Kuhn*, 569 F.2d 527 (7th Cir. 1978), the NFL notes that a federal court has upheld the baseball commissioner's "best interests" authority. Br. 40-41. But the issue here is not Goodell's "conduct detrimental" authority as Commissioner; it is his disregard, as arbitrator, of the collectively bargained fines for equipment violations and the undisputed notice requirement. Indeed, baseball's commissioner also may not rely on "a general provision" to impose sanctions that contravene "specific terms." *Atl. Nat'l League Baseball Club, Inc. v. Kuhn*, 432 F. Supp. 1213, 1224-26 & n.9 (N.D. Ga. 1977).

"over and over (and over and over)" (Br. 42) in vain for a single word about this Policy, the Game-Related Player Conduct Rules, the equipment violations provision (JA384), or the collectively bargained "schedule of fines" (JA389). Goodell's "choice" was to ***ignore*** both the applicable fine and the Policy's repeated notice that, for equipment violations: "***First offenses will result in fines***." JA384.[6]

Black-letter law establishes that, "[w]here, as here, the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract." *Clinchfield Coal Co. v. Dist. 28, United Mine Workers*, 720 F.2d 1365, 1369 (4th Cir. 1983); *George A. Hormel & Co. v. United Food & Commercial Workers, Local 9*, 879 F.2d 347, 351 (8th Cir. 1989) ("where an arbitrator fails to discuss a probative contract term, and at the same time offers no clear basis for how he construed the contract to reach his decision without such consideration, there arises a strong possibility that the award was not based on the contract"); *Sears, Roebuck & Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 155 (6th Cir. 1982) ("This court has consistently adhered to the principle that an arbitrator … lacks authority to disregard or modify plain or unambiguous contract provi-

---

[6] Goodell did cite "the Game Operations Manual" (SPA56 n.16), which contains the Competitive Integrity Policy, but that Manual is distributed only to Clubs, not players, and does not include the applicable Policy, Rules, or fine schedule. Br. 20.

43

sions."). "Although an arbitrator has great freedom in determining an award, he may not 'dispense his own brand of industrial justice'" by "disregard[ing] a specific contract provision." *Pac. Motor Trucking Co. v. Auto. Machinists Union*, 702 F.2d 176 (9th Cir. 1983) (internal citations omitted). Decisions of the Supreme Court and every circuit confirm that "[t]he arbitrator may not ignore the plain language of the contract," including as to "remedies for contract violations." *Misco*, 484 U.S. at 38.[7]

Further, even if Goodell **had** interpreted the collectively bargained fine schedule for player equipment violations and chosen not to follow it, that "choice" would violate the essence of the CBA. Nothing in the Commissioner's general conduct detrimental authority allows him to override a collectively bargained fine announced to the players. The fact that the behavior may be "conduct detrimental" does not empower him to "choose" to disregard the parties' agreement on the penalty or the NFL's obligation to provide notice.

4. Once it becomes clear that Goodell ignored these CBA requirements, nothing remains of the NFL's appeal. Without quoting the Game-Related Player

---

[7] *See*, *e.g.*, *Kashner Davidson Secs. Corp. v. Mscisz*, 531 F.3d 68, 77-78 (1st Cir. 2008); *Penn. Power Co. v. Local Union No. 272, Int'l Bhd. of Elec. Workers, AFL-CIO*, 276 F.3d 174, 179 (3d Cir. 2001); *Beaird Indus. Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir. 2005); *Tootsie Roll Indus., Inc. v. Local Union No. 1, Bakery, Confectionery & Tobacco Workers' Int'l Union*, 832 F.2d 81, 84 (7th Cir. 1987); *Conoco, Inc. v. Oil, Chemical & Atomic Workers Int'l Union*, 1988 WL 163062, *4 (10th Cir. 1988).

Conduct Rules, the NFL offers *its counsel's* interpretive gloss that "the equipment policy specifically recognizes the Commissioner's authority to suspend players for violations." Br. 24. But no player reading the Policy's five unambiguous assurances that "*First offenses will result in fines*" could plausibly have notice of a suspension for first-time equipment tampering. *See* JA384; JA406-407 (specifying "fines" for "first offense[s]" another three times). More fundamentally, the *post hoc* interpretation of League lawyers cannot overcome *the arbitrator's* abject failure to construe a concededly "potentially applicable" remedy (NFL Br. 43) in determining whether Brady received the required CBA notice.

Goodell's CBA defiance is only underscored by his reliance on the Steroid Policy. SPA57. Viewing this Policy as "his [own] guiding principle of equity" (*Marine Pollution*, 857 F.2d at 93), Goodell used it to support the award. But as the NFL concedes, that Policy does not apply to ball tampering. Br. 36. And Goodell was not free to "eschew[] the remedies" bargained for equipment violations in favor of harsher penalties bargained for other types of misconduct. *Marine Pollution*, 857 F.2d at 93. As the district court held, Brady had "no notice that his discipline would be the equivalent of the discipline imposed upon a player who used performance enhancing drugs." SPA21. In failing to consider the "specific

Player Policies regarding equipment violations," Goodell's award violated the essence of the CBA. SPA32.[8]

### B. Brady also lacked notice that he could be disciplined for his alleged "awareness" of the activities of others.

As shown above, even if Brady had personally deflated footballs before the AFC Championship Game, the most severe penalty of which he had notice was a fine. But the Wells Report, and Vincent's disciplinary letter, never found that Brady had any such involvement in ball deflation. Instead, Vincent's discipline was based on the Wells Report's finding that Brady was "generally aware" and had "knowledge" of the "inappropriate" activities of others. JA97, 112.

Thus, even if players had notice that they could be suspended for ball tampering, it would still be necessary to affirm. The NFL does not claim that any Policy or CBA provision put Brady on notice that he could be disciplined for cognizance of ball tampering "by *others*." SPA27 (emphasis added).

Indeed, the NFL disavows Brady's alleged "general awareness" of others' misconduct as the basis for discipline. It criticizes the district court for supposedly

---

[8] The district court further held that, insofar as Goodell relied on "the Competitive Integrity Policy," Brady had "no legal notice of discipline under th[at] Policy," which is "distributed solely to" Club officials "and not to players." SPA30. The NFL concedes that this Policy, which was the basis for the Pash/Wells investigation, does not apply to players, but disputes that the NFL punished Brady pursuant to it. Br. 20. Whether Brady was punished pursuant to the Competitive Integrity Policy is ultimately an academic question, because there can be no dispute that he was ***not*** punished pursuant to the applicable Discipline for Game-Related Misconduct Policy.

"insist[ing] that the award must be justified only by the Wells Report's 'general awareness' finding" when, the NFL says, "the Wells Report and [Vincent's] initial disciplinary letter" were "based on knowledge, approval, awareness, and consent—all of which supported the Commissioner's finding that Brady participated in the scheme." Br. 42, 55 (citation omitted).

At the outset, the NFL's argument is contrary to the arbitral record. Vincent's discipline letter cited only the Wells Report's finding that Brady "w[as] at least generally aware of the actions of the Patriots' employees involved in the deflation of footballs and that it was unlikely that their actions were done without [his] knowledge." JA329. Vincent testified that this finding was "the [one] … that [he] relied on in order to impose discipline." JA1010 (Tr. 242:21-243:10). And Wells testified that this finding was "a fair summary of what [he] concluded with respect to Mr. Brady." JA1017 (Tr. 273:11-20).

But even if Brady's discipline were based on a claim that he "approved" of or "consented" to others' misconduct, the award would still have to be vacated. The district court's holding that "no NFL policy or precedent notifies players that they may be disciplined (much less suspended) for general awareness of misconduct by others" (SPA27) applies equally to any claim that Brady "approved" of or "consented" to others' alleged wrongdoing. The NFL points to nothing—not any Player Policy, not Article 46, not the Player Contract—that provides notice that

47

players may be punished for cognizance of ***others'*** misconduct. On the contrary, Paragraph 15 states that a player may be disciplined only if "he" is found "guilty" of conduct detrimental. JA353-354.

Thus, no player has ***ever*** been disciplined for "approving" of, or "consenting" to, others' "conduct detrimental." The League has never asserted, for example, that a player could be disciplined for consenting to or approving of a teammate's use of steroids, or of stickum on his gloves.

In 2009, Goodell disciplined a New York Jets equipment employee for "attempt[ing] to use unapproved equipment to prep the K[icking] Balls." JA1194. This "attempt to use unapproved materials … could [have] easily be[en] interpreted as an attempt to gain a competitive advantage." *Id.* But the Jets kicker was not even ***questioned*** about whether he knew of, or approved of, the ball tampering. JA1012 (Tr. 250:2-12) (Vincent); *see supra* at 24-25 (discussing like incidents).

It is no answer for the NFL to assert Goodell's award transformed Brady's alleged state of mind into "***participat*[*ion*]**" in a conspiratorial "***scheme***" in which he "***induce*[*d*]**" ball tampering. *Compare* JA329 *with* SPA51, 54. Although Goodell used the word "scheme" fourteen times, it appears nowhere in the 139-page Wells Report. Goodell's "quantum leap" (JA1458) in using these words "[wa]s wholly inconsonant with his fact-finding, [suggesting] that he was not fulfilling his obligation to interpret and apply the parties' agreement." *Boise Cas-*

48

*cade*, 309 F.3d at 1085 n.10.  Hoping to compensate for the Wells Report's limited findings concerning Brady's state of mind, Goodell pulled his "participat[ion]" and "inducement[]" language from thin air.  SPA54, 51.  But such arbitral gamesmanship cannot save the award.  *Leed*, 916 F.2d at 65 (judicial review does not end simply because the arbitrator "[made] noises of contract interpretation").

Further, under longstanding law that arbitrators may not "exceed[] the scope of the [parties'] submission" (*Enter. Wheel*, 363 U.S. at 597), Goodell lacked authority to affirm Brady's suspension based on alleged "participat[ion]" in a "scheme" that was not the basis for Vincent's discipline of Brady.  JA345-346 § 2(a) (arbitrator conducts only an "appeal" of the discipline imposed); *Peterson*, 88 F. Supp. 3d at 1091-92 (NFL arbitrator exceeded his authority and violated the essence of the CBA by sustaining discipline on alternative grounds).

The NFL attempts to blur the line between the Commissioner's roles as disciplinarian and arbitrator, but they are distinct.  As ***arbitrator***, the Commissioner was constrained by the LMRA and FAA.  As ***arbitrator***, he lacked authority to impose new discipline, or to sustain discipline on new grounds.  *Peterson*, 88 F. Supp. 3d at 1091-92; JA1397 (*Rice* Tr. 396:17-25) (Birch).[9]  Thus, Goodell could

---

[9] *Enterprise Wheel* forecloses the claim that "the Commissioner unquestionably had discretion to consider … new evidence."  NFL Br. 43.  But in any event, neither the award nor the NFL identifies any "new evidence" that Brady "participated in" or "induce[d]" ball-tampering.

49

not sustain punishment for Brady "participat[ing]" in a "scheme" mentioned nowhere in the Wells Report or the Vincent discipline.

### C. Affirming a suspension based on non-cooperation would likewise violate the CBA notice requirement.

Nor may Goodell's award be confirmed based on Brady's "non-cooperation." The charges that Brady failed to cooperate—or even obstructed the investigation by destroying his phone—are simply part of Goodell's adverse inference that Brady knew of ball tampering. NFL Br. 55; SPA21, 54. Even if the award had apportioned part of Brady's suspension to non-cooperation, however, that part of the award would have to be set aside as violating the CBA's notice requirement. No player in NFL history had previously been suspended for obstructing an NFL investigation, and Wells declined to warn Brady that he might be the first.

Wells' testimony and Goodell's award both confirm that Brady's alleged non-cooperation led them to draw an adverse inference that he had knowledge of ball tampering. As Wells testified, he rejected Brady's denials "based on my assessment of his credibility and his refusal or decision not to give me what I requested in terms of responsive documents," which "hurt how I viewed his credibility." JA1025 (Tr. 304:9-20). Wells revealed that, but for Brady's failure to provide the requested communications, he might have reached a different conclusion about Brady's knowledge of ball deflation: "I do not know. I can't go back in a

50

time machine, but I will say this. It hurt my assessment of his credibility." JA1025 (Tr. 304:21-305:14).

Similarly, Goodell "dr[ew] an adverse inference from the lack of cooperation" and, based on that inference, "interpret[ed] [the] available evidence in a manner that support[ed] findings of misconduct." SPA54. The NFL concedes that the award does not distinguish between discipline "attributable to alleged ball tampering" and discipline "attributable to non-cooperation." SPA21. And once it becomes clear that Brady's non-cooperation led to the adverse inference about ball tampering, it's back to square one: The only penalty of which Brady had notice was the collectively bargained *fine* for equipment violations. *Supra* at 38-46.

Further, even if Goodell *had* apportioned his discipline, Brady had no notice that he could be suspended for declining to produce his private communications. Wells testified: "I want to be clear—I did not tell Mr. Brady at any time that he would be subject to punishment for not giving—not turning over the documents. I did not say anything like that." JA1033 (Tr. 336:15-23).

Moreover, no player in NFL history had previously been suspended for obstructing an NFL investigation (SPA55), so Brady had no notice of that possibility. In *Bounty*, former Commissioner Tagliabue vacated a seven-game Goodell suspension for obstruction because, for at least "forty years," "the NFL's practice [is] fining, not suspending players, for serious [obstruction] violations"; "[t]here is no ev-

51

idence of a record of past suspensions based purely on obstructing a League investigation." JA1306. Goodell's award attempted to distinguish *Bounty* as **legal** precedent, but the award concedes *Bounty*'s **factual** finding that there is no precedent for suspending players for obstructing or failing to cooperate fully in a League investigation. SPA55.

## II. The judgment should be affirmed on the independent ground that the arbitral proceedings were fundamentally unfair.

Wholly apart from the award's defiance of the essence of the CBA, this Court should affirm because the arbitration proceedings violated the requirement of fundamental fairness. "[A]lthough not required to hear all the evidence proffered by a party, an arbitrator 'must give each of the parties to the dispute an adequate opportunity to present its evidence and argument.'" *Tempo Shain*, 120 F.3d at 20 (quoting *Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985)); *accord Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co.*, 232 F.3d 383, 388 (4th Cir. 2000). Because Goodell "excluded evidence … pertinent and material to the controversy," his award must be set aside for failing to comply with these LMRA/FAA mandates. *Tempo Shain*, 120 F.3d 20-21; 9 U.S.C. § 10(a)(3).

52

**A.     Denying Brady access to the investigative files "relied" upon by the NFL defied fundamental fairness and the CBA.**

Goodell disregarded his "affirmative duty" as arbitrator "to insure that relevant documentary evidence in the hands of one party [wa]s fully and timely made available to the other party." *Home Indem. Co. v. Affiliated Food Distribs., Inc.*, 1997 WL 773712, *4 (S.D.N.Y. Dec. 12, 1997) (citation omitted).  As this Court explained, where an arbitrator "refus[es] to receive evidence against the challenged claims," the award "must be vacated under § 10"; where "documents [] in the hands of [a] claimant" are "of any importance" to the arbitration, they "should [be] called for." *Hyman v. Pottberg's Ex'rs*, 101 F.2d 262, 265 (2d Cir. 1939); *see also Marrowbone*, 232 F.3d at 391 ("[v]acatur is appropriate … when the exclusion of relevant evidence 'so affects the rights of a party that it may be said that he was deprived of a fair hearing'") (quoting *Hoteles*, 763 F.2d at 40).  Thus, courts have recognized that, "where [as here] a party can show prejudice," the "failure to discharge this simple duty" is "a violation of [FAA § 10(a)(3)]." *Home Indem.*, 1997 WL 773712, *4 (citation omitted).[10]

Goodell denied the NFLPA's motion to compel the Paul, Weiss investigative files on the pretense that they "played no role in the disciplinary decisions; the Wells Report was the basis for those decisions."  SPA65.  But Article 46 expressly

---

[10] The NFL concedes that the FAA and LMRA standards are "'materially the same.'"  Br. 32-33 n.1 (citation omitted).

53

required the NFL to "exchange copies of any exhibits upon which [it] intend[ed] *to rely*." JA346 § 2(f)(ii) (emphasis added). It is undisputed that the Wells Report was the exclusive basis for Vincent's discipline, and it therefore follows that the NFL "relied" on the underlying investigative materials. Indeed, the League nowhere disputes that the NFL relied on the Wells Report or that the NFL's arbitration counsel (Paul, Weiss) was free to use its investigative files in defending the NFL's discipline at the hearing. JA329; JA1010 (Tr. 242:21-243:10, 244:19-245:2) (Vincent); SPA43-44, 47-51, 60.

In *Bounty*, former Commissioner Tagliabue applied Article 46 to require the NFL to produce the files supporting the investigative report that was the basis for discipline. JA1186-1189 (investigative files underlying NFL "Security Report"). And in *Rice* the NFL, adhering to the requirements of *Bounty*, produced its investigative files. JA1362 (Tr. 150:10-151:22).

The NFL asserts that it "had already produced … all documents that the Paul, Weiss team considered when preparing the report." Br. 15. That is false. Goodell stated only that "the Management Council produced all of the *NFL* documents considered by the investigators in preparing their report." SPA65 (emphasis added). The NFLPA received *not one* file generated by the Pash/Wells investigation. *Id.*; *see also* SPA42.

54

Nor can the NFL claim that these materials were attorney "work product." *E.g.*, Br. 52. That doctrine protects only materials prepared "because of" the prospect of litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998); 8 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2024 (3d ed. 1998). The NFL would have investigated the events here regardless of whether arbitration or litigation ensued. Indeed, as the NFL announced (JA1198), the Wells Report was prepared for the public.

Finally, the district court's findings of prejudice are unassailable. Brady "was denied the opportunity to examine and challenge materials that may have led to his suspension." SPA37.[11] For example, Brady was denied access to information about the numerous interviews concerning the flawed halftime football testing, as well as interviews by all those who denied any ball deflation. This prejudice was "compound[ed]" because "Paul, Weiss acted as both alleged 'independent' counsel during the Investigation and also … as retained counsel to the NFL during the arbitration." SPA37. Thus, Paul, Weiss alone was able to use the investigative files to help form its examination of Brady and other arbitration witnesses. SPA37-38.

---

[11] The NFL falsely states that "Brady's counsel was present for many of the interviews." Br. 16. Of the more than 66 Paul, Weiss interviews (JA119-122), Brady's counsel (his agents) were present for *one*—Brady's—and the NFLPA was present for *another* (Patriots kicker Stephen Gostkowski's). JA122-123.

**B.      Precluding Pash's testimony further deprived Brady of funda-mental fairness.**

Affirmance is also warranted because Goodell excluded Pash's testimony. As this Court has held, excluding relevant testimony when there is "no reasonable basis … to determine that … [it] would be cumulative" requires vacatur. *Tempo Shain*, 120 F.3d at 20-21.  That is especially so where, as here, no other witness is "competent to address the substantive core of the claim." *Commercial Risk Reins. Co. v. Sec. Ins. Co.*, 526 F. Supp. 2d 424, 429 (S.D.N.Y. 2007).

Moreover, players' right to an Article 46 hearing entitles them to cross-examine the investigators whose work underpins their discipline.  In *Rice*, Judge Jones explained that NFL arbitrators must "compel[] the witnesses necessary for the hearing to be fair."  JA1162.  And in *Bounty*, Tagliabue compelled the NFL's lead investigator to testify.  JA1159.

The NFLPA sought Pash's testimony because the NFL publicly announced that its "investigation is being led jointly by NFL Executive Vice President Jeff Pash and Ted Wells."  JA1198; *see also* JA1134; JA1137-1139.  Goodell denied the request (SPA63), asserting that Pash was merely a "facilitat[or]." *Id*.  But that assertion is belied by page one of the Wells Report: the NFL "retained Theodore V. Wells, Jr. and the law firm … 'Paul, Weiss' to conduct an investigation, togeth-er with NFL Executive Vice President Jeff Pash."  JA96.  Further, Wells testified

56

that Pash *edited* the Report—testimony irreconcilable with Pash's serving as a mere "facilitat[or]." JA1016 (Tr. 268:13-25).

The NFL does not defend Goodell's illogical assertion that Pash's testimony would have been "cumulative." Br. 48. The award offers "no specification" of "the ways Pash's testimony would have been 'cumulative'" (SPA34), much less a "reasonable basis" for that conclusion (*Tempo Shain*, 120 F.3d at 20-21). Pash's testimony cannot have been "cumulative" when no one else could testify what edits Pash made to the "Wells" Report. JA1016 (Tr. 269:4-21) (Wells).

The NFL asserts that "[n]othing in the CBA requires the League to authorize or an arbitrator to rely on only 'independent' investigations." Br. 50. But whether the NFL is *required* to conduct an independent investigation is irrelevant, because Vincent and Goodell both expressly *relied on* the Wells Report's purported "independence" in rendering their determinations. JA329; SPA43, 60.

The NFL claims that the NFLPA "waived [its] objection to the exclusion of Pash's testimony by declining to take the Commissioner up on his offer to 'revisit' that evidentiary ruling at the appeal hearing." Br. 25 (citation omitted). But the NFLPA again objected to Goodell's exclusion of Pash's testimony in its post-arbitration hearing brief. SPA60 n.21. And it was *Goodell*—not the NFLPA—who was supposed to "revisit" the ruling: "I note that Mr. Wells may be asked whether Mr. Pash played a substantive role in the investigation; if the answer is in

57

the affirmative, *I will revisit that ruling with respect to Mr. Pash's testimony*."

SPA64 (emphasis added).

As in *Tempo Shain*, which vacated an award because the arbitrator "exclude[d] evidence … pertinent and material to the controversy" (120 F.3d 20-21), precluding Pash's testimony "foreclosed [Brady] from exploring, among other things, whether the Pash/Wells Investigation was truly 'independent,' and how and why the NFL's General Counsel came to edit a supposedly independent investigation report." SPA35.

### III. If this Court were to reject the district court's grounds for vacatur, the case should be remanded for further determinations or, alternatively, affirmed on the other grounds presented.

Having vacated the award on three independent grounds, the district court declined to reach the additional grounds for vacatur. SPA38-39. Accordingly, if this Court does not affirm on any ground adopted below, it should remand in accordance with the "usual practice to allow the district court to address arguments in the first instance." *Dardana Ltd v. Yuganskneftegaz*, 317 F.3d 202, 208 (2d Cir. 2003). Should the Court consider the NFLPA's alternative grounds in the first instance, however, they independently justify affirmance.

### A. Goodell's refusal to hear the NFLPA's delegation argument defied fundamental fairness.

Fundamental fairness compels vacating Goodell's award for failing to "give each of the parties to the dispute an adequate opportunity to present its evidence

and argument." *Tempo Shain*, 120 F.3d 20-21. As the Player Contract provides, conduct detrimental discipline may be imposed "only after giving Player the opportunity for a hearing." JA353-354.

Brady's first ground for appeal (JA1118) was that Goodell had improperly assigned his "exclusive[]" conduct detrimental authority to Vincent (JA345 § 1(a)). Goodell's delegation was in line with his publicly stated intention to relinquish his "exclusive[]" role as the conduct detrimental disciplinarian.[12] As the NFL has conceded, however, Goodell simply "deci[ded] not to hear evidence" on this ground for appeal. NFL Mem. of Law, ECF No. 35 at 12.

"[D]en[ying] a party sufficient opportunity to present proof of a claim or defense … renders the resulting arbitral decision biased, irrational or arbitrary." *Id.* at 10-11 (citing *Supreme Oil Co. v. Abondolo*, 568 F. Supp. 2d 401, 408 (S.D.N.Y. 2008), and *Red Apple Supermarkets/Supermarkets Acquisitions v. Local 338 RWDSU*, 1999 WL 596273, *5 (S.D.N.Y. Aug. 9, 1999)). It is hard to imagine a more blatant deprivation of fairness than Goodell "deci[ding] not to hear evidence," declaring "facts" of his own delegation conduct without any record, and then rejecting the NFLPA's argument without a hearing. Goodell simply decreed, "*I* did not delegate my disciplinary authority to Mr. Vincent" (SPA67 (emphasis

---

[12] The issue of Goodell's lack of authority to delegate his "exclusive[]" disciplinary power is a significant CBA dispute and the subject of a pending grievance between the parties.

added)), and then barred the NFLPA from soliciting or presenting any evidence on the subject. SPA62-63. That violated fundamental fairness.

### B. Goodell's evident partiality compels vacating the award.

Goodell's evident partiality also warrants vacatur. As arbitrator, he was bound by the legal prohibition of evident partiality, which "can be inferred from objective facts inconsistent with impartiality." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013); *accord Ovalar*, 492 F.3d at 137; 9 U.S.C. § 10(a)(2). Any reasonable person would conclude that Goodell could not impartially decide the CBA legality of his own delegation. *Ovalar*, 492 F.3d at 137-139 (applying a "reasonable person" test).

Citing dictum from *Williams v. NFL*, 582 F.3d 863, 885 (8th Cir. 2009), the NFL insists that parties "'can ask no more impartiality than inheres in the [arbitration] method they have chosen.'" Br. 57; *see Williams*, 582 F.3d at 886 (finding a waiver of the "evident partiality" argument because the players "*fail*[*ed*] *to object*" during the arbitration). But "even the agreed-upon appointment of an arbitrator with known links to one side of the controversy does not immunize the status or conduct of [a] decisionmaker from all judicial scrutiny." *Nat'l Hockey League Players' Ass'n v. Bettman*, 1994 WL 738835, *13 (S.D.N.Y. Nov. 9, 1994). Just as certain conflicts of interest cannot be waived, Article 46 did not give Goodell *carte blanche* to arbitrate appeals involving the legality of his own conduct.

For example, in *Erving*, this Court rejected arguments that the district court "had no power to direct the substitution of a neutral arbitrator for the disqualified Commissioner of the American Basketball Association"—"in spite of the contract clause naming the Commissioner as arbitrator"—based on his employment "as a partner of the law firm representing [a party to the arbitration]." 468 F.2d at 1067, 1068 & n.2. "[F]ederal law is to be implemented in such a way as to make the arbitration effective," and a rule barring courts from substituting a neutral arbitrator would "emasculate arbitration procedures under the federal act." *Id*. at 1067-68.

Similarly, in *Morris v. N.Y. Football Giants*, the court disqualified then-Commissioner Tagliabue from serving as arbitrator even though "[t]he contracts expressly provide[d] that the disputes be submitted to [him]." 575 N.Y.S.2d 1013, 1016-17 (N.Y. Sup. Ct. 1991). There, the players presented "evidence of lack of neutrality and 'evident partiality'" due to Tagliabue's prior advocacy—as an NFL lawyer—of a position he was called upon to arbitrate. *Id*. When presented with the NFLPA's demands for recusal in *Bounty* and *Rice*, the same evident partiality objection to a designated arbitrator adjudicating his own behavior led Goodell to recuse himself. JA1294; JA1316.

Here, Goodell and Vincent were essential fact witnesses on Goodell's improper delegation of disciplinary authority to Vincent. The evident partiality inherent in this situation is obvious from Goodell's summary denial of the delegation

argument based on "findings" about his own conduct.  SPA67; *see also* SPA62-63 (Goodell precluding his and Vincent's testimony on delegation).

Ironically, the NFL asserts that Goodell "was in the best position to make these factual determinations, given that they concerned the exercise of his disciplinary power."  Br. 56.  But that is the very personal involvement that rendered him evidently partial.  *YLL Irrevocable Trust*, 729 F.3d at 104.[13]

## CONCLUSION

Judicial deference to arbitration awards is not equivalent to a rubber stamp.  Courts must vacate awards where the arbitrator defies the essence of the CBA by declining to discuss the applicable collectively bargained penalty in favor of his own brand of industrial justice.  The award here sustained discipline imposed without notice and did so without regard to fundamental standards of procedural fairness.  The judgment below should be affirmed.

---

[13]  The NFLPA presented an additional ground for vacatur:  the League's failure to employ testing protocols to ensure "fair and consistent" discipline  JA77-81.  This point would be appropriate for consideration on any remand.

Respectfully submitted,

/s/ Jeffrey L. Kessler

STEFFEN N. JOHNSON                    JEFFREY L. KESSLER
*Winston & Strawn LLP*                DAVID L. GREENSPAN
*1700 K Street N.W.*                  *Winston & Strawn LLP*
*Washington, DC  20006*               *200 Park Avenue*
*(202) 282-5000*                      *New York, NY  10166*
*sjohnson@winston.com*                *(212) 294-6700*
                                      *jkessler@winston.com*

ANDREW S. TULUMELLO
*Gibson, Dunn & Crutcher*
*1050 Connecticut Avenue, N.W.*
*Washington, DC  20036*
*(202) 955-8500*

*Counsel for Appellees*
*National Football League Players Association and Tom Brady*

DECEMBER 7, 2015

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 13,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

December 7, 2015

                              s/ Jeffrey L. Kessler
                              Jeffrey L. Kessler

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 7, 2015, an electronic copy of the foregoing Brief for Appellees was filed with the Clerk of Court using the ECF system and thereby served upon counsel appearing in this case for Appellants National Football League Management Council and National Football League. Further, two hard copies of the same were served via first-class U.S. mail to Appellant Michelle McGuirk at the following address provided for that purpose:

Michelle McGuirk
P.O. Box 369
New York, NY 10113

s/ Jeffrey L. Kessler
Jeffrey L. Kessler
