*National Football League Management Council et al. v. National Football League Players Association et al.*

# In the
# United States Court of Appeals
## for the Second Circuit

————

August Term, 2015

No. 15-2801 (L), No. 15-2805 (CON)

NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL,
*Plaintiff-Counter-Defendant-Appellant,*

and

NATIONAL FOOTBALL LEAGUE,
*Defendant-Appellant,*

*v.*

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own
behalf and on behalf of Tom Brady,
*Defendant-Counter-Claimant-Appellee,*

and

TOM BRADY,
*Counter-Claimant-Appellee.*[*]

————

Appeal from the United States District Court
for the Southern District of New York.
Nos. 15-5916, 15-1982 (RMB) — Richard M. Berman, *Judge.*

————

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

Argued: March 3, 2016
Decided: April 25, 2016

_____

Before: KATZMANN, *Chief Judge*, PARKER and CHIN, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*). Following an investigation, the National Football League imposed a four-game suspension on New England Patriots quarterback Tom Brady. The suspension was based on a finding that he participated in a scheme to deflate footballs used during the 2015 American Football Conference Championship Game to a pressure below the permissible range. Brady requested arbitration and League Commissioner Roger Goodell, serving as arbitrator, entered an award confirming the discipline. The parties sought judicial review and the district court vacated the award based upon its finding of fundamental unfairness and lack of notice. The League has appealed.

We hold that the Commissioner properly exercised his broad discretion under the collective bargaining agreement and that his procedural rulings were properly grounded in that agreement and did not deprive Brady of fundamental fairness. Accordingly, we REVERSE the judgment of the district court and REMAND with instructions to confirm the award.

Chief Judge Katzmann dissents in a separate opinion.

_____

PAUL D. CLEMENT (Erin E. Murphy, Michael H. McGinley, *on the brief*), Bancroft PLLC, Washington, D.C.; Daniel L. Nash, Pratik A. Shah,

2

1　　　　　　　　Stacey R. Eisenstein, Gregory W. Knopp & James
2　　　　　　　　E. Tysse, Akin Gump Strauss Hauer & Feld LLP,
3　　　　　　　　Washington, D.C., *on the brief, for Plaintiff-Counter-*
4　　　　　　　　*Defendant-Appellant and Defendant-Appellant.*

5　　　　　　　　JEFFREY L. KESSLER (David L. Greenspan, *on the*
6　　　　　　　　*brief*), Winston & Strawn LLP, New York, NY;
7　　　　　　　　Steffen N. Johnson, Winston & Strawn LLP,
8　　　　　　　　Washington, D.C., *on the brief*; Andrew S.
9　　　　　　　　Tulumello, Gibson, Dunn & Crutcher,
10　　　　　　　　Washington, D.C., *on the brief, for Defendant-*
11　　　　　　　　*Counter-Claimant-Appellee and Counter-Claimant-*
12　　　　　　　　*Appellee.*

13　　　　　　　　————————

14　BARRINGTON D. PARKER, *Circuit Judge*:

15　　　　This case involves an arbitration arising from New England
16　Patriots quarterback Tom Brady's involvement in a scheme to
17　deflate footballs used during the 2015 American Football Conference
18　Championship Game to a pressure below the permissible range.
19　Following an investigation, the NFL suspended Brady for four
20　games. Brady requested arbitration and League Commissioner
21　Roger Goodell, serving as arbitrator, entered an award confirming
22　the discipline. The parties sought judicial review and the district
23　court vacated the award, reasoning that Brady lacked notice that his
24　conduct was prohibited and punishable by suspension, and that the
25　manner in which the proceedings were conducted deprived him of
26　fundamental fairness. The League has appealed and we now
27　reverse.

28　　　　The basic principle driving both our analysis and our
29　conclusion is well established: a federal court's review of labor
30　arbitration awards is narrowly circumscribed and highly
31　deferential—indeed, among the most deferential in the law. Our

3

role is not to determine for ourselves whether Brady participated in a scheme to deflate footballs or whether the suspension imposed by the Commissioner should have been for three games or five games or none at all.  Nor is it our role to second-guess the arbitrator's procedural rulings.  Our obligation is limited to determining whether the arbitration proceedings and award met the minimum legal standards established by the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* (the "LMRA").  We must simply ensure that the arbitrator was "even arguably construing or applying the contract and acting within the scope of his authority" and did not "ignore the plain language of the contract."  *United Paperworks Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).  These standards do not require perfection in arbitration awards.  Rather, they dictate that even if an arbitrator makes mistakes of fact or law, we may not disturb an award so long as he acted within the bounds of his bargained-for authority.

Here, that authority was especially broad.  The Commissioner was authorized to impose discipline for, among other things, "conduct detrimental to the integrity of, or public confidence, in the game of professional football."  In their collective bargaining agreement, the players and the League mutually decided many years ago that the Commissioner should investigate possible rule violations, should impose appropriate sanctions, and may preside at arbitrations challenging his discipline.  Although this tripartite regime may appear somewhat unorthodox, it is the regime bargained for and agreed upon by the parties, which we can only presume they determined was mutually satisfactory.

Given this substantial deference, we conclude that this case is not an exceptional one that warrants vacatur.  Our review of the record yields the firm conclusion that the Commissioner properly exercised his broad discretion to resolve an intramural controversy between the League and a player.  Accordingly, we REVERSE the

4

judgment of the district court and REMAND with instructions to confirm the award.[1]

**BACKGROUND**

On January 18, 2015, the New England Patriots and the Indianapolis Colts played in the American Football Conference Championship Game at the Patriots' home stadium in Foxborough, Massachusetts to determine which team would advance to Super Bowl XLIX. During the second quarter, Colts linebacker D'Qwell Jackson intercepted a pass thrown by Brady and took the ball to the sideline, suspecting it might be inflated below the allowed minimum pressure of 12.5 pounds per square inch. After confirming that the ball was underinflated, Colts personnel informed League officials, who decided to test all of the game balls at halftime. Eleven other Patriots balls and four Colts balls were tested using two air gauges, one of which had been used before the game to ensure that the balls were inflated within the permissible range of 12.5 to 13.5 psi. While each of the four Colts balls tested within the permissible range on at least one of the gauges, all eleven of the Patriots balls measured below 12.5 psi on both.

On January 23, the National Football League announced that it had retained Theodore V. Wells, Jr., Esq., and the law firm of Paul, Weiss, Rifkind, Wharton & Garrison to conduct an independent investigation into whether there had been improper ball tampering before or during the game. That investigation culminated in a 139-page report released on May 6, which concluded that it was "more probable than not" that two Patriots equipment officials—Jim McNally and John Jastremski—had "participated in a deliberate

---

[1] We affirm the district court's denial of Michelle McGuirk's motion to intervene, No. 1:15-cv-05916-RMB-JCF, ECF No. 90, in a summary order filed simultaneously with this Opinion. Below and on appeal, McGuirk offers no explanation of her right or need to intervene, beyond a desire to prevent "fraud" on the court. The relevant Federal Rules of Civil and Appellate Procedure do not permit parties with a mere academic interest in a litigation to insert themselves into the dispute.

effort to release air from Patriots game balls after the balls were examined by the referee." Joint App. at 97.[2] Specifically, the Report found that McNally had removed the game balls from the Officials Locker Room shortly before the game, in violation of standard protocol, and taken them to a single-toilet bathroom, where he locked the door and used a needle to deflate the Patriots footballs before bringing them to the playing field.

In addition to videotape evidence and witness interviews, the investigation team examined text messages exchanged between McNally and Jastremski in the months leading up to the AFC Championship Game. In the messages, the two discussed Brady's stated preference for less-inflated footballs. McNally also referred to himself as "the deflator" and quipped that he was "not going to espn . . . yet," and Jastremski agreed to provide McNally with a "needle" in exchange for "cash," "newkicks," and memorabilia autographed by Brady. Joint App. at 99–102. The Report also relied on a scientific study conducted by Exponent, an engineering and scientific consulting firm, which found that the underinflation could not "be explained completely by basic scientific principles, such as the Ideal Gas Law," particularly since the average pressure of the Patriots balls was significantly lower than that of the Colts balls. Joint App. at 104–08. Exponent further concluded that a reasonably experienced individual could deflate thirteen footballs using a needle in well under the amount of time that McNally was in the bathroom.[3]

The investigation also examined Brady's potential role in the deflation scheme. Although the evidence of his involvement was "less direct" than that of McNally's or Jastremski's, the Wells Report concluded that it was "more probable than not" that Brady had been

---

[2] The Report assessed the evidence under the "more probable than not" standard, which applies to violations of this kind.

[3] The Wells Report concluded that the evidence did not establish that any other Patriots personnel participated in or had knowledge of these actions.

6

"at least generally aware" of McNally and Jastremski's actions, and that it was "unlikely that an equipment assistant and a locker room attendant would deflate game balls without Brady's" "knowledge," "approval," "awareness," and "consent." Joint App. at 112, 114. Among other things, the Report cited a text message exchange between McNally and Jastremski in which McNally complained about Brady and threatened to overinflate the game balls, and Jastremski replied that he had "[t]alked to [Tom] last night" and "[Tom] actually brought you up and said you must have a lot of stress trying to get them done." Joint App. at 112. The investigators also observed that Brady was a "constant reference point" in McNally and Jastremski's discussions about the scheme, Joint App. at 112, had publicly stated his preference for less-inflated footballs in the past, and had been "personally involved in [a] 2006 rule change that allowed visiting teams to prepare game balls in accordance with the preferences of their quarterbacks," Joint App. at 114.

Significantly, the Report also found that, after more than six months of not communicating by phone or message, Brady and Jastremski spoke on the phone for approximately 25 minutes on January 19, the day the investigation was announced. This unusual pattern of communication continued over the next two days. Brady had also taken the "unprecedented step" on January 19 of inviting Jastremski to the quarterback room, and had sent Jastremski several text messages that day that were apparently designed to calm him. The Report added that the investigation had been impaired by Brady's refusal "to make available any documents or electronic information (including text messages and emails)," notwithstanding an offer by the investigators to allow Brady's counsel to screen the production. Joint App. at 116.

In a letter dated May 11, 2015, NFL Executive Vice President Troy Vincent, Sr., notified Brady that Goodell had authorized a four-game suspension of him pursuant to Article 46 of the Collective Bargaining Agreement between the League and the NFL Players

7

Association (the "Association" or the "NFLPA") for engaging in "conduct detrimental to the integrity of and public confidence in the game of professional football."  Joint App. at 329.[4]  The disciplinary letter cited the Wells Report's conclusions regarding Brady's awareness and knowledge of the scheme, as well as his "failure to cooperate fully and candidly with the investigation, including by refusing to produce any relevant electronic evidence (emails, texts, etc.) despite being offered extraordinary safeguards by the investigators to protect unrelated personal information."  Joint App. at 329.

Brady, through the Association, filed a timely appeal of the suspension, and the Commissioner exercised his discretion under the CBA to serve as the hearing officer.  The Association sought to challenge the factual conclusions of the Wells Report, and also argued that the Commissioner had improperly delegated his authority to discipline players pursuant to the CBA.  Prior to the hearing, the Association filed several motions, including a motion to recuse the Commissioner, a motion to compel NFL Executive Vice President and General Counsel Jeff Pash to testify regarding his involvement in the preparation of the Wells Report, and a motion to compel the production of Paul, Weiss's internal investigation notes.

---

[4] Article 46, Section 1(a), reads, in full:

> All disputes involving a fine or suspension imposed upon a player for conduct on the playing field (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

Joint App. at 345.  Article 46 further provides that "the Commissioner may serve as hearing officer in any appeal under Section 1(a) of this Article at his discretion."  Joint App. at 346.

The Commissioner denied the motions in decisions issued on June 2 and June 22, 2015. He reasoned that his recusal was not warranted because he did not "delegate [his] disciplinary authority to Mr. Vincent" and did "not have any first-hand knowledge of any of the events at issue." Special App. at 67–68. The Commissioner also declined to compel Pash's testimony, saying that Pash did not "play a substantive role in the investigation," and that the Wells Report made clear that it was "prepared entirely by the Paul Weiss investigative team." Special App. at 63. The Commissioner offered to revisit his ruling "should the parties present evidence showing that the testimony of [Pash] . . . is necessary for a full and fair hearing," Special App. at 64, but the Association never asked him to reconsider. As to the Paul, Weiss investigation notes, the Commissioner ruled that the CBA did not require their production and, in any event, the notes played no role in his disciplinary decision.

On June 23, the Commissioner held a hearing involving nearly ten hours of sworn testimony and argument and approximately 300 exhibits. Shortly before the hearing, it was revealed that on March 6—the same day that he was to be interviewed by the Wells investigative team—Brady had "instructed his assistant to destroy the cellphone that he had been using since early November 2014, a period that included the AFC Championship Game and the initial weeks of the subsequent investigation," despite knowing that the investigators had requested information from the phone several weeks before. Special App. at 42. Although Brady testified that he was following his ordinary practice of disposing of old cell phones in order to protect his personal privacy, he had nonetheless retained phones that he had used before and after the relevant time frame.

On July 28, the Commissioner issued a final decision affirming the four-game suspension. Based upon the newly revealed evidence regarding the destruction of the cell phone, the Commissioner found that Brady had not only failed to cooperate with the investigation,

but "made a deliberate effort to ensure that investigators would never have access to information that he had been asked to produce." Special App. at 54. The Commissioner consequently drew an adverse inference that the cell phone would have contained inculpatory evidence, and concluded:

> (1) Mr. Brady participated in a scheme to tamper with the game balls after they had been approved by the game officials for use in the AFC Championship Game and (2) Mr. Brady willfully obstructed the investigation by, among other things, affirmatively arranging for destruction of his cellphone knowing that it contained potentially relevant information that had been requested by the investigators.

Special App. at 54. Finally, the Commissioner analogized Brady's conduct to that of steroid users, whom he believed seek to gain a similar systematic competitive advantage, and consequently affirmed that, in his view, the four-game suspension typically imposed on first-time steroid users was equally appropriate in this context.

The League commenced an action the same day in the United States District Court for the Southern District of New York (Berman, *J.*), seeking confirmation of the award under the LMRA. The Association brought an action to vacate the award in the United States District Court for the District of Minnesota, which was subsequently transferred to the Southern District.

On September 3, the district court issued a decision and order granting the Association's motion to vacate the award and denying the League's motion to confirm. *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 125 F. Supp. 3d 449 (S.D.N.Y. 2015). The court reasoned that Brady lacked notice that he could be suspended for four games because the provisions applicable to his conduct provided that only fines could be imposed. The court also

10

held that the award was defective because the Commissioner deprived Brady of fundamental fairness by denying the Association's motions to compel the production of Paul, Weiss's internal notes and Pash's testimony regarding his involvement with the Wells Report.  The League timely appealed, and we now reverse.

## STANDARD OF REVIEW

We review a district court's decision to confirm or vacate an arbitration award *de novo* on questions of law and for clear error on findings of fact.  *Wackenhut Corp. v. Amalgamated Local 515*, 126 F.3d 29, 31 (2d Cir. 1997).  Because this dispute involves the assertion of rights under a collective bargaining agreement, our analysis is governed by section 301 of the LMRA.  *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001).

The LMRA establishes a federal policy of promoting "industrial stabilization through the collective bargaining agreement," with particular emphasis on private arbitration of grievances.  *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960).  The Act embodies a "clear preference for the private resolution of labor disputes without government intervention."  *Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 714 (2d Cir. 1998).

Under this framework of self-government, the collective bargaining agreement is not just a contract, but "a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate."  *Warrior*, 363 U.S. at 578.  Collective bargaining agreements are not imposed by legislatures or government agencies.  Rather, they are negotiated and refined over time by the parties themselves so as to best reflect their priorities, expectations, and experience.  Similarly, the arbitrators are chosen by the parties because of their expertise in the particular business and their trusted judgment to "interpret and apply [the] agreement in accordance with the 'industrial common law of the shop' and the various needs

11

and desires of the parties." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53 (1974). The arbitration process is thus "part and parcel of the ongoing process of collective bargaining." *Misco*, 484 U.S. at 38.

Our review of an arbitration award under the LMRA is, accordingly, "very limited." *Garvey*, 532 U.S. at 509. We are therefore not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement, but inquire only as to whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement. Because it is the arbitrator's view of the facts and the meaning of the contract for which the parties bargained, courts are not permitted to substitute their own. *Misco*, 484 U.S. at 37–38. It is the arbitrator's construction of the contract and assessment of the facts that are dispositive, "however good, bad, or ugly." *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2071 (2013). Contrary to our dissenting colleague, we do not consider whether the punishment imposed was the most appropriate, or whether we are persuaded by the arbitrator's reasoning. In short, it is not our task to decide how we would have conducted the arbitration proceedings, or how we would have resolved the dispute.

Instead, our task is simply to ensure that the arbitrator was "even arguably construing or applying the contract and acting within the scope of his authority" and did not "ignore the plain language of the contract." *Misco*, 484 U.S. at 38. Even failure to "follow arbitral precedent" is no "reason to vacate an award." *Wackenhut*, 126 F.3d at 32. As long as the award "'draws its essence from the collective bargaining agreement' and is not merely the arbitrator's 'own brand of industrial justice,'" it must be confirmed. *Niagara Mohawk*, 143 F.3d at 714 (quoting *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)); *see also Garvey*, 532 U.S. at 509; *187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir.

2005).[5]  If the arbitrator acts within the scope of this authority, the remedy for a dissatisfied party "is not judicial intervention," but "for the parties to draft their agreement to reflect the scope of power they would like their arbitrator to exercise."  *United Bhd. of Carpenters v. Tappan Zee Constr., LLC*, 804 F.3d 270, 275 (2d Cir. 2015) (internal quotation marks omitted) (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 345 (2d Cir. 2010)).  Against this legal backdrop, we turn to the decision below and the arguments advanced on appeal.

## DISCUSSION

Article 46 of the CBA empowers the Commissioner to take disciplinary action against a player whom he "reasonably judge[s]" to have engaged in "conduct detrimental to the integrity of, or public confidence in, the game of professional football."  Joint App. at 345, 353.[6]  A disciplined player is entitled to appeal to the Commissioner and seek an arbitration hearing, and the Commissioner may appoint either himself or someone else to serve as arbitrator.  Article 46 does not articulate rules of procedure for the hearing, except to provide that "the parties shall exchange copies of any exhibits upon which they intend to rely no later than three (3) calendar days prior to the hearing."  Joint App. at 346.

On this appeal, the Association does not contest the factual findings of the Commissioner.  Nor does the Association dispute that the Commissioner was entitled, under Article 46, to determine that Brady's "participat[ion] in a scheme to tamper with game balls"

---

[5] This deferential standard is no less applicable where the industry is a sports association.  We do not sit as referees of football any more than we sit as the "umpires" of baseball or the "super-scorer" for stock car racing.  Otherwise, we would become mired down in the areas of a group's activity concerning which only the group can speak competently.  *See Crouch v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 845 F.2d 397, 403 (2d Cir. 1988); *Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527, 536–38 (7th Cir. 1978).

[6] Players are put on notice of the Commissioner's Article 46 authority by way of the League Policies for Players and the NFL Player Contract.

13

was "conduct detrimental" worthy of a four-game suspension. The parties disagree, however, as to whether other aspects of the CBA and the relevant case law require vacatur of the award.

The district court identified three bases for overturning Brady's suspension: (1) the lack of adequate notice that deflation of footballs could lead to a four-game suspension, (2) the exclusion of testimony from Pash, and (3) the denial of access to the investigative notes of the attorneys from Paul, Weiss who prepared the Wells Report. We conclude that each of these grounds is insufficient to warrant vacatur and that none of the Association's remaining arguments have merit.

## I. Lack of Adequate Notice

The parties agree that the "law of the shop" requires the League to provide players with advance notice of "prohibited conduct and potential discipline." The district court identified several grounds for concluding that Brady had no notice that either his conduct was prohibited or that it could serve as a ground for suspension.

### A. The Player Policies

The Association's chief ground for vacatur, relied upon by the district court, is that the Commissioner improperly suspended Brady pursuant to the "conduct detrimental" clause of Article 46 because Brady was only on notice that his conduct could lead to a fine under the more specific "Discipline for Game-Related Misconduct" section of the League Policies for Players (the "Player Policies"). These Policies, which are collected in a handbook distributed to all NFL players at the beginning of each season, include a section entitled "Other Uniform/Equipment Violations."[7]

---

[7] The "Other Uniform/Equipment Violations" section reads, in full:

The 2014 Uniform Policy, the 2014 On Field Policy, and the enforcement procedures for these policies are attached at the end of this section.

A League representative will conduct a thorough review of all players in

14

The Association argues that the Commissioner was not permitted to impose a four-game suspension under Article 46 because the Player Policies mandated only a fine for equipment infractions. The Association further contends that the award is additionally defective because the Commissioner failed to make findings as to the applicability or interpretation of the Player Policies. *See Clinchfield Coal Co. v. Dist. 28, United Mine Workers*, 720 F.2d 1365, 1369 (4th Cir. 1983) ("Where . . . the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract.").

This argument by the Association has a tortured procedural history. During arbitration, the Association disclaimed the applicability of the Player Policies, saying "we don't believe this policy applies either, because there is nothing here about the balls." Joint App. at 956. This change of position is itself grounds for

---

uniform during pregame warm-ups.

All uniform and On Field violations detected during the routine pregame check must be corrected prior to kickoff, or the offending player(s) will not be allowed to enter the game. A violation that occurs during the game will result in the player being removed from the game until the violation is corrected.

League discipline may also be imposed on players whose equipment, uniform, or On Field violations are detected during postgame review of video, who repeat violations on the same game day after having been corrected earlier, or who participate in the game despite not having corrected a violation when instructed to do so. **First offenses will result in fines.**

In addition, in accordance with Article 51, Section 13(c) of the NFL-NFLPA Collective Bargaining Agreement, all players will be required to wear a non-obtrusive sensor or GPS tracking device during NFL games. League discipline will be imposed on any player who refuses to wear such a device, or after having such a device affixed to his equipment, removes the device prior to or during a game. **First offenses will result in fines.**

Joint App. at 384.

rejecting the Association's argument. *See York Research Corp. v. Landgarten*, 927 F.2d 119, 122 (2d Cir. 1991) ("[A] party 'cannot remain silent, raising no objection during the course of the arbitration proceeding, and when an award adverse to him has been handed down complain of a situation of which he had knowledge from the first.'" (quoting *Cook Indus., Inc. v. C. Itoh & Co. (Am.) Inc.*, 449 F.2d 106, 107–08 (2d Cir. 1971))). We nonetheless exercise our discretion to address it. We conclude that the equipment provision does not apply and, in any event, the punishments listed for equipment violations are minimum ones that do not foreclose suspensions.

### 1.     Applicability of the Player Policies

The Association primarily relies on a statement in the "Other Uniform/Equipment Violations" section, which provides that "First offenses will result in fines." It argues that equipment violations include "ball or equipment tampering" and "equipment tampering such as ball deflation." But the Association finds language in the "Other Uniform/Equipment Violations" provision that we cannot locate. The provision says nothing about tampering with, or the preparation of, footballs and, indeed, does not mention the words "tampering," "ball," or "deflation" at all. Moreover, there is no other provision of the Player Policies that refers to ball or equipment tampering, despite an extensive list of uniform and equipment violations ranging from the length of a player's stockings to the color of his wristbands.

On the other hand, Article 46 gives the Commissioner broad authority to deal with conduct he believes might undermine the integrity of the game. The Commissioner properly understood that a series of rules relating to uniforms and equipment does not repeal his authority vested in him by the Association to protect professional football from detrimental conduct. We have little difficulty in concluding that the Commissioner's decision to discipline Brady pursuant to Article 46 was "plausibly grounded in the parties'

agreement," which is all the law requires. *See Wackenhut*, 126 F.3d at 32**.**

### 2. 2014 Schedule of Fines

Even were the district court and the Association correct, and they are not, that Brady could be punished only pursuant to the Player Policies and its "Other Uniform/Equipment Violations" provision, it would not follow that the only available punishment would have been a fine. While the Player Policies do specify that, with regard to "Other Uniform/Equipment Violations," "[f]irst offenses will result in fines," the 2014 Schedule of Fines, which appears five pages later and details the fines for these violations, makes clear that the "[f]ines listed below are minimums." Joint App. at 384, 389. The Schedule of Fines goes on to specify that "[o]ther forms of discipline, including higher fines and suspension may also be imposed, based on the circumstances of the particular violation." Joint App. at 389. Read in conjunction, these provisions make clear that even first offenders are not exempt from punishment, and serious violations may result in suspension. But even if other readings were plausible, the Commissioner's interpretation of this provision as allowing for a suspension would easily withstand judicial scrutiny because his interpretation would be at least "barely colorable," which, again, is all that the law requires. *See In re Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir. 1978).

### B. Steroid Comparison

The district court also took issue with the comparison drawn by the Commissioner between Brady's conduct and that of steroid users. In his arbitration award, the Commissioner noted that the four-game suspension typically imposed on first-time steroid users was a helpful point of comparison because, like Brady's conduct, "steroid use reflects an improper effort to secure a competitive advantage in, and threatens the integrity of, the game." Special

App. at 57. Finding such a comparison inappropriate, the district court held:

> [N]o player alleged or found to have had a general awareness of the inappropriate ball deflation activities of others or who allegedly schemed with others to let air out of footballs in a championship game and also had not cooperated in an ensuing investigation, reasonably could be on notice that their discipline would (or should) be the same as applied to a player who violated the NFL Policy on Anabolic Steroids and Related Substances.

*Nat'l Football League*, 125 F. Supp. 3d at 465. The Association approaches this comparison somewhat differently, contending that the Commissioner's failure to punish Brady pursuant to the Player Policies "is only underscored by his reliance on the Steroid Policy." Appellees' Br. 45.

We are not troubled by the Commissioner's analogy. If deference means anything, it means that the arbitrator is entitled to generous latitude in phrasing his conclusions. We have little difficulty concluding that the comparison to steroid users neither violated a "right" to which Brady was entitled nor deprived him of notice. While he may have been entitled to notice of his range of punishment, it does not follow that he was entitled to advance notice of the analogies the arbitrator might find persuasive in selecting a punishment within that range.

The dissent contends that we must vacate the award because the Commissioner failed to discuss a policy regarding "stickum," which the dissent views as "a natural starting point for assessing Brady's penalty." Dissenting Op. at 7. We do not believe this contention is consistent with our obligation to afford arbitrators substantial deference, and by suggesting that the stickum policy is the more appropriate analogy, the dissent improperly weighs in on a

pure sports question—whether using stickum by one player is similar to tampering with footballs used on every play. And even if the fine for stickum use is the most appropriate analogy to Brady's conduct, nothing in the CBA or our case law demands that the arbitrator discuss comparable conduct merely because we find that analogy more persuasive than others, or because we think the analogy the arbitrator chose to draw was "flawed" or "inapt."[8]  Nor does the CBA require the arbitrator to "fully explain his reasoning," Dissenting Op. at 6; it merely mandates that the hearing officer render a "written decision," Joint App. at 346.  The Commissioner not only did just that, but he also explained why he found the analogy to steroid use persuasive.  Not even the Association finds defect in the award on this point—this argument was never raised by the Association, either below or on appeal.  While we appreciate that our dissenting colleague might view the penalty meted out to Brady as harsh, we do not believe that view supplies a sufficient basis to warrant vacatur.

Accordingly, we believe the Commissioner was within his discretion in drawing a helpful, if somewhat imperfect, comparison to steroid users.  In any event, we believe this issue is much ado about very little because the Commissioner could have imposed the same suspension without reference to the League's steroid policy.

## C.  General Awareness

The district court also concluded that the award was invalid because "[n]o NFL policy or precedent provided notice that a player could be subject to discipline for general awareness of another person's alleged misconduct."  *Nat'l Football League*, 125 F. Supp. 3d at 466.  This conclusion misapprehends the record.  The award is clear that it confirmed Brady's discipline not because of a general awareness of misconduct on the part of others, but because Brady

---

[8] This is especially true here given that, despite knowing that Brady had been suspended four games, the Association never attempted to draw an analogy to the punishment for stickum users.

both "participated in a scheme to tamper with game balls" and "willfully obstructed the investigation by . . . arranging for destruction of his cellphone." Special App. at 54.

The Association takes a somewhat different tack and argues that the Commissioner was bound to the Wells Report's limited conclusion that Brady was at least "generally aware" of the inappropriate activities of Patriots equipment staff. But the Association offers no persuasive support for its contention that the universe of facts the Commissioner could properly consider was limited by the Wells Report. Nothing in Article 46 limits the authority of the arbitrator to examine or reassess the factual basis for a suspension. In fact, in providing for a hearing, Article 46 strongly suggests otherwise. Because the point of a hearing in any proceeding is to establish a complete factual record, it would be incoherent to both authorize a hearing and at the same time insist that no new findings or conclusions could be based on a record expanded as a consequence of a hearing.

Additionally, it was clear to all parties that an important goal of the hearing was to afford the Association the opportunity to examine the findings of the Wells Report, and the Association availed itself of that opportunity. *See* Joint App. at 952 ("[W]e are about to tell you why we thing [sic] the Wells report is wrong . . . ."; "[W]e believe you are going to conclude when you hear [Brady's testimony] that he is not somebody who was responsible for anything . . . ."), 953 ("What it turns out is there are so many unknowns which are in the Wells report."). In light of Brady's effort to challenge the factual conclusions of the Wells Report by presenting exculpatory evidence, it would make little sense to accept the Association's contention that the introduction and consideration of inculpatory evidence violates the Commissioner's broad authority to manage the hearing.

The issue before the Commissioner was whether the discipline imposed on Brady was warranted under Article 46, and that was the

issue he decided.  The Commissioner did not develop a new basis for the suspension, nor did he deprive Brady of an opportunity to confront the case against him.  We see nothing in the CBA that suggests that the Commissioner was barred from concluding, based on information generated during the hearing, that Brady's conduct was more serious than was initially believed.

Moreover, the Wells Report did not limit itself to a finding of "general awareness."  It also found that "it is unlikely that [McNally and Jastremski] would deflate game balls without Brady's knowledge and approval" or that they "would personally and unilaterally engage in such conduct in the absence of Brady's awareness and consent."  Joint App. at 114.  The Commissioner's shift from "knowledge and approval" to "participation" was not, as the Association argues, a "quantum leap," but was instead a reasonable reassessment of the facts that gave rise to Brady's initial discipline, supplemented by information developed at the hearing.

Unprompted by the Association, our dissenting colleague contends that because the Wells Report "never concluded that it was 'more probable than not' that the gifts Brady provided were intended as rewards or advance payments for deflating footballs in violation of League Rules," Dissenting Op. at 3, the Commissioner deprived Brady of notice by concluding that he "provided inducements and rewards in support of [the] scheme," Special App. at 51.

But the Wells Report was clear that its conclusion was "significantly influenced by the substantial number of communications and events consistent with [its] finding, including that [McNally] . . . received valuable items autographed by Tom Brady the week before the AFC Championship Game."  Joint App. at 108.  With specific regard to Brady's involvement, the Wells Report noted that "Brady [was] a constant reference point in the discussions between McNally and Jastremski about . . . items to be received by McNally."  Joint App. at 112–13.  And as the dissent admits, the

Association questioned Brady at the hearing on this very point, and
the Commissioner determined that Brady's testimony was not
credible.  The record establishes that Brady was on notice from the
outset that the Wells Report's conclusions were "significantly
influenced" by his providing McNally[9] with autographed
memorabilia, the Association confronted this allegation at the
hearing, and the Commissioner rejected Brady's explanation.  Brady
knew that the factual predicates of his discipline (the text messages,
the phone calls, the autographed memorabilia, etc.) would be at
issue in the arbitration.  That he chose to focus on some more than
others simply reflects his own tactical decision as to how to present
his case.  And again, the Association never put forth this contention,
either before us or in the district court below.

We therefore find that the Commissioner was within his
discretion to conclude that Brady had "participated in a scheme to
tamper with game balls."  Because the parties agree that such
conduct is "conduct detrimental," the district court erred in
concluding that the Commissioner's deviation from the Wells
Report's finding of general awareness was a ground for vacatur.

### D.    Discipline for Non-cooperation

The district court held and the Association contends that
Brady's suspension cannot be sustained on the grounds that he
obstructed the Commissioner's investigation.  The court reasoned
that "[n]o player suspension in NFL history has been sustained for
an alleged failure to cooperate with—or even allegedly
obstructing—an NFL investigation."  *Nat'l Football League*, 125 F.
Supp. 3d at 465 (internal quotation marks omitted).  The League, on
the other hand, argues that not only is the deliberate obstruction of a
league investigation "conduct detrimental" within the meaning of
Article 46, but also the destruction of the cell phone permitted the

---

[9] The Commissioner never referenced the gifts Jastremski received from Brady.

Commissioner to draw an adverse inference against Brady that supported the finding that he participated in the deflation scheme.

The Association's argument is essentially procedural. The Association does not dispute that the Commissioner properly used the destruction of the cell phone to draw an adverse inference against Brady. In the face of this concession, the Association insists that because the award is invalid in light of the Commissioner's failure to discipline Brady under the Player Policies, the award cannot be salvaged on the alternative theory that Brady could have been suspended for his obstruction of the investigation. Specifically, the Association contends that "once it becomes clear that Brady's non-cooperation led to the adverse inference about ball tampering, it's back to square one: The only penalty of which Brady had notice was the collectively bargained *fine* for equipment violations." Appellees' Br. 51. This argument fails for the simple reason that, as we have explained, the Player Policies are inapplicable and, in any event, suspensions may be imposed for violations of the League's equipment policies.

At oral argument, the Association contended, for the first time, that Brady had no notice that the destruction of the cell phone would even be at issue in the arbitration proceeding.[10] Ordinarily, an argument such as this that is not raised in the briefs is waived and thus not appropriate for consideration on appeal. *Littlejohn v. City of New York*, 795 F.3d 297, 313 n.12 (2d Cir. 2015). However, because the parties discussed this issue at length during oral argument, we exercise our discretion to address it.

For a number of reasons, the Association's assertion that Brady lacked notice that the destruction of the cell phone would be

---

[10] By contrast, in its brief, the Association argued only that "Brady had no notice that he could be suspended for declining to produce his private communications." Appellees' Br. 51. Because the parties agree that the Commissioner properly drew an adverse inference based on the destruction of the cell phone, we need not confront this argument.

an issue in the arbitration has no support in the record.  The League's letter to Brady notifying him of his suspension pointed to Brady's "failure to cooperate fully and candidly with the investigation, including by refusing to produce any relevant electronic evidence (emails, texts, etc.)."  Joint App. at 329.  Having been given clear notice that his cooperation with the investigation was a subject of significant interest, we have difficulty believing that either Brady or the Association would have been surprised that the destruction of the cell phone was of importance to the Commissioner.  The notion that Brady was unfairly blindsided by the Commissioner's adverse inference is further belied by the opening statement of the Association's counsel at the arbitration, who defended Brady's handling of electronic evidence:

> We are also going to put in a declaration from a forensic person who dealt with the issue of e-mail and texts.  And you know from your decision that [this] was an aspect of the discipline. . . .
>
> . . . .
>
> [T]here were no incriminating texts being withheld or e-mails, and there never have been any incriminating texts or e-mails.  And now he has gone through and produces exactly what Ted Wells had asked for at the time that existed at the time and exists today.
>
> . . . He was following the advice of his lawyers and agents at the time.

Joint App. at 953.  Counsel for the Association later went further, directly acknowledging the destruction of the cell phone and referencing an expert declaration submitted in support of Brady.  Whatever it may say now about its expectations for the hearing, the

Association had at least enough notice of the potential consequences of the cell phone destruction to retain an expert in advance of the arbitration to assist counsel in explaining why an adverse inference should not be drawn.

At oral argument, the Association further contended that the Commissioner was improperly punishing Brady for destroying his cell phone because he was required to institute a new disciplinary action (so that Brady could then appeal any determination that he had destroyed his cell phone).  This argument fails because, as set forth in the original disciplinary letter, Brady was punished for failing to cooperate, and it is clear from the Commissioner's decision that Brady's cell phone destruction was part and parcel of the broader claim that he had failed to cooperate.  Further, as we stated with regard to general awareness, nothing in Article 46 limits the arbitrator's authority to reexamine the factual basis for a suspension by conducting a hearing.  Additionally, the Commissioner did not increase the punishment as a consequence of the destruction of the cell phone—the four-game suspension was not increased.  Rather, the cell phone destruction merely provided further support for the Commissioner's determination that Brady had failed to cooperate, and served as the basis for an adverse inference as to his participation in the scheme to deflate footballs.

Finally, any reasonable litigant would understand that the destruction of evidence, revealed just days before the start of arbitration proceedings, would be an important issue.  It is well established that the law permits a trier of fact to infer that a party who deliberately destroys relevant evidence the party had an obligation to produce did so in order to conceal damaging information from the adjudicator.  *See, e.g.*, *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002); *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107–12 (2d Cir. 2001); *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).  These principles are sufficiently settled that there is no need for any specific mention of

25

them in a collective agreement, and we are confident that their application came as no surprise to Brady or the Association.

### E. Competitive Integrity Policy

The final ground for vacatur due to inadequate notice identified by the district court was Brady's purported lack of notice of the Competitive Integrity Policy, which authorized the initial investigation. The district court reasoned that Brady was improperly suspended pursuant to the Competitive Integrity Policy, which is distributed only to teams, and not to players. This conclusion is incorrect because, as we have seen, Article 46 properly supplied the basis for the suspension.

Tellingly, the Association does not defend the district court's analysis on appeal. The League in its initial punishment and the Commissioner in his arbitration award were both clear that Brady was being disciplined pursuant to Article 46, not the Competitive Integrity Policy.[11] The Competitive Integrity Policy, which says nothing about disciplining players, merely supplied the Commissioner with the authority to conduct an investigation and to require the Patriots' cooperation. The operative question for notice, as the parties agree, is whether Brady was aware that his conduct could give rise to a suspension. Article 46 put him on notice prior to the AFC Championship Game that any action deemed by the Commissioner to be "conduct detrimental" could lead to his suspension.[12]

---

[11] *See* Joint App. at 329–30 (explaining twice that the source of the discipline was the Commissioner's authority under "Article 46 of the CBA"); Special App. at 58–59 n.19 ("As the discipline letter makes clear, Mr. Brady was suspended for conduct detrimental to the integrity of and public confidence in the game of professional football, not for a violation of the [Competitive Integrity Policy].").

[12] The dissent emphasizes at various points that Brady's four-game suspension was "unprecedented." *E.g.*, Dissenting Op. at 1, 6, 9. But determining the severity of a penalty is an archetypal example of a judgment committed to an arbitrator's discretion. The severity of a penalty will depend on any number of considerations, including the culpability of the individual, the circumstances of the misconduct, and the balancing of interests inherently unique in every work environment. Weighing and applying these

## II.     Exclusion of Testimony from NFL General Counsel

Prior to the commencement of arbitration proceedings, the Commissioner denied the Association's motion to call NFL General Counsel Jeff Pash to testify at the arbitration concerning his role in the preparation of the Wells Report.  The Commissioner did so on the grounds that Pash did not "play a substantive role in the investigation" and the Wells Report made clear that it was "prepared entirely by the Paul Weiss investigative team."  Special App. at 63.  As an independent ground for vacatur, the district court held that it was fundamentally unfair to exclude Pash from testifying because "it is logical that he would have valuable insight into the course and outcome of the Investigation and into the drafting and content of the Wells Report."  *Nat'l Football League*, 125 F. Supp. 3d at 471.  Again, we cannot agree with this conclusion.

It is well settled that procedural questions that arise during arbitration, such as which witnesses to hear and which evidence to receive or exclude, are left to the sound discretion of the arbitrator and should not be second-guessed by the courts.  *Misco*, 484 U.S. at 40.  Arbitrators do not "need to comply with strict evidentiary rules," and they possess "substantial discretion to admit or exclude evidence."  *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 194–95 (2d Cir. 2013); *see also Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989).

However, a narrow exception exists under the Federal Arbitration Act ("FAA"), which provides that an award may be vacated where "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3).  We have held that vacatur is warranted in such a circumstance only if "fundamental fairness is violated."  *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997).[13]  There is little

---

factors is left not to the courts, but to the sound discretion of the arbitrator.

[13] The FAA does not apply to arbitrations, like this one, conducted pursuant to the LMRA, "but the federal courts have often looked to the [FAA] for guidance in labor

1   question that the exclusion of the testimony was consistent with the
2   Commissioner's broad authority to regulate procedural matters and
3   comported with the CBA.  Thus, the Commissioner's ruling can be
4   revisited in court only if it violated fundamental fairness, and we see
5   no such violation.

6          The central issue in the arbitration was whether Brady had
7   engaged in conduct detrimental to the League.  The "insights" Pash
8   might have had and the role he might have played in the
9   preparation of the Wells Report were concerns that were collateral to
10  the issues at arbitration.  The CBA does not require an independent
11  investigation, and nothing would have prohibited the Commissioner
12  from using an in-house team to conduct the investigation.  The
13  Association and the League bargained for and agreed in the CBA on
14  a structure that lodged responsibility for both investigation and
15  adjudication with the League and the Commissioner.  Moreover, the
16  Commissioner made clear that the independence of the Wells Report
17  was not material to his decision, thus limiting any probative value
18  the Pash testimony may have had.

---

arbitration cases." *Misco*, 484 U.S. at 40 n.9.  However, we have never held that the requirement of "fundamental fairness" applies to arbitration awards under the LMRA, *cf. Bell Aerospace Co. Div. of Textron, Inc. v. Local 516 Int'l Union*, 500 F.2d 921, 923 (2d Cir. 1974) (applying, without explanation, 9 U.S.C. § 10(a)(3) (formerly § 10(c)) to an arbitration under the LMRA), and we note that the circuits are divided on this question, *compare Lippert Tile Co., Inc. v. Int'l Union of Bricklayers*, 724 F.3d 939, 948 (7th Cir. 2013) ("[LMRA] review simply does not include a free-floating procedural fairness standard absent a showing that some provision of the CBA was violated."), *with Carpenters 46 N. Cal. Ctys. Conference Bd. v. Zcon Builders*, 96 F.3d 410, 413 (9th Cir. 1996) ("Although deference must be given to an arbitrator's decisions concerning procedural issues, it is generally recognized that the courts may consider a claim that a party to an arbitration has been denied a fundamentally fair hearing.").  While the League does not explicitly dispute the applicability of the "fundamental fairness" standard here, it also does not contest the Association's arguments regarding fundamental unfairness, and instead only argues that the Commissioner's procedural rulings did not violate the terms of the CBA.  Regardless of which position we adopt, our result is the same, and thus we need not decide whether the "free-floating procedural fairness standard" of the FAA ought to be imported to our review of arbitrations conducted pursuant to the LMRA.

In any event, the Commissioner did receive extensive testimony from Troy Vincent regarding the initiation of the investigation and its initial stages, and from Theodore Wells regarding the investigation itself and the preparation of the report. All of this is compounded by the fact that when initially denying the Association's request to call Pash, the Commissioner noted that "should the parties present evidence showing that the testimony of a witness . . . is necessary for a full and fair hearing," he would be willing to "revisit the NFLPA's motion to compel [the] testimony." Special App. at 64. The Association never renewed its objection or further pursued the issue. We thus conclude that the Commissioner's decision to exclude the testimony fits comfortably within his broad discretion to admit or exclude evidence and raises no questions of fundamental fairness.

## III. Denial of Access to Investigative Files

The district court's third and final ground for vacatur is that Brady was entitled under the CBA to the interview notes and memoranda generated by the investigative team from Paul, Weiss, and that the denial of those notes amounted to fundamental unfairness. The League argues that this is not a ground for vacatur because the CBA does not require the exchange of such notes.

We agree. Article 46 specifies that "[i]n appeals under Section 1(a), the parties shall exchange copies of any exhibits upon which they intend to rely." Joint App. at 346. The Commissioner reasonably interpreted this provision to not require more extensive discovery. Significantly, the parties agreed in the CBA to permit more comprehensive discovery in other proceedings, such as those under Article 15, Section 3, which allows "reasonable and expedited discovery upon the application of any party." Special App. at 65.

The Commissioner further concluded that Brady was not deprived of fundamental fairness because the Commissioner "did not review any of Paul, Weiss' internal interview notes or any other

29

documents generated by Paul, Weiss other than their final report," and the League had already "produced all of the NFL documents considered by the investigators." Special App. at 65. The Commissioner pointed out that the Association had not even "identified any material factual dispute that Paul, Weiss' internal work product would help to resolve." Special App. at 66.

In making these findings, the Commissioner was, at the very least, "arguably construing or applying the contract," *Misco*, 484 U.S. at 38, and he reasonably concluded that he would not require the production of attorney work product he had not relied on, or even seen. Had the parties wished to allow for more expansive discovery, they could have bargained for that right. They did not, and there is simply no fundamental unfairness in affording the parties precisely what they agreed on.

## IV.  Additional Issues

Because the district court held that Brady was deprived of adequate notice and fundamental fairness, it declined to address the Association's alternative grounds for vacatur. Although it is our usual practice to allow the district court to address arguments in the first instance, we choose to address the Association's arguments here because they were fully briefed below and on appeal and because they are meritless. *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 218 (2d Cir. 2002). Accordingly, we turn to the two remaining arguments advanced on appeal that (1) the Commissioner deprived Brady of fundamental fairness when he denied an evidentiary hearing on the claim that he delegated his authority to discipline Brady to Vincent in violation of the CBA's grant of exclusive disciplinary authority to the Commissioner, and (2) the Commissioner was evidently partial because he, rather than some neutral third party, decided the delegation issue.[14]

---

[14] In a footnote on the last page of its brief, the Association faults the League for its "failure to employ testing protocols to ensure 'fair and consistent' discipline." Appellees' Br. 62 n.13. "We ordinarily deem an argument to be forfeited . . . when it is

### A.    Refusal to Hear Evidence on Delegation

The Association contends that Brady was deprived of fundamental fairness when the Commissioner chose not to hear evidence on whether he improperly delegated his disciplinary authority to Vincent in violation of Article 46.  The Association offered only two meager pieces of evidence in support.  First, it pointed to a press release in which the Commissioner noted that "Troy Vincent and his team will consider what steps to take in light of the [Wells] report."  Joint App. at 1207.  Second, it cited the disciplinary letter from the League announcing the four-game suspension, which was sent and signed by Vincent instead of Goodell.

The Commissioner adequately explained that he "did not delegate [his] authority as Commissioner to determine conduct detrimental or to impose appropriate discipline."  Special App. at 59.  Rather, he "concurred in [Vincent's] recommendation and authorized him to communicate to . . . Mr. Brady the discipline imposed under [the Commissioner's] authority."  Special App. at 59.  Tellingly, the Commissioner went on to remind the Association that this procedure "ha[d] been employed in numerous disciplinary hearings over the past two decades and ha[d] never before been asserted as a basis for compelling the Commissioner or anyone else to testify in an Article 46 disciplinary proceeding."  Special App. at 62.

We see no impropriety and certainly no fundamental unfairness because the resolution of this matter fell well within the broad discretion afforded arbitrators.  And the allegation lacks merit, as the record is clear that the discipline imposed on Brady was pursuant to the "Commissioner's authority," which is what Article 46 contemplates.  Where a claim is facially deficient, an arbitrator

---

only addressed in a footnote," *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011), and hold likewise here.

may summarily dismiss it, so long as doing so does not contravene the collective agreement. *See Sheldon v. Vermonty*, 269 F.3d 1202, 1207 (10th Cir. 2001).[15]  If it is seriously believed that these procedures were deficient or prejudicial, the remedy was to address them during collective bargaining.  Had the parties wished to otherwise limit the arbitrator's authority, they could have negotiated terms to do so.

### B.    Evident Partiality

The Association's final contention is that the Commissioner was evidently partial with regard to the delegation issue and should have recused himself from hearing at least that portion of the arbitration because it was improper for him to adjudicate the propriety of his own conduct.  This argument has no merit.

We may vacate an arbitration award "where there was evident partiality . . . in the arbitrator[]."  9 U.S.C. § 10(a)(2).[16]  "Evident partiality may be found only 'where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'"  *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 64 (2d Cir. 2012) (quoting *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007)).  The party seeking vacatur must prove evident partiality by "clear and convincing evidence."  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 106 (2d Cir. 2013).  However, arbitration is a matter of contract, and consequently, the

---

[15] The record strongly suggests that the delegation argument was raised by the Association in order to procure a more favorable arbitrator.  *See* Joint App. at 1120 ("In light of the above, the NFLPA believes that neither Commissioner Goodell nor anyone with close ties to the NFL can serve as arbitrator in Mr. Brady's appeal.").  Parties to arbitration have no more right than litigants in court to force recusals by leveling meritless accusations against the decision maker.

[16] As above, we do not pass on whether the FAA's "evident partiality" standard applies to arbitrations under the LMRA.  Because the parties did not brief this issue and because the resolution of this case is unaffected, we assume that it does.  *See supra* note 13.

parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen. *Williams v. Nat'l Football League*, 582 F.3d 863, 885 (8th Cir. 2009); *Winfrey v. Simmons Foods, Inc.*, 495 F.3d 549, 551 (8th Cir. 2007).

Here, the parties contracted in the CBA to specifically allow the Commissioner to sit as the arbitrator in all disputes brought pursuant to Article 46, Section 1(a). They did so knowing full well that the Commissioner had the sole power of determining what constitutes "conduct detrimental," and thus knowing that the Commissioner would have a stake both in the underlying discipline and in every arbitration brought pursuant to Section 1(a). Had the parties wished to restrict the Commissioner's authority, they could have fashioned a different agreement.

## CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND with instructions for the district court to confirm the arbitration award.

33