# No. 15-2801(L)

## 15-2805, 15-3228 (Con)

### United States Court of Appeals for the Second Circuit



NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL,

PLAINTIFF-COUNTER-DEFENDANT-APPELLANT

AND

NATIONAL FOOTBALL LEAGUE, DEFENDANT-APPELLANT

AND

MICHELLE MCGUIRK, APPELLANT

*v.*

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,

ON ITS OWN BEHALF AND ON BEHALF OF TOM BRADY,

DEFENDANT-COUNTER-CLAIMANT-APPELLEE

AND

TOM BRADY, COUNTER-CLAIMANT-APPELLEE

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NOS. 15-5916, 15-5982

**BRIEF FOR NEW ENGLAND PATRIOTS, L.L.C. AS *AMICUS CURIAE* SUPPORTING THE PETITION OF APPELLEES NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION AND TOM BRADY FOR REHEARING OR REHEARING EN BANC**

DANIEL L. GOLDBERG, ESQ.
MORGAN, LEWIS & BOCKIUS LLP
One Federal St.
Boston, MA 02110
(617) 951-8000
*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned attorney of record for the New England Patriots, L.L.C. states that the parent company of New England Patriots, L.L.C. is The Kraft Group, L.L.C, and that no publicly held corporation owns 10% or more of its equity.

    Respectfully submitted,

    /s/ Daniel L. Goldberg
    Daniel L. Goldberg
    daniel.goldberg@morganlewis.com
    **MORGAN, LEWIS & BOCKIUS LLP**
    One Federal Street
    Boston, MA  02110-1726
    +1.617.341.7700

    *Attorney for New England Patriots, L.L.C.*

Dated:  May 25, 2016

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Tempo Shain Corp. v. Bertek, Inc.*,
　120 F.3d 16 (2d Cir. 1997) ................................................................................3

**STATUTES**

9 U.S.C. § 10(a)(3) ...................................................................................................3

**OTHER AUTHORITIES**

https://wellsreportcontext.com/ ................................................................................5

https://wellsreportcontext.com/wells-report-critical-articles/ ...................................4

https://wellsreportcontext.com/wells-report-critical-science-articles/ ......................4

This case presents an issue of exceptional importance — the extent to which settled precedent and fundamental fairness operate as a check on the broad authority of arbitrators. Two judges within this Circuit (the district court and Chief Judge Katzmann) determined that the procedures afforded Tom Brady in the appeal of his suspension were unlawful and fundamentally unfair and therefore warranted vacatur. Two other judges (the panel majority) disagreed. As explained in the petition for rehearing, the panel majority's decision conflicts with settled circuit precedent by ignoring the terms of the NFL CBA and granting the arbitrator sweeping and illogical "authority" to change the grounds for its decision after an appeal has been taken. Under the existing 2-1 decision, the Patriots stand to lose their All-Pro quarterback for 25% of the upcoming regular season based on a severely flawed process. But the impact of the majority opinion is not limited to professional football. It threatens to undermine vital principles governing arbitration of collective bargaining agreements throughout the national economy.[1]

Unfairness has permeated the entire handling of this matter by the League.[2] Among other matters, and as set forth in Appellees' Petition for Rehearing, the

---

[1] This brief was authored wholly by counsel for the Patriots and funded wholly by the Patriots.

[2] From the outset of this matter the League's conduct reflects less a search for the truth than pursuit of a pre-determined result and defense of a report which, despite no direct evidence of tampering or Mr. Brady's involvement, was relied on to impose penalties with no precedent or correlation to the alleged offense. The League's commitment to the conclusions of the Wells Report on which the penalties were based was so absolute that in Mr. Brady's appeal one of the chief Paul Weiss investigators and an author of the Report, Mr. Reisner, served as the League's

Commissioner treated Mr. Brady's appeal not as an appeal but as a continuation of the investigation. The Commissioner made new findings and shifted the basis for his discipline of Mr. Brady in a decision from which Mr. Brady then had no appeal rights. SPA 42-61. Among the most critically unfair aspects of the process, in addition to the points made in Appellees' Petition, was to refuse to provide Mr. Brady with Paul Weiss's notes of its interviews of the NFL officials who observed the halftime testing of footballs. The panel concluded that the Commissioner acted "reasonably" because the Commissioner stated that he had not relied on the information and that the Association had not "identified any material factual dispute that [the files] would help to resolve." Panel Decision at 30. Both points are erroneous. The Commissioner explicitly relied on the Wells Report, which was based on Paul Weiss's witness interviews. As explained below, these notes were

---

counsel and examined witnesses. JA 974-986, 998-1006, 1052-1056, 1059-1061, 1065. In addition, at the very outset of the investigation the League leaked materially incorrect PSI information and refused to correct it for months, allowing public misperceptions to fester. At the AFC Championship Game itself, and despite having no knowledge of the impact of weather on PSI (as admitted under oath, JA1007 at 231:6), League personnel were already accusing the Patriots of cheating. The League made a "preliminary finding" of wrongdoing by Patriots' employees less than 24 hours after the Game. JA1195. Penalties were imposed only three business days after receipt of the 139 page Wells Report and the 82 page Exponent Report and obviously without any critical assessment of either. The Commissioner publicly praised the Wells Report, imposed penalties based on it, and then insisted on hearing and deciding Mr. Brady's appeal himself despite the authority to appoint an independent person to do so. When evidence at that hearing did not provide support for enhanced findings against Mr. Brady (to go beyond "general awareness" of violations by others), the Commissioner made new findings and changed the basis on which Mr. Brady was being penalized.

2

the only basis on which Mr. Brady could challenge the premise of the Wells Report: that the PSI of the Patriots' footballs could not be scientifically explained.

The panel's decision raises issues of exceptional importance: the fundamental fairness of arbitration proceedings, an arbitrator's duty to "give each of the parties to the dispute an adequate opportunity to present its evidence and argument," and the arbitrator's duty to hear all "pertinent material evidence." *Tempo Shain Corp. v. Bertek, Inc*., 120 F.3d 16, 20 (2d Cir. 1997); 9 U.S.C. § 10(a)(3). The requirement for vacatur where an arbitrator has "refused to hear pertinent and material evidence" is meaningless if an arbitration award is upheld despite the arbitrator's refusal to allow a party access to information that is highly "pertinent and material." 9 U.S.C. § 10(a)(3).

The Commissioner acknowledged that the Wells Report and the accompanying Exponent analysis "formed the factual basis for the discipline that [he] imposed." SPA 43. The premise of the Wells Report, supposedly based on the Exponent Report, was that science could not fully explain the PSI of the Patriots footballs. JA207-208. However, as the Exponent Report stated, science fully explains the Patriots halftime PSI numbers depending on when, during halftime, officials measured the PSI of the footballs.[3] JA249-250. The Wells

---

[3] Since the correct PSI figures became available to the public (when the Wells Report was issued), numerous independent scientists have studied the data. Every scientist known to have examined this data since then has concluded that the halftime PSI of the Patriots footballs was

3

Report conceded that "[t]he analysis of the data is ultimately dependent on assumptions and information that is uncertain" and that "varying the applicable assumptions can have a material impact on the ultimate conclusions." JA107-108.

The timing of PSI measurements during halftime is, therefore, critical.[4] Paul Weiss interviewed the seven witnesses to the halftime PSI gauging of Patriots and Colts footballs, all of whom are League employees. JA161. Nowhere does the Wells Report reveal what any of those witnesses said about when during halftime the gauging began, how long it took, or when it ended. Paul Weiss simply told Exponent what assumptions to make about the timing of these halftime events.[5] JA249-250. These timing assumptions fell outside the parameters Exponent concluded would provide a scientific basis for the PSI.[6] Consequently, the most

---

consistent with the Ideal Gas Law. *See* collection of scientific reports at https://wellsreportcontext.com/wells-report-critical-science-articles/. Similarly, the Wells Report itself has drawn countless critiques. *See*, e.g., articles collected at https://wellsreportcontext.com/wells-report-critical-articles/.

[4] As more fully explained in the scientific articles cited at https://wellsreportcontext.com/wells-report-critical-science-articles/, PSI drops by a quantifiable amount when footballs move from the warm temperature of the Officials Locker Room to the colder field. When the footballs return to the warmer locker room at halftime, their PSI starts to return to its pre-game levels. *See also* Amicus Brief of Professors of Physics and Engineering at pp. 6-7 regarding the high percentage of NFL games where the weather cause footballs to be below regulation.

[5] As pointed out in the Amicus Brief of Professors of Physics and Engineering, additional critical assumptions were made regarding which gauge was used pre-game and varying assumptions were made about the temperature in the Officials' Locker Room.

[6] The Patriots have posted at https://wellsreportcontext.com/ various materials which identify the fundamental flaws of the Wells Report, including both a lengthy annotation of the Wells Report and an article entitled: *"The Background and Myths of 'Deflategate' — Separating Fact from*

basic premise of the Wells Report turned on *assumptions* provided by Paul Weiss on issues about which Paul Weiss interviewed seven League witnesses.

The only way Mr. Brady's counsel could test the timing assumptions that Paul Weiss directed Exponent to follow was to obtain the notes of those interviews.[7] The Commissioner denied that discovery. SPA 64-66. That left Mr. Brady unable to challenge the fundamental premise of the Wells Report: that science alone does not explain the PSI of the Patriots footballs. This unfairness fell only on Mr. Brady, since the League not only had access to the notes but actually used as counsel in Mr. Brady's appeal hearing one of the Paul Weiss lawyers who conducted the very interviews at issue.

In short, the Commissioner relied on the Wells Report. The Wells Report relied on Exponent's "conclusion" that science did not explain the PSI of the Patriots footballs. Exponent based that conclusion on assumptions from Paul

---

*Fiction"* (the "Myths Article"). The Myths Article details why the assumptions Paul Weiss told Exponent to make about halftime sequencing of events are both unsupportable and illogical. *See* Myths #1 through 6.

[7] Formal written requests to Paul Weiss by Patriots counsel to be present for such interviews were repeatedly rejected. Paul Weiss did not allow other counsel to be present for their interviews of League employees. Assuming those seven interviews were conducted in the same fashion that Paul Weiss conducted the interviews of 17 Patriots employees (the only interviews that Patriots counsel was allowed to attend), then the "notes" of these interviews are actually akin to transcripts. For every interview of Patriots' personnel, four Paul Weiss lawyers were present, two of whom spent the entirety of each interview on their laptops, transcribing the questions and answers. The withheld interview "notes," moreover, are neither privileged communications nor work product — they were not prepared in contemplation of litigation, but as part of an "independent" investigation.

5

Weiss. Those assumptions could only be tested by having access to the interview notes sought in discovery. The Commissioner refused to allow that discovery.

The paucity of evidence against Mr. Brady magnifies the unfairness of refusing the requested discovery. As the Myths Article (*see* fn. 6, *supra*) points out, there is no direct evidence of either Mr. Brady's knowledge of or involvement in any tampering or of any such tampering, and the circumstantial evidence relied upon does not support either conclusion. After months of investigation and scores of witness interviews, the most that Paul Weiss could conclude was that Mr. Brady was probably "generally aware" of a violation by others. JA97. That standard for imposing a penalty was challenged in the appeal to the Commissioner. No additional evidence of Mr. Brady's knowledge or involvement was presented at his appeal hearing. The Commissioner, to move beyond the "general awareness" finding, asserted that Mr. Brady was not credible when he testified that he and Mr. Jastremski only discussed the preparation of footballs for the Super Bowl in their communications in the days following the AFC Championship Game. SPA50. That finding was made before it was known the transcripts of the hearing would be made public. The transcripts, later ordered to be made public, reveal that the Commissioner misstated the evidence and that, in fact, Mr. Brady testified he and Mr. Jastremski spoke about both the preparation of footballs for the upcoming

6

Super Bowl and about the PSI story that was garnering media attention.[8] JA968-969.

Similarly, the Commissioner concluded that Mr. Brady's non-retention of his cell phone was evidence of guilt without acknowledging that: (i) Paul Weiss lawyers had explicitly advised Mr. Brady that they did not want to either image his cell phone or take possession of it, *see* Myth #14 of the Myths Article and JA1032-1033; (ii) Mr. Brady provided the League with a complete listing of his calls and texts and the League could have sought text content from those with whom texts were exchanged, *see* SPA53; and (iii) the League already had the content of texts from the cell phones of Messrs. Jastremski and McNally — the only two individuals who the League asserted carried out the purported scheme. Like the new "evidence," the new findings and the new basis for penalties divined by the Commissioner at the appeal hearing, the pre-existing circumstantial evidence relied

---

[8] This misstatement of Mr. Brady's testimony about the content of the Brady-Jastremski communications was repeated at oral argument in this Court by League counsel. That misstatement, unfortunately, continued the pattern of misstatements in the NFL's brief to this Court about the record in this case. For example, to address the refusal to provide discovery of interview notes, the NFL's brief asserted that Mr. Brady's counsel was present at numerous of the Paul Weiss interviews. In fact, they were present at only Mr. Brady's interview. *See* JA123. The NFL's brief further stated that the term "deflator" was used in Jastremski-McNally texts before and throughout the 2014 season; in fact, the term appears in only one of thousands of texts, a text that occurred four months before the season in a string of texts having nothing to do with the preparation of footballs. JA170. The NFL's brief also totally mischaracterized the content of other texts, asserting, for example, that they contained demands by Mr. McNally that Mr. Brady provide him with financial or other benefits; in fact, not a single text stated that. All these mischaracterizations were designed to make the evidence against Mr. Brady seem far stronger than it was. The actual texts at issue are set forth in detail in the Wells Report, so this Court need not rely on their mischaracterizations in the NFL's brief.

on to penalize Mr. Brady did not provide a rational basis on which to conclude he violated any rules of the League.  *See* Myths #7 -14 of the Myths Article.

The panel majority's opinion ignored or excused these fatal failings.  It endorsed the outcome of a highly manipulated and fundamentally unfair process designed and used by the Commissioner to reach and justify a predetermined outcome in violation of the CBA and this Court's precedents.  It renders meaningless the vital protections afforded by a bargained-for right to appeal and to obtain and present pertinent evidence.  Its impacts will be felt far beyond the NFL.  This Court should grant a rehearing and restore the fundamental fairness of arbitration appeals guaranteed by the CBA and this Court's cases.

Respectfully submitted,

/s/ Daniel L. Goldberg
Daniel L. Goldberg
daniel.goldberg@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
+1.617.341.7700

*Attorney for New England Patriots, L.L.C.*

Dated:  May 25, 2016

8

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office in 14 size font, Times New Roman.

Dated: May 25, 2016

/s/ Daniel L. Goldberg
Daniel L. Goldberg
daniel.goldberg@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA 02110-1726
+1.617.341.7700

*Attorney for New England Patriots, L.L.C.*

## CERTIFICATE OF SERVICE

I, Daniel L. Goldberg, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 25, 2016.

/s/ Daniel L. Goldberg
Daniel L. Goldberg